```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF WASHINGTON

 3   UNITED STATES OF AMERICA,     )
                                   )
 4             Plaintiff,          )
                                   ) No. CR-06-113-EFS
 5   Versus                        ) December 9, 2016
                                   ) Spokane, Washington
 6   ANTHONY BURKE,                )
                                   ) Pages 1 - 225
 7             Defendant.          )
     _____)

 8

 9                   TRANSCRIPT OF PROCEEDINGS

10

11                      COMPETENCY HEARING

12              BEFORE THE HONORABLE EDWARD F. SHEA

13

     APPEARANCES:
14

     For the Plaintiff:       U. S. ATTORNEY'S OFFICE
15                                 BY:   Stephanie Van Marter
                                         Timothy Ohms
16                                       Attorneys at Law
                                   P. O. Box 1494
17                                 Spokane, WA  99210

18

19
     For the Defendant:       WALDO SCHWEDA & MONTGOMERY, P.S.
20                                 BY:   Peter Schweda
                                         Attorney at Law
21                                 2206 N Pines Road
                                   Spokane, WA  99206
22

     COURT REPORTER:     Mark A. Snover, RPR, RMR, CRR, CSR
23                       P. O. Box 1633
                         Spokane, WA  99210-1633
24                       (509) 458-3434
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

```
 1              FRIDAY, DECEMBER 9, 2016 - 9:22 a.m.

 2              (Whereupon Court reconvened

 3              in the courtroom at 9:22 a.m.)

 4              THE COURT:  Good morning at all of you.  Please be

 5    seated.  Let's get started.

 6              THE DEPUTY CLERK:  Matter before the Court is

 7    United States of America versus Anthony Burke.

 8              Cause number CR-06-113-EFS.

 9              Time set for competency hearing.

09:22AM 10      Counsel, please state your presence for the record.

11              MS. VAN MARTER:  Stephanie Van Marter on behalf of the

12    United States, assisted by Mr. Ohms as co-counsel.

13              MR. SCHWEDA:  Pete Schweda on behalf of Mr. Burke.

14    Who's present.

15              THE COURT:  Counsel, good morning.  Mr. Burke, good

16    morning.

17              Just to begin, nothing serious, just a little growth

18    that had to be removed.  But the bandage is much worse than,

19    actually, I feel.  So I hope you're relieved that I'm not in any

09:22AM 20    serious condition, no pain, no medication, ready to go.

21              All right, with that set aside, I feel like the

22    precedent that I have to disclose any illnesses I have to, to

23    those gathered in the courtroom.

24              With that said, I'm ready to proceed.  Okay.

25              MS. VAN MARTER:  Yes, Your Honor.
```

```
 1              THE COURT:  Miss Van Marter.

 2              MS. VAN MARTER:  The United States would call Doctor

 3   Low.

 4              THE COURT:  Okay.  Doctor Low.

 5              The witness stand is right over here.

 6

 7        WHEREUPON,

 8                         CYNTHIA LOW

 9                   having been first duly sworn

09:23AM 10               testified as follows:

11

12              THE COURT:  Please be seated.  And when you're

13   comfortable, please tell us your first and last name and spell

14   them both for the record.

15              THE WITNESS:  Cynthia Low.  C Y N T H I A.  Low.  L O

16   W.

17              THE COURT:  Do you prefer Doctor?

18              THE WITNESS:  That would be fine.

19              THE COURT:  Okay.  Doctor Low.

09:23AM 20

21                      DIRECT EXAMINATION

22

23   BY MS. VAN MARTER:

24   Q.   Good morning, Doctor.

25   A.   Good morning.
```

1   Q.    How are you currently employed?

2   A.    I'm a forensic psychologist at the Federal Detention Center

3   in Sea-Tac, Washington.

4   Q.    And how long have you been a forensic psychologist with the

5   BOP?

6   A.    Since 2001.

7   Q.    Let's take a minute to talk about your educational

8   background, please.

9   A.    Yes.

09:24AM 10          I have a bachelors degree in psychology from the

11   University of California at Davis, granted in 1992.

12          A masters of science in clinical psychology from St.

13   Louis University, granted in 1995.

14          A Ph.D. in clinical psychology, also from St. Louis

15   University, granted in 1997.

16          And I've been licensed in Washington as a psychologist

17   since '99.

18   Q.    And if you could tell the Court the relevant experiences

19   you've had prior to becoming a forensic psychologist at BOP.

09:24AM 20   A.    Yes.

21          I actually completed an internship at Western State

22   Hospital in Tacoma, Washington, back in 1996.  And I did a

23   forensic rotation then.

24          When I secured my forensic position in the Bureau of

25   Prisons, I received special training within the agency.

LOW / Direct                                                    5

```
 1              And from then on, I have consulted as an, as
 2    necessary, with other forensic psychologists in the agency.
 3              And, of course, I make sure that I get my continuing
 4    education in the field yearly.
 5    Q.   And what is your continuing education requirements?
 6    A.   In the State of Washington we have to have 60 units every
 7    three years.
 8    Q.   And what are your current duties and responsibilities then
 9    with the BOP?
09:25AM 10  A.   I mainly conduct court-ordered evaluations, nationwide.
11    Mainly for competency to stand trial, as well as for insanity at
12    the time of the alleged offenses.
13              I generate reports for the Courts and I testify as
14    needed.
15    Q.   And in your position with the BOP, are you considered then
16    a neutral evaluator?
17    A.   I am.
18    Q.   And what does that mean?
19    A.   It means that I am not working for either side.  I'm not
09:25AM 20  working for the prosecutor, I'm not working for the defense
21    attorney, I'm simply trying to answer the questions that the
22    Courts have posed.
23    Q.   Okay.
24              THE COURT:  Doctor Low, feel comfortable just to talk
25    to Mr. Miss Van Marter.  I know that that, I've had you testify
```

```
 1    in my court before, so.

 2              THE WITNESS:  Thank you.

 3              THE COURT:  But whatever, just do whatever you feel

 4    natural doing, so.

 5              THE WITNESS:  Thank you, sir.

 6    BY MS. VAN MARTER:

 7    Q.    And, approximately, how many evaluations have you done in

 8    your career?

 9    A.    I'm just roughly guessing a few hundred.  I don't really

09:26AM 10    keep track of that.

11    Q.    And do you know specifically to competency?

12    A.    I don't.

13              Again, the bulk of our evaluations are in competency

14    though, rather than insanity.

15    Q.    And during your time as a forensic psychologist, have you

16    ever been in a circumstance where you have found somebody

17    incompetent to proceed to criminal trial?

18    A.    Certainly.

19    Q.    And do you know a percentage of how many of your overall

09:26AM 20    competency evaluations?

21    A.    I would say approximately 15 percent or so.

22    Q.    And in conducting your evaluations, do you ever consult

23    with your peers, when needed?

24    A.    I do.

25              If I have a particular, particularly complex case I
```

1    will do so.

2    Q.    And in this particular case, did you consult with any of

3    your peers regarding the evaluation of Mr. Burke?

4    A.    No, I didn't feel a need to do that.

5    Q.    And why not?

6    A.    It just wasn't a particularly complex case.

7    Q.    Was your report with respect to Mr. Burke reviewed by

8    anyone, however?

9    A.    It was reviewed by my chief psychologist, which is part of

09:27AM 10   our policy.

11   Q.    A part of procedure?

12   A.    Yes.

13   Q.    Okay.

14          And I know Judge Shea just referenced this, but

15   you've, obviously, previously testified in Federal Court; is

16   that correct?

17   A.    I have.

18   Q.    And how many times have you been qualified as an expert?

19   A.    I think about 65 as of now.

09:27AM 20   Q.    And specifically in the area of competency?

21   A.    Yes.

22   Q.    And just generally, for the record, in this particular

23   case, were you tasked with doing a competency evaluation of Mr.

24   Burke?

25   A.    Yes, I was.

1   Q.   And what is the purpose of the competency evaluation?

2   A.   Well, the purpose, as laid forth in the court order, was to

3   determine whether or not he suffered from a mental disease or

4   defect, rendering him mentally incompetent, to the extent that

5   he's either unable to understand the nature and charges against

6   him, or to assist in his defense.

7   Q.   All right.

8           MS. VAN MARTER:  Your Honor, at this time, I would

9   like to approach the witness and present government's proposed

09:28AM 10   exhibit number 1, which is Doctor Low's evaluation.

11          We do have, marked as government's 2, her curriculum

12   vitae that's already been provided to the Court, just for the

13   record, in terms of her background.  May I --

14          THE COURT:  And counsel as well?

15          MS. VAN MARTER:  And to counsel as well.  May I

16   approach.

17          THE COURT:  You may.

18          (Handing exhibit to witness.)

19          THE COURT:  Mr. Schweda, you had her CV, is that

09:28AM 20   correct, and you read her report?

21          MR. SCHWEDA:  I don't have her CV.  I do have her

22   report, Your Honor.

23          THE COURT:  Okay.

24          Do you have any questions about whether she's an

25   expert?

```
 1            MR. SCHWEDA:  No, Your Honor.

 2            THE COURT:  Okay.

 3            MS. VAN MARTER:  And, Your Honor, we did previously

 4   send that curriculum vitae.

 5            I do have an extra copy, I will give that to

 6   Mr. Schweda.

 7            THE COURT:  Thank you.

 8            For the record, Doctor Low is qualified as an expert

 9   on the issue of competence to testify today.

09:29AM 10   BY MS. VAN MARTER:

11   Q.   And, Doctor Low, you recognize what has been handed you as

12   government's proposed 1 and 2?

13   A.   Yes, I do.

14   Q.   And how do you recognize them, just for the record?

15   A.   Well, one is my vitae and one is the report that I

16   generated for this case.

17            MS. VAN MARTER:  Your Honor, United States would move

18   to admit government's 1.

19            THE COURT:  For the record, actually, 1 is your report

09:29AM 20   and 2 is your vitae, right?

21            THE WITNESS:  I'm sorry.  Yes.  Yes.

22            MS. VAN MARTER:  Thank you.

23            The United States would move to admit, Your Honor.

24            MR. SCHWEDA:  Your Honor, if I may, we, I would ask

25   that they be published under seal at this time, until the Court
```

1    has had an opportunity to determine whether they should be

2    unsealed.

3              THE COURT:  The testimony's taken in open court, and

4    I'll, I'll permit the seal only on a temporary basis.

5              The report itself is in evidence and I'm not persuaded

6    at this time, as you know, Mr. Schweda, that it should remain

7    under seal, but her testimony is certainly open and she can

8    refer to her report on a repeated basis, as necessary, under the

9    questioning by both Miss Van Marter and yourself.

09:30AM 10             And so I'll permit it to remain under seal, until I

11   make a decision on the motion to disclose to Snohomish County

12   and Western State Hospital.  Thank you.

13             MR. SCHWEDA:  Okay.

14             MS. VAN MARTER:  Thank you, Your Honor.

15             THE COURT:  Thank you.

16   BY MS. VAN MARTER:

17   Q.   Doctor Low, with respect to Mr. Burke and this particular

18   evaluation, I just, I wanted to just cover the time period

19   first.

09:30AM 20             When did he first come to the facility for purposes of

21   your evaluation?

22   A.   He arrived on May 26th, 2016.

23   Q.   And how long was he there?

24   A.   I'm not sure exactly when he left, but my last meeting with

25   him was July 6 of 2016.

LOW / Direct                                    11

```
 1   Q.   And approximately how many times did you meet specifically

 2   with Mr. Burke during that time period?

 3   A.   I met with him for nine times for the interviewing and that

 4   lasted for approximately seven hours total.

 5   Q.   Okay.

 6        Let's talk a little bit about your report and

 7   specifically some of the sections in your report before we get

 8   to your conclusions.

 9        There is a section within this report that refers to,

10   on page two, background information, according to the defendant.

11        THE COURT:  Excuse me, counsel, I need to ask a

12   question.

13        MS. VAN MARTER:  Yes.

14        THE COURT:  You say you met with Mr. Burke nine times

15   over seven hours.

16        Was that by choice, is that something that you do

17   normally, rather than a long session, is that to determine his

18   behavior over different times at different dates?

19        THE WITNESS:  That is exactly one of the reasons why

20   we do that.

21        First of all, we have 30 days to work with a person.

22   I don't like to tire them out, I don't like to tire myself out,

23   doing a very long session.

24        I like to see them over multiple points in time, to

25   see how they present over multiple points in time, yes.
```

LOW / Direct                                        12

1              THE COURT:   Okay.   Thank you.

2    BY MS. VAN MARTER:

3    Q.   And I'll follow the Court's question with that a little bit

4    out of order, but do you also take into account the observations

5    of other staff members of the facility?

6    A.   Oh, yes.

7    Q.   And why is that?

8    A.   Well, often times -- well, I wouldn't say often times --

9    sometimes people may present very differently in my office, in

09:32AM 10   front of me, than they might to other staff, the correctional

11   officers, who might have them for a whole eight-hour period,

12   medical staff, other people like that.  So it's very valuable to

13   obtain these other observations.

14   Q.   And did you do that in this particular case?

15   A.   Yes.

16   Q.   Okay.

17            So let's talk about that background information

18   according to the defendant.

19            What is the purpose of that section within your

09:32AM 20   report?  And starting on page two.

21   A.   Yes.

22            Typically, I like to have the defendant, basically,

23   tell me their life story.  I want to hear it straight from the

24   horse's mouth in other words and be able to gather that.

25            It's their opportunity to tell me about themselves, in

1    various capacities, in terms of their family upbringing, mental

2    illness, substance abuse criminal history, that sort of thing.

3    Q.    And why is that?

4    A.    It's just part of the history gathering.  And it also gives

5    me an indication, too, of how credible or how reliable a

6    reporter they may be.

7    Q.    And you have had contact with Mr. Burke in the past; is

8    that correct?

9    A.    Yes, I have.

09:33AM 10    Q.    And when was that?

11    A.    Back in 2007 he was actually sent to our facility for a

12    different kind of court-ordered evaluation and I saw him then.

13    Q.    And what was the purpose of that previous court-ordered

14    evaluation?

15    A.    That one was to determine whether or not he was suffering

16    from mental disease or defect in which he might need inpatient

17    hospitalization.

18    Q.    And you note that prior contact in this evaluation?

19    A.    I'm sorry?

09:33AM 20    Q.    You note that prior contact in this evaluation?

21    A.    Yes, I did.

22    Q.    And why did you do that?

23    A.    Well, because I had obtained a vast amount of information

24    back then, I did not want to be repetitive.

25          So I noted that for history sake and also wanted to

1   focus, basically, on things that had happened since our last

2   evaluation.

3   Q.   And for the record, here, your evaluation and the

4   competency evaluation that you conducted with Mr. Burke, did you

5   rely on, in any way, on your previous evaluation results?

6   A.   I didn't rely on it, per se.  Again, it was more historical

7   data.

8   Q.   And so is this evaluation based upon all of the things that

9   you did, as noted in this recent report, as admitted as

09:34AM 10   government's number 1?

11   A.   Yes.

12   Q.   And with respect to the historical or background

13   information, that was provided by Mr. Burke, was he able to do

14   that?

15   A.   Yes, he was able to provide a good amount of information, a

16   good amount of detail.

17         He did claim some difficulties remembering dates of

18   certain occurrences, but aside from that, there really weren't

19   any problems that I saw.

09:34AM 20   Q.   And was there anything significant to you as the evaluator

21   as he was recounting his historical background?

22   A.   Yes.

23         When we approached the time frame of about 2013, in

24   which he had reported absconding from, I believe, a halfway

25   house and coming over to Western Washington from Eastern

 1    Washington, he declined to discuss the events around that

 2    period.

 3              And when I asked him if he was referring to the arrest

 4    for a murder charge, he acknowledged that that was what he did

 5    not want to talk about.

 6    Q.    And just so that we're clear on the record, are you

 7    referring to page five, the top paragraph of government's

 8    exhibit number 1?

 9    A.    Yes.

09:35AM 10    Q.    And why was that particular statement from Mr. Burke

11    significant to you?

12    A.    I thought it indicated a very good sense of judgment and

13    logic to not discuss something that could possibly incriminate

14    him.

15    Q.    And aside from those statements, you had indicated that he

16    at times had difficulty remembering dates and things.

17              Did you find that there was any contradiction in terms

18    of his memory?

19    A.    Yes.

09:36AM 20    Q.    For instance, specifically referencing his prior contact

21    with you.

22    A.    Yes.

23    Q.    And in what regard, if you could?

24    A.    Well, the first day I met him and screened him, I reminded

25    him that he had been in our place in 2007 and that I had met

LOW / Direct                                    16

1    with him.

2           And he said that he didn't really remember it all too

3    well.

4           But then later on, during that same meeting, he

5    spontaneously referenced the report that I wrote, as well as the

6    diagnosis, one of the diagnosis that I had given him, of autism.

7           And then further, more near the end of that same

8    meeting, when I had advised him that he was going to be housed

9    in the segregation unit, because of this escape attempt from

09:37AM 10   Western State Hospital, he then spontaneously told me, well,

11   back in 2007 I was also put up there for an escape, but you were

12   the one who cleared me, so that I could come out into the

13   general population.

14   Q.   And did that appear to be consistent with some of his

15   indications regarding his memory?

16   A.   It showed me that he really had pretty good memory and was

17   trying to convey that he did not.

18   Q.   And I know we're going to touch upon some of the other

19   statements in that historical area later on, but let's move on

09:37AM 20   to the next section of your evaluation.

21          The information from supplemental sources.

22          What other information did you review, aside from your

23   meetings with Mr. Burke, as well as the information provided to

24   you by the staff at BOP?

25   A.   I had a lot of records to review.

1          There were several records, legal records, discovery

2    records, and there were voluminous records from Western State

3    Hospital.

4    Q.   And with respect to -- and all of those records are noted

5    on pages seven through, through to page 21 of your report; is

6    that correct?

7    A.   Yes.

8    Q.   And I want to ask you a few questions specific to some of

9    the records, at least the more recent records that were of

09:38AM 10   significance to you from Western State Hospital.

11          If we could go all the way to page, page 15 of your

12   report.

13          There's a several notations from records through the

14   state, the Snohomish County state court proceedings, regarding

15   the competency restoration of Mr. Burke, during the state court

16   proceedings.

17          Do you recall that section?

18   A.   Yes.

19   Q.   And there's a particular statement in the second paragraph

09:39AM 20   that you put in quotes, regarding statements made by Mr. Burke

21   in court.

22          Why was -- if you could please read, in the second

23   paragraph, the quote that you included within your evaluation

24   from Mr. Burke.

25   A.   Yes.

LOW / Direct                                    18

1              This was referring to after his murder charge was

2    dismissed and he was civilly committed for 180 days.

3              Mr. Burke was upset and he stated, "I thought this was

4    all over and I would go home."

5    Q.   And why was that significant to you to include?

6    A.   I think it shows his line of thinking, in that he believed

7    that he would simply be able to, to go home and resume his life,

8    even after such a severe charge had been dismissed.

9    Q.   Okay.

09:40AM 10            THE COURT:  Just for the record, you're referring to

11   notes in a record from Western State Hospital, correct?

12            THE WITNESS:  Yes.

13            THE COURT:  Thank you.

14   BY MS. VAN MARTER:

15   Q.   If we could go to page 16, Doctor Low.

16            And you were able to review the note, chart notes from

17   Western State Hospital of a Doctor Gallagher; is that correct?

18   A.   Yes.

19   Q.   And who is Doctor Gallagher, to the best of your

09:41AM 20   understanding, from the Western State Hospital records?

21   A.   Yes.

22            I believe she's a forensic psychologist there, because

23   she was conducting a forensic risk assessment of Mr. Burke at

24   the time.

25   Q.   Okay.

1              And in the second paragraph, there's some

2    recommendations by Doctor Gallagher that you note specifically.

3              And what, of significance, were those recommendations

4    to you and why were they included in your evaluation?

5    A.   Yes.

6              Doctor Gallagher noted that Mr. Burke presented very

7    differently within a time frame of like 35 minutes.

8              And she thus recommended that he be tested for

9    malingering.

09:41AM 10         She noted that, in the first part of talking with him,

11   he was logical, coherent, asked questions without any problems.

12             But as soon as she began to address the actual risk

13   assessment issues, he would say, I don't know, I don't remember.

14   Again, just act much more differently than he had just prior to

15   that.

16   Q.   And you have -- we'll discuss this in more detail with

17   respect to your report -- but there's a statement regarding

18   exaggerating symptoms.

19   A.   Yes.

09:42AM 20   Q.   And what does that mean to you, in terms of your role in

21   this evaluation and why was it significant?

22   A.   Yeah.

23             The term of exaggerating symptoms basically means that

24   a person is trying to present themselves as functioning much

25   worse than they are.

LOW / Direct                                    20

```
 1              They're trying to say that their symptoms are much
 2   worse than they actually are.
 3   Q.    There's a, on page 17, the third paragraph down, or second
 4   full paragraph, there's another quote in there, regarding
 5   information you received from Western State Hospital and Mr.
 6   Burke's interaction with a social worker.
 7              Are you there?
 8   A.    Yes.
 9   Q.    All right.
09:42AM 10         MR. SCHWEDA:  I'm sorry, what page?
11              MS. VAN MARTER:   Page 17.
12              The second full paragraph or third paragraph down the
13   page.
14   BY MS. VAN MARTER:
15   Q.    And you quote from the records.
16              And what is that quote on the second line there?
17   A.    Second line, he told an social worker, "I wasn't planning
18   on talking to you, but realized you may be useful to me."
19   Q.    And why was that significant for you, with respect to the
09:43AM 20   review of these records and including it in your evaluation?
21   A.    Again, to me, that reflects a little bit more evidence of
22   an antisocial personality disorder.
23              Somebody who is looking at people as more of a means
24   to an end.
25   Q.    And with respect to that same social worker, lower down in
```

1   that paragraph, as well as the last paragraph on page 17, the

2   social worker noted particular subject areas that Mr. Burke was

3   interested in.  And you included that in your evaluation.

4        What were those areas and why did you include it?

5   A.   Yes.

6        He asked her about how to quash warrants, how to

7   petition, that he should be absolved of different historical

8   charges or responsibilities for certain probation requirements.

9        So he was asking some pretty sophisticated legal

09:44AM 10   questions, which I thought was noteworthy.

11  Q.   And, again, in this time period, this is after Mr. Burke

12  was civilly committed in state court, but prior to his escape

13  that in part we are here today; is that correct?

14  A.   Yes.

15  Q.   And so this actual time period, with respect to these

16  records and notes, to the best of your knowledge, they have not,

17  this, these evaluations have not actually been litigated before

18  state court either at this time.

19  A.   Correct.

09:44AM 20  Q.   If we could turn to page 18.  Let's see, one two, three,

21  four, fourth full paragraph, relative to chart notes, specific

22  to January 25th of 2016 in your evaluation.

23       Again, on January 28, towards the bottom of that

24  paragraph, 2016, on page 18 of your evaluation.

25       There's, again, some questions that are quoted by you

1    attributed to Mr. Burke.

2            Is that correct?

3    A.    Yes.

4    Q.    And, again, what are those questions and why is that

5    significant to you?

6    A.    Yes.

7            He asked, he asked if murder charges, basically, would

8    be refiled, how many times they would be refiled.

9            And, again, that was significant to me, because it

09:45AM 10   shows that he was aware that these charges were still floating

11   around out there, so to speak, and could be refiled again.

12   Q.    And in the last paragraph there, February 12, 2016, records

13   from Western State Hospital.  There's a series of information

14   there.

15           What is reported there, in summary, and why was it

16   significant to you to include in your evaluation?

17   A.    Yes.

18           I thought this was very interesting information.  He

19   was talking to a psychologist, he was asserting that he was well

09:46AM 20   enough mentally to leave the hospital and enter the community.

21           But at the same time, he was saying that he was still

22   hearing voices, having really severe memory impairments, and

23   that his medications weren't working at all.

24           And the psychologist actually challenged him on some

25   of these assertions and said, well, you're able to basically

LOW / Direct                                    23

1    carry on this conversation with me.

2            But, again, he became defensive, talked about how

3    impaired he was.

4            And what I thought was very noteworthy was, he was

5    saying that, although he was well enough to leave the hospital

6    and enter the community, that he was impaired to the point where

7    he wouldn't be able to assist his attorney with his defense.

8    Q.   And why, why is that significant to you?

9    A.   Well, it shows very goal-oriented thinking to me.

09:47AM 10           He was, obviously, very focused on wanting to leave

11   the hospital and trying to convey that he was well enough for

12   that, yet he wanted to make it known that he still wouldn't be

13   well enough to, to face another competency evaluation or face

14   other charges.

15   Q.   And was this type of conversation that you noted here from

16   Western State Hospital something that you experienced with Mr.

17   Burke in your contact with him?

18   A.   Parts of it was, yes.  Certainly in terms of the

19   exaggeration of symptoms.

09:47AM 20   Q.   If you could turn to page 19.  The last paragraph.  The

21   largest paragraph on that page, government's exhibit 1.

22   Beginning, on March 8, 2016.

23           Are you there, doctor?

24   A.   Yes.

25           THE COURT:  Excuse me one second.  Miss Vargas.

LOW / Direct                                              24

```
 1              (Discussion with clerk and Court off the record.)

 2              (Pause.)

 3              THE COURT:  Okay.  You may resume.  Thank you.  A

 4    little computer glitch on my part that enabled me to get online.

 5    But ready to go.

 6              MS. VAN MARTER:  Thank you.

 7              THE COURT:  That is online with the court, some court

 8    materials.  Thank you.

 9    BY MS. VAN MARTER:

09:49AM 10    Q.   All right.

11              Again, on page 19 of government's number 1, the last

12    full paragraph beginning, on March 8, 2016.

13              In this particular paragraph, there's quite a bit of

14    information there that you quote for your evaluation.

15              Could you please indicate the sections that are

16    significant to you and why you included them.

17    A.   Yes.

18              Mr. Burke was having a conversation with a social

19    worker at Western State Hospital and pointed out several reasons

09:49AM 20    why he felt he was ready to leave the hospital, not be a risk to

21    the community.

22              But, again, at the same time, he reported having these

23    other symptoms and said that it would interfere with being able

24    to work with an attorney.

25              The social worker challenged him about that and she
```

1    asked him about a time when he had symptoms, but was yet

2    successful in the community.

3              And I thought it was interesting how Mr. Burke said

4    that, well, you refer back to a time when he was in a halfway

5    house, but then the social worker said, to him, oh, along the

6    lines of, well, you absconded from the halfway house.

7              And she, he said that, well, he couldn't stay there,

8    again, because of the voices.

9              So he referred back to his symptoms, which contradicts

09:50AM 10  what he was trying to tell the social worker earlier in saying,

11   even though I have these symptoms, I could still do well in the

12   community.

13             So the social worker brought that up to him, and there

14   was some back and forth there, in that he then claimed, well,

15   no, it wasn't the voices that caused me to leave the halfway

16   house, I did that of my own choice, and I knew of the potential

17   consequences.

18   Q.   And why is that significant?

19   A.   It's very significant because, again, here he's really

09:51AM 20  making an effort to explain how the voices can affect one part

21   of his functioning, but not the other, in a way to benefit him

22   greatly, in the best way possible.

23   Q.   And this time period, in March, carries on over into a

24   number of incidences on page 20, where it appears that he,

25   again, becomes concerned about the ability for the state to

1    refile the charges.

            Was that --

3    A.    Yes.

4    Q.    -- was that something that was significant to you as well?

5    A.    Yes, that was apparently an ongoing concern of his, that he

6    brought up to numerous people.

7    Q.    And at some point was he advised by the employees of

8    Western State Hospital that they would be recommending to the

9    state that they potentially should refile?

09:52AM 10   A.    Yes.

11           In Western State Hospital's release summary, they

12   indicated in there that they had told him that they would be

13   doing that.

14   Q.    And did they tell him prior to his escape?

15   A.    The way the release summary reads, it appears they did tell

16   him this before his escape.

17   Q.    Is that significant to you, that he was advised that they

18   would be recommending the state, the state was going to refile

19   and then subsequent to that he escaped the facility?

09:52AM 20   A.    Yes.

21   Q.    Why?

22   A.    Well, again, I think he had clearly let the staff know that

23   he wanted to be released from the hospital, that he felt he was

24   ready to be released from the hospital; yet he wouldn't be able

25   to assist his attorney.

```
 1              So the timing of all of that is quite suspect.
 2    Q.    Let's talk a little bit more about that summary that
 3    Western State Hospital provided after, provided, that you've
 4    included on page 20.  And the long paragraph that begins on
 5    April 2nd, 2016.
 6              Again, what was the conclusions in the summary from
 7    Western State Hospital after his escape?
 8    A.    Well, first of all, they noted his medication regimen and
 9    they said that he was stable on those medicines.
09:53AM 10              They pointed out how he continued to complain of
11    persistent auditory/visual hallucinations, memory problems,
12    thought blocking.
13              And how they tried to have him take responsibility for
14    these reports and how they tried to point out to him how
15    discrepant these reports were, compared to his ability to
16    function on the ward.
17              Also noteworthy were their statements about how he did
18    not appear to be invested in treatment, that he seemed to just
19    participate in a superficial manner.
09:54AM 20              And one quote, too, which I thought was very telling,
21    states, "efforts were undoubtedly devoted to trying to project a
22    rather incapacitated person who, according to his own
23    statements, was capable of handling responsibilities and
24    privileges inherent in this milieu, but totally incompetent to
25    assist his lawyer regarding his legal issues."
```

```
 1    Q.    And I wanted to point your attention to a quote above that
 2    and a quote below that.
 3            And I think this is referring in the middle of the
 4    paragraph.
 5    A.    Um-hum.  Yes.
 6    Q.    There's a quote there.
 7            What is that quote?
 8    A.    Yes.
 9            The staff noted that, despite his complaints, there
10    was, "an obvious ability to function on a daily basis with lack
11    of objective evidence of signs and symptoms expected to be
12    present in cases of active psychosis."
13    Q.    And in layman terms, what does that mean?
14    A.    In layman terms, that means he was functioning pretty darn
15    well on the ward, and he would not have been doing that if he
16    were truly experiencing the type of symptoms that he was
17    complaining of.
18    Q.    And at the bottom of that paragraph there is another quote.
19            If you could read that, Doctor Low.
20    A.    Sure.  Yeah.
21            The staff there gave him a poor prognosis, due to, "no
22    compliance with treatments beyond superficial participation with
23    perceived requirements."
24    Q.    What does that mean?
25    A.    Again, it means that he simply went with the flow and did
```

```
 1   what he had to do, but really wasn't very engaged in treatment.
 2   Q.   Okay.
 3         So then from, on the next page at, is it accurate to
 4   say that government's exhibit number 1, page 21, then reflects
 5   kind of a -- excuse me, a history of your contact with him at
 6   the facility?
 7   A.   Yes.
 8         It's a history of different contacts with medical
 9   staff, so.
10   Q.   The next section is your evaluation findings.
11         And that goes from page 22, all the way through 26.
12         Is that correct?
13   A.   Yes.
14   Q.   Okay.
15         Let's, let's first talk about what you have included
16   here under the heading of mental status, noted on page 22, to
17   the top of page 23.
18         And what were your findings in regard to Mr. Burke,
19   with respect to mental status?
20   A.   Well, first of all, in terms of his mood, he was pretty
21   much anxious every time I saw him, a little bit dysphoric or
22   sad, not suicidal, though.
23         He spent a great deal of time discussing all the
24   different psychotic symptoms that he was reportedly
25   experiencing.
```

1              He would frequently even state, "I'm deep in

2    psychosis."

3              While we were meeting, he would claim to have a visual

4    hallucination of an orb, an orb be passing by.

5              He would speak about various memory impairments and

6    what he called thought blocking.  Saying that his thoughts were

7    being taken from him.

8              And even throughout our meetings, he would claim that

9    oh, you know, a thought was just taken from me right now.  I was

09:57AM 10   going to say something and now I can't remember.

11             But despite all these claims, all of our conversations

12   were, I didn't have any problems understanding him.

13             He was very organized in his thought process, he was

14   very clear, coherent, logical.

15             He was tangential at times.  He would go off topic and

16   usually just start talking about different psychotic symptoms.

17             But then I would just simply redirect him to what we

18   were talking about and he was able to be redirected.

19   Q.   And is it significant to you his proclamations that, "I'm

09:58AM 20   deep in psychosis"?

21   A.   Um-hum.  That was a very suspicious type of phrase to use.

22             Most mentally ill people, the vast majority of

23   severely mentally ill people, first of all, don't usually try to

24   emphasize how mentally ill they are.

25             And most people who are actually in an acute psychotic

1    episode aren't able to recognize that they're in an acute

2    psychotic episode and they would never come up with such a

3    statement.

4    Q.    And there's repeated reference, again, here, with respect

5    to your conclusions that what you observed in your interactions

6    with him did not appear to be consistent with his reported

7    symptoms.

8          Is that accurate?

9    A.    Yes.

09:59AM 10    Q.    On page 23, you go on to his course at the institution.

11    What is that section supposed to address?

12    A.    I use this section sometimes when I see some different

13    behaviors that occur during the time that the person is with us.

14          Especially as it may relate to different changes

15    in-housing, as is what happened with Mr. Burke.

16    Q.    So, is that always included in your evaluations?

17    A.    No.

18    Q.    And why was it included here?

19    A.    Because there were some other noteworthy things that

09:59AM 20    happened.

21    Q.    And what were those, as noted, just for the record, so we

22    have it clear, on pages 23 to page 24 of exhibit 1.

23    A.    Yes.

24          Well, some of this was related to Mr. Burke coming in

25    and out of the Special Housing Unit.

LOW / Direct

1           Again, like I mentioned before, that's where he was

2    initially placed, but then he was released from there, after

3    successfully talking to the warden and giving a very rational,

4    logical reason for why he shouldn't be held in there.

5    Q.    And why was that significant?

6    A.    Well, it was significant because, again, it shows his level

7    of intelligence, his level of being able to think rationally and

8    logically.

9           Because he essentially told the warden that, well, I

10:00AM 10   supposedly escaped from a hospital, not a correctional facility,

11   so I shouldn't be kept up here as an escape risk, per say.

12          This section also includes different observations of

13   correctional officers.  Nobody ever observed any unusual

14   behavior.  He was simply described as being very quiet, pretty

15   isolative, having poor hygiene.

16          And, again, I detail how he was then kind of checking

17   himself into segregation, basically because he was claiming that

18   he was "in psychosis" and was either bothering his roommate

19   through his pacing behaviors or things of that nature.

10:01AM 20   Q.    And, again, that statement reflects back to your prior

21   testimony regarding concerns about some kind of self awareness

22   of being in psychosis.

23   A.    Yes.

24   Q.    On page 24, the last paragraph of that section, just above

25   intellectual functioning, there's an event that occurs on June

LOW / Direct

1    22nd of 2016 where there, again, is a quote from you in your

2    report.

3              Are you at that location?

4    A.    Yes.

5    Q.    And could you explain to the Court the circumstances of

6    that and what the, what Mr. Burke's statement was?

7    A.    Um-hum.

8              There were two occasions in which he simply didn't

9    want to meet with me.  Which was fine.

10:02AM 10              And there were also times when he wanted to end a

11    meeting prematurely.

12              So, on this particular date, June 22nd of 2016, he

13    explained that we could end the meeting early because, "I think

14    you have enough information to render an opinion."

15              Again, I thought this was a very sophisticated

16    proclamation to make and certainly not indicative of a person

17    with severe mental illness who is unable to function well.

18    Q.    And this is during the same time period where he is self

19    reporting being deep in psychosis?

10:02AM 20    A.    Yes.

21    Q.    At the bottom of that paragraph there's an indication that

22    Mr. Burke -- paragraph, that paragraph, page 24, government's

23    1 -- did not want to take any of the tests.

24              Was that of any significance to you?

25    A.    Yes.

1        Mr. Burke was very reluctant to engage in any

2  psychological testing.

3        He made different excuses for why he didn't want to or

4  could not do so, saying that he couldn't focus, saying that the

5  other psychologists never used tests, they only talked to him,

6  so why couldn't I just do that.  But he eventually consented.

7  Q.    Okay.

8        Let's talk a little bit about some of those tests then

9  in this next section.  Intellectual functioning, on pages 24.

10:03AM 10  And then 25 also, personality dimensions.

11        First, did you administer any IQ tests for Mr. Burke?

12  A.    No.

13  Q.    Why not?

14  A.    IQ intelligence is noted to be a pretty stable construct.

15  It wouldn't really change all that much, unless there was a

16  significant head injury or whatnot.

17        So I didn't feel a need for that.

18  Q.    And did, what results did you rely upon from his previous

19  IQ test?

10:03AM 20  A.    I relied upon older records, which were referenced in my

21  first report.

22        So, as you can see here, he was tested back in 2006 at

23  Eastern State Hospital and he did pretty well.

24        High average range overall.

25        Very superior range in performance IQ, which is

LOW / Direct                                    35

```
        1   nonverbal reasoning.

        2          And then in the average range with his verbal IQ.

        3   Q.   And in the next section you referred to the TOMM test.

        4   What is that?

        5   A.   The TOMM is the Test of Memory Malingering.  And I felt

        6   that this was something that I needed to give, because Mr. Burke

        7   repeatedly complained of poor memory.

        8   Q.   And what were the results of that test?

        9   A.   This is a test that distinguishes plausible memory

10:04AM 10   complaints from feigned ones.

       11          And this basically showed that Mr. Burke didn't really

       12   provide good effort on the test.

       13   Q.   And, in fact, I think at the left, the conclusion, or,

       14   what's your, what's your conclusion regarding those results,

       15   aside from his lack of effort?

       16          Because I know that there's a mention here regarding

       17   just by chance guessing and versus what his actual scores were.

       18   A.   Yes.

       19          This test has 50 questions on it.  There's only two

10:05AM 20   answers.

       21          So, if you guessed on 50 of them, you would expect

       22   that somebody would get anywhere from between 21 and 29 correct.

       23          There's two different trials, and he scored in those

       24   zones, on both trials, 22 on the first trial, 23 on the second

       25   trial.
```

LOW / Direct                                                                36

1          So, again, that means that he scored no better than

2    someone who is guessing.

3    Q.    And with respect to the personality dimensions.  What is

4    the PAI?

5    A.    The PAI is the Personality Assessment Inventory.

6          And it's an objective questionnaire that measures

7    different areas of mental disorders and personality

8    characteristics.

9    Q.    And what were the results of Mr. Burke's testing on the

10:06AM 10   PAI?

11   A.    Well, first of all, he responded to some of the items in a

12   very idiosyncratic or individual way.

13         In other words, interpreting them maybe in ways that

14   they weren't meant to be interpreted.

15         But he also exaggerated symptoms and tended to portray

16   himself in a negative manner.

17   Q.    And is that consistent with your contact and observations

18   of Mr. Burke --

19   A.    Yes.

10:06AM 20   Q.    -- during your time?

21   A.    Yes.

22   Q.    I just wanted to note also, on page 25, government's

23   exhibit number 1, the third full paragraph down.

24         There is a reference to his level of motivation for

25   treatment with respect to the testing.

LOW / Direct                     37

1              What were the results or your conclusion there?

2     A.    Yes, the PAI showed that his level of motivation for

3     treatment was lower than people who were typically in a

4     treatment setting.

5              That he's resistant to thinking about making changes

6     within himself.

7              And that really goes hand in hand with what the staff

8     at Western State Hospital found.

9     Q.    And in that next paragraph, you administered the MMPI-2.

10:07AM 10  And why did you administer that?

11    A.    Well, because the PAI wasn't -- well, I don't want to say

12    it wasn't valid -- because of the exaggerated response style on

13    that, I wanted to give another personality inventory to see if

14    he would be more open and more forthright with that.

15             But, unfortunately, he just responded in a, such an

16    inconsistent way, that it just completely invalidated the test.

17    Q.    And was that of significance to you and how so?

18    A.    Yes, it was significant, because it shows that he really,

19    really wasn't cooperative in his approach.

10:08AM 20            Again, this didn't surprise me though, because he

21    wasn't pleased when I asked him to take this other test.

22    Q.    And the next test was the M-FAST.

23             What is the M-FAST test?

24    A.    The M-FAST is the Miller Forensic Assessment of Symptoms

25    Test.

1          It's a screening test to determine whether or not

2     somebody might be malingering psychotic symptoms.

3     Q.    And you indicate that Mr. Burke made many spontaneous

4     comments.

5          Was that before the administration of the test or

6     during?

7     A.    That was during.

8          And what's significant about that is, again, he was,

9     it seemed to me he was trying to emphasize all of these

10:08AM 10     different severe psychotic symptoms that he was having.

11          He spoke of having to search for aliens who were

12     hiding in his room.

13          And then he talked about some other visual

14     hallucinations that he had not previously reported.

15     Q.    And what were the results of Mr. Burke's M-FAST test?

16     A.    Well, he scored over the conservative cutoff score and that

17     shows us that there's a probability that he's malingering

18     psychotic symptoms.

19     Q.    And in the last sentence of that paragraph that carries

10:09AM 20     over on to the top of page 26 --

21     A.    Um-hum.

22     Q.    -- indicates, "He endorsed the psychological symptoms that

23     are rarely seen in combination, unusual hallucinations, and his

24     self report was inconsistent with observed behavior."

25          Can you explain that last sentence?

A.    Yes, there are different areas that the M-FAST taps into. Again, it's just a screening test.

          But these were the areas that really seemed to be more significantly elevated for Mr. Burke.

          Again, these were, he endorsed different symptoms that we, in the real world, they just don't happen together.

          Unusual hallucinations, a lot of things that he reported are kind of unusual.

          The visual hallucinations of these orbs, that's very atypical.  And, again, his self report is inconsistent with observed behavior.

          And that goes back to a lot of behavioral observations that I witnessed, other staff witnessed, as well as Western State Hospital staff.

Q.    Beginning on page 26, through page 30, it includes your diagnosis and prognosis section.

          Let's, first, what is your -- start with your diagnosis.

          What is your diagnosis with respect to the evaluation of Mr. Burke?

A.    Yeah, I felt Mr. Burke met criteria for three different diagnosis.

          The first is schizophrenia, multiple episodes, currently in partial remission.

          Malingering.

1            And then lastly, antisocial personality disorder.

2   Q.    Let's first talk about the diagnosis of schizophrenia.

3   Could you please explain that diagnosis.

4   A.    Sure.

5            Schizophrenia is a thought disorder, in which you

6   might see a combination of things, like hallucinations and that,

7   hearing voices, maybe seeing things, delusions, which are very

8   unusual beliefs, sometimes disorganized speech, disorganized

9   thought patterns.

10:11AM 10           Negative symptoms, which is what we refer to as a

11   diminished emotional expression.

12           And what I viewed and what most every other mental

13   health professional viewed, is that Mr. Burke presents with what

14   we call this flat affect.

15           He's very blunted when he talks with you, there's not

16   a lot of emotional responsiveness to, to different topics.

17           He has a very well-documented history of these sorts

18   of symptoms.  We have seen times when he's been off his

19   medications and his thoughts are extremely disorganized and

10:11AM 20   don't make any sense.

21           But I, I indicated that he's currently in partial

22   remission, because not all of those symptoms seemed to be as

23   severe as they could with other people, and they're not

24   impairing his functioning significantly.

25   Q.    And you had referenced that there's a well-documented

1   history.

2          Has this been consistent with the records that you

3   reviewed from other evaluators as well as Western State

4   Hospital?

5   A.   Yes.

6   Q.   All right.

7          THE COURT:  Just, Doctor, if, his prior IQ testing was

8   referenced on page 24.

9          And that shows that he, in the intellectual

10  functioning section of your report, how did you, how did he come

11  out on those tests?  Or the tests that had already been

12  administered.

13         THE WITNESS:  How did he score on those tests?

14         THE COURT:  Yes.  Yes.

15         THE WITNESS:  I don't have those, the actual numbers

16  with me, but, again, he, he's scoring, what I would say --

17         THE COURT:  Well on --

18         THE WITNESS:  --higher than --

19         THE COURT:  Well, under four, under intellectual

20  functioning, you mentioned that test.  He scored average on the

21  verbal IQ --

22         THE WITNESS:  Um-hum.

23         THE COURT:  -- very superior range with performance IQ

24  and high average on the full scale IQ.

25         THE WITNESS:  Yes.

1              THE COURT:  Is that correct?

2              THE WITNESS:  Yes.

3              THE COURT:  Okay.

4              And that, and you said those results appear to be the

5    most accurate reflection of his true intellectual function.

6              THE WITNESS:  Yes.

7              THE COURT:  Okay.  Thank you.

8    BY MS. VAN MARTER:

9    Q.   And just a follow-up question.

10:13AM 10              Again, why is it that you do not repeat an IQ test?

11   A.   Well, typically, like I said before, IQ is a pretty stable

12   construct.

13              And not only that, I didn't have any concerns about

14   his intellectual abilities.

15              You know, every now and then we will get a defendant

16   where these, the specific question is, hey, this person seems

17   really low functioning, I don't think they're understanding us.

18              And so, in those cases, we're going to have to do much

19   more thorough cognitive testing.

10:13AM 20              THE COURT:  And I elicited the questions and answers,

21   in order to make sure that the record reflects we're not dealing

22   with a borderline intellectual issue.

23              MS. VAN MARTER:  Yes, Your Honor.

24              THE COURT:  Thank you.

25

LOW / Direct                                          43

```
 1   BY MS. VAN MARTER:
 2   Q.    All right.
 3           Let's go on to your second diagnosis, Doctor, with
 4   respect to malingering.
 5           What is malingering?
 6   A.    Malingering is an intentional production of either really
 7   grossly exaggerated symptoms, if not outright feigned
 8   psychological symptoms; where there's some sort of a motivation
 9   to obtain some other goal, such as financial compensation, maybe
10   somebody whose trying to get on disability income, somebody
11   whose trying to obtain drugs, somebody whose trying to evade
12   criminal prosecution.
13   Q.    And in this particular case, we talked a little bit about
14   this throughout your testimony, but what, what would, what did
15   you rely upon in making this diagnosis?
16   A.    I relied upon several, several sources of data.
17           Again, we went over all of the observations and
18   reports from Western State Hospital, in which they questioned
19   the veracity of his statements about the severity of his
20   symptoms, because they weren't observing it.
21           I relied upon my own observations of such, as well as
22   the observations of our staff members.
23           I relied upon some of his -- well, again, a lot of the
24   atypical statements that he would make, that most severely
25   psychotic people don't talk about.  Like, "I'm in deep psychosis
```

 1   right now."

 2          Then, of course, the testing supported all of the

 3   hypothesis, too.  And we went through that.

 4          He was over exaggerating symptoms on the PAI, he

 5   exceeded a conservative cutoff on the M-FAST, he showed very

 6   poor effort on the TOMM.

 7          So I think there are plenty of data points that

 8   support the malingering diagnosis.

 9   Q.   And is this also consistent with some of the more recent

10:15AM 10   records that you reviewed from Western State Hospital regarding

11   what their opinion was with respect to Mr. Burke?

12   A.   Yes.

13   Q.   And at the end of that paragraph on page 26, there's a

14   sentence that appears, "he believes if he is viewed to be

15   extremely psychotic, he may be able to evade criminal

16   prosecution."

17   A.   Yes.  Yes.

18          And again, in the Western State Hospital records, he

19   clearly articulated that he was so impaired, he would not be

10:16AM 20   able to assist in his defense.

21   Q.   And I don't want to jump around too much, but we're going

22   to talk a little bit about Doctor Brown's report in a minute.

23          In your, have you had the opportunity to review Doctor

24   Brown's report, submitted by the defense as an exhibit in this

25   case?

```
 1   A.   Yes.

 2   Q.   And did you see information within Doctor Brown's report

 3   consistent with your diagnosis of malingering?

 4   A.   Yes.

 5   Q.   And just generally, what types of information was referred

 6   in Doctor Brown's report that's consistent with your diagnosis?

 7   A.   I thought it was interesting how, when she first met with

 8   Mr. Burke, one of the first things that he wanted to emphasize

 9   was that my report was incorrect and that he truly was mentally

10   ill.

11          Again, I find that very unusual for somebody to really

12   want to bring attention to their mental illness.

13   Q.   Let's move on.

14          And your last diagnosis, Doctor, of antisocial

15   personality disorder.  If you could please tell the Court the

16   basis of that diagnosis.

17   A.   Yes.

18          This is a personality disorder in which what's

19   prominent is a long-standing pattern of disregarding other

20   people's rights or violating other people's rights.

21          And it begins in either childhood or adolescence and

22   it continues into adulthood.

23          And, historically, Mr. Burke had a diagnosis of a

24   conduct disorder when he was a teenager.

25          He's run away, he was involved with thefts,
```

1   destruction of property.  Since age 15 he's continued with these

2   sorts of behaviors.

3          He also exhibits traits of irritability,

4   aggressiveness, deceitfulness, lack of remorse for his actions.

5   Q.   And there's a last paragraph there, just before your

6   ultimate opinion, with respect to competency regarding

7   prognosis.

8          And what's your opinion regarding the prognosis of Mr.

9   Burke?

10:18AM 10  A.   Overall, I said it's poor.  He didn't show good motivation

11  for treatment, as shown in the Western State Hospital records,

12  and I believe that he'll continue to exaggerate his psychotic

13  symptoms, if he thinks it benefits him.

14          On the other hand though, I also want to acknowledge

15  that, you know, this man does have schizophrenia, he does need

16  to stay on his medication, and he does need to be, to be

17  monitored for that.

18          He benefits from the medication, regardless of what he

19  says about that.

10:18AM 20  Q.   And the last segment of your report, just for the record,

21  noted on pages 27, 28, and 29, of government's exhibit number 1,

22  reflects your opinion regarding his overall competency.

23          What is your opinion regarding Mr. Burke's competency?

24  A.   I believe that he is able to understand the nature and

25  consequences of the proceedings against him and that he is able

1    to assist counsel in his defense.

2    Q.   And what is the basis of that opinion?

3    A.   Well, I administered a competency instrument,

4    semi-structured instrument and he was able to clearly understand

5    the nature of his probation violations.

6         He had been able to discuss all those in pretty good

7    detail with me, in a bit of a more informal conversation.

8         Again, he's a bright guy, so he's not going to have

9    any problems understanding all of the different factual portions

10   of court proceedings.

11        You know, what a trial is and who the different

12   players in the court are and what they do and different pleas

13   that are available.

14        I felt that he was able to assist a defense, if he

15   wants to.

16        Again, he asserted that he couldn't remember, due to

17   thought blocking and stating that he was psychotic.

18        But, again, like I said, the testing showed that he's

19   providing poor effort with regard to memory.  So I think that

20   that is not a credible claim.

21   Q.   And regarding the testing.  For the record, are you

22   referring to the ILK test, as noted on the bottom of page 27, as

23   the testing that you administered?

24   A.   That's one of them.

25        I also administered the RCAI, the Revised Competency

LOW / Direct                                           48

1    Assessment Instrument.

2    Q.    And what were the results, first, of the ILK?

3    A.    The ILK, gives us information about, again, how much effort

4    a person is putting forth in answering legal questions.

5          And out of 61 questions, he only got 29 of them right.

6    Again, this is no better than chance, a little bit less than

7    chance.

8          So it shows that he was guessing or, you know, just

9    putting forth poor effort into those answers.

10:21AM 10    Q.    And the second test?  What test is that and what were Mr.

11   Burke's results?

12   A.    The RCAI is a semi-structured interview and that's where we

13   get into all the nitty gritty about different things that happen

14   in court, different participants, his attorney, his relationship

15   with him.

16          And again, he really didn't show any kind of

17   significant impairment at all.

18   Q.    Okay.

19          And the basis of your opinion, does that also include

10:21AM 20   some of the records you reviewed in interactions by Mr. Burke

21   with Western State Hospital?

22   A.    Yes.

23   Q.    Including some statements regarding the legal situation he

24   was in and things that you previously testified to.

25   A.    Yes.

LOW / Direct

1   Q.   And is there anything else, before we move on to Doctor

2   Brown's report, with respect to your overall, your ultimate

3   conclusion regarding Mr. Burke's competency, that we missed?

4   A.   No, I don't think so.   I think we were pretty thorough.

5   Q.   All right.

6        Let's talk a bit --

7        THE COURT:   Excuse me a second.

8        On page 29, at the bottom -- sorry, page 29 at the

9   bottom.   The last paragraph says, "Overall, Mr. Burke

10:22AM 10  demonstrated an average ability to understand the nature and

11  consequences of the court proceedings against him and an average

12  ability to properly assist counsel in his defense.

13       From the available information, there is no evidence

14  to indicate the defendant suffers from a mental disorder or

15  disease that would substantially impair his present ability to

16  understand the nature and consequences of the court proceedings

17  brought against him or substantially impair his ability to

18  assist counsel in his defense.

19       He is exaggerating his psychotic symptoms and

10:23AM 20  exaggerating, if not feigning, memory impairment.

21       Mr. Burke has the ability to assist counsel, should he

22  so choose."

23       Did I directly correctly read that paragraph out of

24  your report?

25       THE WITNESS:   Yes, Your Honor.

LOW / Direct                                           50

1              THE COURT:  Thank you.  You may go.

2              MS. VAN MARTER:  Thank you, Your Honor.

3    BY MS. VAN MARTER:

4    Q.   You previously testified you had the opportunity to review

5    the defendant's exhibit from Doctor Brown, regarding her

6    evaluation.

7    A.   Yes, I did.

8              MS. VAN MARTER:  And I know that that has been

9    submitted as a defense exhibit, I don't have any objection to

10:23AM 10   the admission of that exhibit at this time, Your Honor.

11             MR. SCHWEDA:  Which exhibit is that?

12             MS. VAN MARTER:  Your exhibit number 1.  Doctor

13   Brown's report.

14             THE COURT:  I have that as document 250 on ECF.

15             MS. VAN MARTER:  ECF 250.

16             I know he marked it as an exhibit as well, Your Honor.

17             THE COURT:  It should be --

18             MS. VAN MARTER:  Yes.

19             MR. SCHWEDA:  Right.

10:24AM 20             And I have it marked, Your Honor, as exhibit number

21   13, in this binder.

22             THE COURT:  Exhibit 13.

23             MR. SCHWEDA:  Or 213.

24             THE COURT:  What?

25             MR. SCHWEDA:  213.

```
 1              THE COURT:  Defense exhibit 13 admitted.

 2              MR. SCHWEDA:  Yes.  Yes.

 3              THE COURT:  For all purposes?

 4              MR. SCHWEDA:  No, Your Honor.

 5              Again, we would ask that it just be admitted, until we

 6    have a chance to --

 7              THE COURT:  Well, it's admitted.  I'll keep it under

 8    seal, temporarily, until you have a chance to brief, as we have

 9    indicated, and you'll get that done by next Tuesday --

10    MR. SCHWEDA:  Yes, Your Honor.

11              THE COURT:  -- as I recall, at noon.  Okay.  And then

12    we're good to go then.  It's in.

13              Exhibit number 3, sealed at the moment.

14              And that's Doctor Brown's report.  Exhibit 13.  Excuse

15    me.

16              MS. VAN MARTER:  Exhibit 13.

17              Thank you, Your Honor.

18              MR. SCHWEDA:  Yeah, 113, actually, Your Honor, so --

19              MS. VAN MARTER:  Okay.  Correction.  According to

20    Mr. Schweda, 113.  Exhibit 113 of the defense --

21              THE COURT:  Okay.

22              MS. VAN MARTER:  -- has been admitted.

23              THE COURT:  Okay.

24    BY MS. VAN MARTER:

25    Q.   Doctor Low, you indicate --
```

1          THE COURT:  Oh, and for the record, Doctor Brown is

2     here?

3          MR. SCHWEDA:  Yes, she's seated in the courtroom.

4          THE COURT:  Yes, I assumed.  Doctor Brown is present.

5     Thank you.  Go ahead, please.

6     BY MS. VAN MARTER:

7     Q.   And, Doctor Low, you had the opportunity to read the

8     entirety of Doctor Brown's report or evaluation; is that

9     correct?

10:25AM 10    A.   Yes.

11    Q.   And in reviewing that evaluation, did that change or impact

12    your ultimate opinion with regard to Mr. Burke?

13    A.   It did not change my opinion on Mr. Burke.

14    Q.   And why not?

15    A.   Well, she also, I believe, if I'm interpreting what she

16    wrote correctly, I believe she came to the same conclusion I

17    did; in that, he was able to understand the nature of his

18    probation violations and assist counsel.

19    Q.   And in reviewing this report, did you have, was there

10:25AM 20    anything of concern or significance to you regarding Doctor

21    Brown's report?

22    A.   Yes, there were a few things.

23    Q.   Okay.

24         Let's, let's -- and in your review of this, or -- I

25    think there was specifically three particular items that we

1    discussed.

2         Is that correct?

3    A.   Yes.

4    Q.   Okay.

5         Let's start first with your first concern.  And I

6    think that related to personality testing.

7         Is that correct?

8    A.   Yes.

9    Q.   Okay.

10:26AM 10        And could you please tell the Court what it is about

11   that, that stood out to you?

12   A.   I was curious as to why Doctor Brown did not administer a

13   separate personality test, first of all.

14   Q.   And why is that significant?

15   A.   Well, I would think that that would be an important thing

16   to do, if she were completing an independent evaluation.

17   Q.   And is that something that is standard in the field?

18   A.   Yes.

19   Q.   When conducting a competency evaluation?

10:26AM 20   A.   Yes, because it had been several months between the time I

21   saw him and Doctor Brown saw him.

22   Q.   And is that why you don't just rely on the previous

23   personality tests that have been conducted with Mr. Burke

24   earlier?

25   A.   Correct.

LOW / Direct                                                54

```
 1   Q.   Kind of directed towards the Court's questions, it's
 2   important to repeat those tests?
 3   A.   It is for personality tests, because different things can
 4   change, in lots of different ways.
 5             And a person's results can be vastly different from
 6   one time point to another.
 7   Q.   And according to Doctor Brown's report, what personality
 8   tests did she rely upon?
 9   A.   She relied upon my test, the Personality Assessment
10   Inventory, that I gave to Mr. Burke.
11   Q.   And then no other personality tests or --
12   A.   No.
13   Q.   -- information.
14   A.   No.
15   Q.   And what was the second area of concern with respect to
16   Doctor Brown's report that you noted?
17   A.   Well, getting back to the PAI, I believe that she
18   misinterpreted the results that I obtained.
19   Q.   And how so?
20   A.   Well, she indicated that I said that there was an
21   exaggeration of his symptoms, but then she goes on to point out
22   that all the symptoms that he endorsed were the same symptoms
23   that were reflected in the record.
24             And, to me, that doesn't show a good understanding
25   that that's the whole point of exaggeration is that he's
```

1    endorsing these same symptoms at a very high degree of a very

2    severe level.

3    Q.   And, just for the record, do you have the page in mind with

4    respect to Doctor Brown's report?

5    A.   Yes, that's at the top of page 25.

6    Q.   And so, even though Mr. Burke is reporting these symptoms,

7    there's still an exaggeration of the same symptoms.

8    A.   Yes.

9    Q.   And was, and is that directly relevant to any of your

10:28AM 10   diagnosis then?

11   A.   It's relevant to the malingering diagnosis.

12             THE COURT:  What part -- on what portion is it?  Page

13   25?

14             THE WITNESS:  I'm sorry.  It's --

15             THE COURT:  Let me get there.

16             THE WITNESS:  The top of page 25.  Where my results

17   are summarized.

18             That very first paragraph on page 25.

19             THE COURT:  Which paragraph?

10:29AM 20             Is it the one that begins, October 28th, or the one

21   before or after that or if you --

22             THE WITNESS:  Oh.

23             THE COURT:  If you would identify the paragraph.

24             THE WITNESS:  It's the very first paragraph.

25             THE COURT:  First paragraph.  Okay.  Hang on.

```
 1                THE WITNESS:  Yes.

 2                THE COURT:  All right.

 3                And having read -- you're talking the first full

 4    paragraph or the first paragraph?

 5                THE WITNESS:  That first full paragraph.

 6                THE COURT:  Beginning with, on October 28th?

 7                THE WITNESS:  No.

 8                THE COURT:  That one.  Okay.

 9                THE WITNESS:  Yes.

10:29AM 10         THE COURT:  The profile was associated with?

11                THE WITNESS:  The one above that.

12                MS. VAN MARTER:  And I believe, for the record --

13                THE WITNESS:  Yours printed out differently than mine.

14                THE COURT:  Perhaps that's true.

15                THE WITNESS:  Yeah, it's the paragraph that starts off

16    with the PAI.

17                THE COURT:  Okay.

18                That's page, that's actually page 24.

19                THE WITNESS:  Yes, that starts on page 24, I'm sorry.

10:30AM 20         MS. VAN MARTER:  And it carries over to the top of 25

21    on this copy.

22    BY MS. VAN MARTER:

23    Q.   But, yes, it begins with, the PAI is an objective

24    personality inventory; is that correct?

25    A.   Yes.
```

1              THE COURT:  So, you're referring to the PAI paragraph

2     that -- okay.  Give me a moment.

3              THE WITNESS:  Yes.

4              THE COURT:  And what's the significance of, the

5     significant point that you're making about that?

6              THE WITNESS:  It seems as though she is trying to

7     downplay the exaggeration, unless I am reading it incorrectly,

8     but it seems to me as though she's saying that, well, Doctor Low

9     says that he's trying to create an unfavorable impression and

10:30AM 10     exaggerating his profile; yet the symptoms that he's reporting

11    are the same sorts of symptoms that other people have seen.

12             But she's not acknowledging that, although that may

13    have been partly the case, that it's still a gross over

14    exaggeration of the symptoms.

15             THE COURT:  Okay.  Thank you.

16    BY MS. VAN MARTER:

17    Q.    And, again, that's specific to the malingering diagnosis.

18    A.    Yes.

19    Q.    And does it appear to be an acknowledgment from Doctor

10:31AM 20    Brown regarding that malingering tendency with those exaggerated

21    symptoms?

22    A.    Right.

23    Q.    I'm going to go to page 24.

24             The page before, under Doctor Brown's psychological

25    competency testing.

LOW / Direct

```
 1              And the second paragraph there, the Miller Forensic

 2    Assessment of Symptoms.

 3              Was there anything with respect to that testing that

 4    was of concern to you, as noted in that paragraph?

 5    A.    About midway through the paragraph, Doctor Brown writes

 6    about how I did not follow-up with the SIRS-2, but she did.

 7              And what I wanted to bring up about that is that

 8    research has shown that the SIRS-2 actually is not a very good

 9    test.  There are some serious questions with regard to its

10    validity.  And that is the exact purpose why I did not

11    administer that test.

12              THE COURT:  The SIRS-2.

13              THE WITNESS:  Correct.

14    BY MS. VAN MARTER:

15    Q.    Well, let's back up just a minute.

16              What is the SIRS-2 and what is the history of the

17    SIRS-2?

18    A.    The SIRS-2 is, as it says, a structured interview of

19    reported symptoms.

20              The 2, obviously, is the second edition.

21              It is authored by a very well-renowned psychologist in

22    the field of malingering, Doctor Rogers.

23              And when he revised it, for some unknown reason, he

24    omitted a portion of the sample which, in turn, skews the

25    results.
```

LOW / Direct

```
 1              And in recent continuing education workshops, which
 2     are focused on malingering, we have been advised by the experts
 3     in the field that this is not a good test to use and you should
 4     really avoid using it.
 5     BY MS. VAN MARTER:
 6     Q.   And so, therefore, is it a practice within the Bureau of
 7     Prisons, as a neutral evaluator, to not use that test?
 8     A.   As far as I know, for those folks who have been made aware
 9     of that, yes.
10:33AM 10     Q.   And did you specifically attend that continuing legal
11     education that discussed the errors with the SIRS-2?
12     A.   Yes.
13     Q.   And did you have an opportunity to review Doctor Brown's
14     curriculum vitae?
15     A.   I did.
16     Q.   And did she attend any of the same training with respect to
17     that area?
18     A.   She actually attended the same workshop in 2014 in which
19     that was addressed.
10:33AM 20     Q.   And so, based upon what you now understand to be some of
21     the flaws with that test, then are those results considered to
22     be valid?
23     A.   I don't think so.
24     Q.   Okay.
25              And I think the last area that I wanted to direct your
```

LOW / Direct                              60

1    attention to with respect to Doctor Brown's report, I think, is

2    probably the most significant.

3            And that starts on page 26 to 27 on to 28, but

4    predominantly on page 27 out of the defense exhibit.

5            Did you have any concerns regarding the ultimate

6    opinion provided or opinions provided by Doctor Brown?

7    A.    Yes, I did.

8    Q.    And what are those concerns?

9    A.    Well, first of all, I was very confused as why there were

10:34AM 10    two separate paragraphs with regard to competency.  And they

11    seemed to be saying different things.

12            And even within one of the sections, it seemed to be

13    saying different things.

14            So, I just wasn't quite clear what was going on.

15            For example, under that first section of competency in

16    the first paragraph.

17    Q.    Is that on page 27?

18    A.    On page 27.

19    Q.    Yes.  Please continue.

10:34AM 20    A.    She writes, "In my opinion, he should have relatively

21    little difficulty with a simple case of a probation violation."

22            And then in the next paragraph though Doctor Brown

23    goes on to say, "I believe he's experiencing mild impairment in

24    his ability to participate in legal proceedings.  These symptoms

25    are likely to adversely affect his ability to interact and plan

1    a defense appropriately with his attorney.

2            He's likely to make poor, if not irrational judgments,

3    in weighing the costs and benefits of alternative legal

4    options."

5            So, that created confusion for me, because she was

6    first saying that he shouldn't have problems in this simple case

7    of a probation violation; yet she then says that he will not be

8    able to interact and plan a defense with his attorney.  So that

9    was contradictory.

10:35AM 10   Q.   So within that first -- well, the first concern is that

11   there's two separate competency sections.

12           Why is that --

13   A.   Yes.

14   Q.   -- significant?

15   A.   There's no need for two.

16           Again, it's very confusing.  I've never seen a report

17   written in such a manner.

18   Q.   And if we first look at the first competency section then,

19   if I understand you correctly, Doctor Low, the two paragraphs

10:36AM 20   are inconsistent with each other.

21   A.   Correct.

22           So, after the reader reads those two paragraphs

23   that -- well, I was just sitting there thinking, so what, what

24   is she saying?  I didn't know what her conclusion was.

25   Q.   And then there's a second competency section.  What, if

LOW / Direct                                                     62

```
 1   anything, is significant there to you?

 2   A.    I thought what was, what really stood out was how Doctor

 3   Brown kind of bifurcated the competency standards, in terms of

 4   parsing out, parsing out his abilities with regard to facing a

 5   probation violation versus having to, perhaps, go to a trial in

 6   a more complicated manner.  I thought that was highly unusual.

 7   Q.    Is that, is that a standard in the field, in regard to an

 8   overall competency conclusion?

 9   A.    No, I've never seen that before.

10   Q.    And so, with respect to your experience, competency is, the

11   standard of competency are the two factors you previously

12   testified to.

13   A.    Correct.

14         And it's supposed to be applied to the defendant's

15   current charges only.

16   Q.    And you've never seen it bifurcated by charge.

17   A.    Never.

18   Q.    But, ultimately, in this second competency section, the

19   conclusion by Doctor Brown is what?

20   A.    Is that he is able to understand the nature and

21   consequences of his current charges of probation violations, and

22   that he would be able to assist.

23   Q.    And does she have a similar prognosis, in terms of his

24   amenability to treatment, as you?

25   A.    In terms of his amenability to treatment?
```

LOW / Direct                                          63

```
 1   Q.    Let me rephrase.
 2            Does she have the same or similar prognosis, regarding
 3   concerns of him returning into the community?
 4   A.    You know, I'm not sure if she addressed that.
 5            She simply talked about how he probably would not be
 6   competent, if having to face a more complicated trial procedure.
 7   Q.    Okay.
 8            Let me just refer you to page 29.  I don't mean to
 9   confuse you in wrapping up my questions here, Doctor Low, so I
10   apologize for that.
11            In the second to last sentence, on the first full
12   paragraph, "He poses a very real danger of offending in a
13   violent manner."
14   A.    I'm sorry, the second to last paragraph?
15            THE COURT:  The very last paragraph --
16            MS. VAN MARTER:  Yes.
17            THE COURT:  -- so to speak, of the, of the report.
18   "Although attempts have been made to intervene."
19            THE WITNESS:  Oh.
20            THE COURT:  That paragraph.
21            Do you have that?
22            THE WITNESS:  Oh.
23            MS. VAN MARTER:  No, no.
24            THE COURT:  Pagination may be different, but I gave
25   you the language, so you could cue in.
```

1              THE WITNESS:  Yes.  Yes.

2              To the best of my knowledge -- well, it looks like

3    she's quoting, she's quoting somebody in a 2007 quote.

4              And, again, at the beginning, it says, "I cannot say

5    it as well as that," so, yes, apparently she agrees.  She agrees

6    with that quote that she's stating.  Yes.  About the danger of

7    offending in a violent manner.  Yes.  So it appears that that is

8    her opinion, too.

9              MS. VAN MARTER:  If I could have a moment, Your Honor.

10:39AM 10              THE COURT:  Yes.

11              (Pause.)

12              MS. VAN MARTER:  I don't have any other questions of

13    Doctor Low, Your Honor.

14              THE COURT:  Okay.

15              Let's take a short break, but how long do you

16    anticipate cross?

17              MR. SCHWEDA:  Maybe 45 minutes.

18              THE COURT:  Okay.

19              And then is that your only witness?

10:39AM 20              MS. VAN MARTER:  Yes, Your Honor.

21              THE COURT:  And then you'll have Doctor Brown.

22              MR. SCHWEDA:  Correct.

23              THE COURT:  Okay.

24              So let's take 10 minutes at this time.

25              (Whereupon Court was recessed at 10:39 a.m.)

```
 1              (Whereupon Court reconvened

 2              in the courtroom at 10:50 a.m.)

 3              THE COURT:  Please be seated.  Let's resume.  You may

 4   proceed.

 5              MR. SCHWEDA:  Thank you, Your Honor.

 6

 7                        CROSS-EXAMINATION

 8

 9   BY MR. SCHWEDA:

10   Q.   Good morning, Doctor Low.

11   A.   Good morning.

12   Q.   I'm Pete Schweda, I represent Mr. Burke.

13              Now you indicated that there was no need to redo the

14   IQ testing, because that's something that doesn't change over

15   time, correct?

16   A.   Correct.

17              It doesn't typically change, unless, like I said,

18   there's a major head injury or something like that.

19   Q.   But isn't it true that, in 2007, when you evaluated Mr.

20   Burke, you did do IQ testing, correct?

21   A.   I did.

22   Q.   And, in fact, the results of your IQ testing were different

23   than the IQ testing that was performed at Eastern State

24   Hospital; isn't that correct?

25   A.   His results were a little bit lower, I believe, yes, with
```

```
 1   me.

 2   Q.    In fact --

 3               MR. SCHWEDA:   Your Honor, I move to admit, again, with

 4   the, with leave to address the sealed nature, defendant's

 5   exhibit 107, which is Doctor Low's 2007 report and --

 6               THE COURT:   Any objections?

 7               MS. VAN MARTER:   Yes, Your Honor.

 8               We object to relevance.   That report's not the basis

 9   of her opinion today.

10   Whatever opinions were rendered in that prior report,

11   there was retesting and the purpose of the evaluation was also

12   different.

13               So, we don't believe it's relevant for the Court's

14   consideration on this particular issue.

15               THE COURT:   I'm not -- her opinions -- he's entitled

16   to use that for cross-examination purposes.

17               So, I'm happy to have you use it for

18   cross-examination, Mr. Schweda, but I'm not certain what its

19   substantive use is here.

20               So, I regard it sort of the same approach, that she's

21   issued a prior report.

22               Do you want to impeach her credibility on the issue of

23   IQ, and show her that sort of thing and --

24               MR. SCHWEDA:   Well --

25               THE COURT:   On the other hand, if you want it for the
```

LOW / Cross                                                    67

1   purposes of substantive evidence, that he had a lower, the

2   testing results were different, then, to that extent, that

3   portion of the report is different and I would consider that as

4   admissible.

5          MR. SCHWEDA:  All right.

6          Well, I'll start with that, Your Honor, and I'll work

7   on, work my way on some other stuff here, because I --

8          THE COURT:  Go ahead.

9          MR. SCHWEDA:  -- that I wanted to address.

10:59AM 10  BY MR. SCHWEDA:

11  Q.   Doctor Low, in front of you, you have a small white binder.

12  A.   Yes.

13  Q.   Would you open that up to tab 7.

14       And go to page 20.

15  A.   Okay.

16       I'm there.

17  Q.   And this is your 2007 report, correct?

18  A.   Yes.

19  Q.   And preliminary -- this was a request from Judge Nielsen to

10:59AM 20  determine whether Mr. Burke should go to a USP or to some type

21  of a treatment facility, correct?

22  A.   Well, it was to see whether or not Mr. Burke suffered from

23  a mental disorder, such that he would need inpatient treatment.

24  Q.   And your opinion was that he didn't need inpatient

25  treatment, correct?

```
 1   A.    Yes.

 2   Q.    And that he would do just fine at a prison.

 3   A.    That his needs should be adequately met at any other given

 4   institution, yes.

 5   Q.    And you realize that he says that, as a result of that,

 6   when he served his 37 months at Victorville, he told you that

 7   that's when he had his biggest psychotic event, correct?

 8   A.    That's what he reported.

 9   Q.    So, if you would go to page 26 -- 20, excuse me.

10         THE COURT:  Page 20?

11         MR. SCHWEDA:  Yes.

12         Under intellectual functioning.

13   BY MR. SCHWEDA:

14   Q.    In the middle of that paragraph, you report the results of

15   your IQ testing, correct?

16   A.    Yes.

17   Q.    And, in fact, your IQ testing was average.

18   A.    Yes, but if you read everything above it, you'll see that

19   he, Mr. Burke actually admitted that he wasn't trying his

20   hardest.

21   Q.    Okay.

22         So, I'm going to ask you some specific questions and I

23   would --

24         THE COURT:  I'm sorry, are you asking about

25   intellectual functioning, Mr. Schweda?
```

11:00AM (line 10)
11:01AM (line 20)

1              MR. SCHWEDA:  Yes.  And --

2              THE COURT:  On page 20?

3              MR. SCHWEDA:  Yes.

4              THE COURT:  And then -- go ahead.

5    BY MR. SCHWEDA:

6    Q.   And it says there, in the middle, "the defendant's

7    performance on the WAIS-3 indicated that he was in the average

8    range of intellectual functioning, when compared with

9    individuals his age, with an estimated scale quotient IQ of 94."

11:01AM 10  Which is average, correct?

11   A.   Yes.

12   Q.   Which is lower than how he scored in, at Eastern State

13   Hospital.

14   A.   Yes.

15   Q.   And the Eastern State Hospital testing was done in 2006.

16   A.   Yes.

17   Q.   Can -- if someone is suffering from psychosis and having a

18   psychotic event, can that, would that have the possibility of

19   changing their score on an IQ test?

11:02AM 20  A.   Yes, it could.

21   Q.   In your, your opinion today -- or let me ask you

22   differently -- your recommendation today is that he will

23   function okay in a prison or should he receive some treatment?

24              MS. VAN MARTER:  Your Honor, I'm going to object to

25   relevance.

```
 1              The scope of her evaluation was for the purpose of
 2    competency.
 3              THE COURT:  That's correct.  Sustained.
 4    BY MR. SCHWEDA:
 5    Q.   Well, do you have an opinion on that?
 6              THE COURT:  We, counsel, this is a competency hearing.
 7    And I, I want to make that clear.  We are here to determine
 8    competency.  That's the nature of the hearing.
 9              MR. SCHWEDA:  And I understand that, Your Honor,
10    and --
11              THE COURT:  So I -- so, so you're insistent, as is
12    appropriate, as a diligent attorney, to not address issues that
13    you don't think were appropriately noted for hearing today, and
14    it was puzzling to me that you were asserting that you were
15    going to elicit from Doctor Brown, a setting for him,
16    hospitalization versus prison.
17              When, in fact, we haven't reached, we haven't reached
18    the question of the violations themselves and, therefore,
19    resolution of a potential violation was not for me today, I'm
20    only here for competency.
21              MR. SCHWEDA:  Okay.
22              Then would it be possible to have Doctor Low come back
23    after the court makes a determination --
24              THE COURT:  Why would -- well, that's not my call.
25    I'm not a lawyer in this case.
```

1            So, I'm not going to -- I'm not going to order her

2    back, when there's no issue currently before the Court.

3            But the nature of your approach seems to concede

4    violations of the supervised release, because you're moving to

5    remedy an outcome, rather than competency.

6            Help me understand your position, would you?

7            MR. SCHWEDA:  Well, while I'm not in a position to

8    concede the violations, I think it's pretty obvious that Mr.

9    Burke absconded.  There's --

11:04AM 10       THE COURT:  That's not the only violation.

11           MR. SCHWEDA:  I understand that.

12           But if, if we just go to that portion, and he is

13   sentenced --

14           THE COURT:  Why would I do that?  Why would I do that

15   today?

16           That's not the issue for today, Mr. Schweda.  You

17   didn't ask for that to be the issue.  This was simply, this is a

18   competency hearing.  It's been set as a competency hearing for

19   weeks and months and continued, at your request so your doctor

11:04AM 20   could, in fact, prepare diligently.  We are here for competency.

21           MR. SCHWEDA:  All right.

22           THE COURT:  Go ahead.

23           MR. SCHWEDA:  Well, Your Honor, I just, as an offer of

24   proof, I just wanted to --

25           THE COURT:  Counsel, we are here for competency.

1           MR. SCHWEDA:  I understand.

2           THE COURT:  And address your remarks on competency.

3           If, at another hearing, you have other issues, that

4    you actually have noted up, that would be different.

5           But, in point of fact, you have not filed any such

6    motions, except an objection to the release of information to

7    other entities.

8           And that's the only affirmative pleading that you

9    filed.

11:05AM 10          MR. SCHWEDA:  All right.  Well, then I would --

11          THE COURT:  That's just the way it is.

12          MR. SCHWEDA:  So I would orally move that, Your Honor.

13          THE COURT:  I'm sorry, what?

14          MR. SCHWEDA:  I would orally move that the Court

15    consider some very limited testimony, as to the appropriate

16    placement.

17          THE COURT:  Well, counsel, you can't do that in the

18    middle of a hearing, when you haven't given adequate notice,

19    either to Doctor Low or to Miss Van Marter, that you were going

11:05AM 20    to address that issue.

21          You wouldn't want to be disadvantaged in that fashion,

22    would you?

23          You would tell me immediately, I haven't had time to

24    study this issue, I need to do research.  Much as you've done in

25    this case already on the issue of disclosure of the reports, and

LOW / Cross                                73

```
 1   I've said okay.

 2          Go ahead.

 3   BY MR. SCHWEDA:

 4   Q.   Now, you agree that Mr. Burke suffers from schizophrenia?

 5   A.   Yes.

 6   Q.   And that would include that he has hallucinations, correct?

 7   A.   Yes.

 8   Q.   And, but it is your testimony that he's exaggerating the

 9   hallucinations?

10   A.   I believe he is.

11   Q.   But he's had hallucinations for a long, long time.  It's

12   reported in his medical records, correct?

13   A.   Just because a person has a history of it doesn't mean that

14   they're exaggerating it.

15   Q.   I asked you a question, ma'am, please answer, please answer

16   just the question.

17   A.   Could you repeat.

18          MS. VAN MARTER:  Your Honor, she was trying --

19          THE COURT:  No, he asked the question, Doctor Low.

20   Please answer his question.

21          THE WITNESS:  Could you repeat it, please.

22   BY MR. SCHWEDA:

23   Q.   May I have the question read back, Your Honor?

24          THE COURT:  I have it.  "But he's had hallucinations

25   for a long, long time.  It's reported in his medical records,
```

1    correct?"

2         That's the question.

3         THE WITNESS:  Yes, he has a history of hallucinations.

4    BY MR. SCHWEDA:

5    Q.   In fact, if you go to tab one of the binder there, that's a

6    discharge summary from when Mr. Burke was 11 years old, from

7    Sacred Heart Hospital's medical, mental ward, correct?

8    A.   That's what it appears to be.

9    Q.   And so, he was, the first time he was committed as a mental

10   patient was at age 11, correct?

11   A.   Yes.

12   Q.   Now your report from 2007, exhibit number 107, lists that

13   his first hospitalization for mental problems was at age 13,

14   correct?

15   A.   Could you tell me what page you're on, sir?

16   Q.   Well, it's --

17        THE COURT:  13.

18   BY MR. SCHWEDA:

19   Q.   It says it on page five.

20        THE COURT:  Oh, okay.

21        THE WITNESS:  Where on page five?  Oh, I see it.  I

22   see it.

23   BY MR. SCHWEDA:

24   Q.   The last paragraph.  The first two sentences.

25   A.   Yes, it does say that.

1   Q.   And, in fact, on page -- and that would have been in 2001,

2   correct?

3          THE COURT:  I'm sorry, what was your question,

4   counsel?

5          MR. SCHWEDA:  That would have been in 2001.

6          THE COURT:  Well, was that -- it's, as it indicates,

7   at age 13, whenever that was.

8          MR. SCHWEDA:  Okay.

9   BY MR. SCHWEDA:

11:08AM 10  Q.   Well, if you go to page 13 of your report.

11          THE COURT:  That's correct.  It says October 3rd to

12   October 17, 2001.

13   BY MR. SCHWEDA:

14   Q.   And it also says that, there's a sentence that says, "He

15   was paranoid and endorsed auditory hallucinations."

16          THE COURT:  Where are you on that page, counsel?

17          MR. SCHWEDA:  Pardon?

18          THE COURT:  It might help if you cited to a specific

19   spot on the page.

11:09AM 20          I was just citing the date for you, so you could

21   locate it.

22          MR. SCHWEDA:  Sure.

23          THE COURT:  Is there another paragraph on that page

24   where you're referring to it and is that page 13?

25          MR. SCHWEDA:  It's the same paragraph, Your Honor.

```
 1                THE COURT:  Same paragraph.  Okay.

 2                MR. SCHWEDA:  Yeah.

 3                THE COURT:  Well, how far down is it?

 4                MR. SCHWEDA:  It's about two thirds of the way, almost

 5     two thirds of the way.

 6                THE COURT:  Okay.

 7                MR. SCHWEDA:  Do you see that Doctor Low?

 8                THE COURT:  On the right hand margin, go down to the

 9     word, "was."

11:09AM 10                THE WITNESS:  Yes, I do see it.

11                THE COURT:  Okay.

12                So it's there; is that correct?

13                THE WITNESS:  I'm sorry?

14                THE COURT:  It's there.

15                THE WITNESS:  Yes, it is.

16                THE COURT:  What else, Mr. Schweda?

17     BY MR. SCHWEDA:

18     Q.    And on -- if we go back, and on the page before, you

19     reviewed school records, correct?

11:10AM 20     A.    Yes.

21     Q.    And in that last paragraph you report that, in October of

22     2001, teachers rated him as being out of touch with reality,

23     having strange ideas, babbling to himself, and repeating one

24     fact over and over, correct?

25     A.    Yes.
```

1    Q.   And, in fact, his history is such that he will say he, he

2    doesn't have any mental problems.  Over the course of his

3    history of his life, he will go in and say, I don't have any

4    mental problems.  But then say, I do have mental problems.  And

5    goes back and forth like that.

6    A.   He had a tendency, early on, to minimize his psychiatric

7    history, yes.

8         So, I remember, back in 2007, when I saw him, he

9    minimized his psychiatric history.

11:11AM 10        And when I saw him this year, he over emphasized his

11   psychiatric symptoms.

12   Q.   The -- go to page 10 of your report.

13        MS. VAN MARTER:  Of which report?  Are we still on the

14   2007 report?

15        MR. SCHWEDA:  Correct.

16        MS. VAN MARTER:  I'll renew my objection regarding

17   relevance, Your Honor.

18        THE COURT:  What is it that we're doing, Mr. Schweda?

19        MR. SCHWEDA:  Well, Your Honor, I'm trying to

11:11AM 20   demonstrate that she's stating -- her opinion of malingering is

21   based upon his over reporting hallucinations, and I'm trying to

22   demonstrate that he's always had hallucinations and he's

23   consistently reported, since a very young age.  I will get to

24   his --

25        THE COURT:  Why don't you simply ask her that.  Why

1    don't you simply ask her about her 2007 reports.

2            MR. SCHWEDA:  Because I think it's important that I

3    bring out the history and show how consistent it is and --

4            THE COURT:  Go ahead.

5            MR. SCHWEDA:  -- and all the different sources --

6            THE COURT:  Go ahead.

7    BY MR. SCHWEDA:

8    Q.   So, he was at -- you interviewed Brenda Chalinor, who was a

9    U.S. probation officer, back in 2007, correct?

11:12AM 10          THE COURT:  Are you asking her if she remembers doing

11   that or are you citing a particular page?

12           MR. SCHWEDA:  No, I'm asking if she recalls that.

13           THE COURT:  Well, is it in the report?

14           MR. SCHWEDA:  Yes.

15           THE COURT:  If it's in the report, then would you do

16   me a favor and just cite to the report, rather than engage in

17   this kind of questioning.

18           MR. SCHWEDA:  Sure, Judge.

19           THE COURT:  That way it, will be a little bit more

11:12AM 20   efficient for the witness and for the Court.

21           MR. SCHWEDA:  Okay.

22           THE COURT:  Thank you.

23           So, what page?

24           MR. SCHWEDA:  Page 10.

25

```
 1   BY MR. SCHWEDA:

 2   Q.    Second to last paragraph.

 3   A.    No, Mr. Schweda, that is in the legal section.

 4          So those are results that I summarized from the legal

 5   discovery.  I did not personally contact the probation officer,

 6   because I would have put that under my collateral section, which

 7   started on page 18.

 8   Q.    Okay.

 9   A.    Because I interviewed his mother.

10   Q.    Okay.

11          So bear with me, Doctor Low.  Would you see the

12   second, second to the last paragraph on page 10?

13   A.    Yes.

14   Q.    Would you read that first sentence?

15   A.    "Miss Chalinor, U.S. Probation Officer, was telephonically

16   contacted on June 4th, 2007."

17   Q.    So you did speak with her, correct?

18   A.    Again, I don't -- I can't recall that and I would not have

19   put it in that section, typically.

20          That could be an error on my part, but I don't have

21   that file with me, so I have no way to confirm to confirm or

22   verify that.

23   Q.    Well, you can verify that it's in your report.

24   A.    Yes, it is in the report.

25   Q.    And you don't have --
```

```
 1    A.    Sorry.

 2    Q.    You don't have any recollection that would differ from

 3    that, do you?

 4    A.    I don't have a lot of recollection of a lot of the

 5    specifics in this report, as it is, because it was nine years

 6    ago.

 7    Q.    Okay.

 8          So let me ask the question again:

 9          You don't have any recollection that would differ from

 10   that, correct?

 11   A.    Correct.

 12   Q.    And so, if you go down -- well, on the right-hand side,

 13   where it says, "Miss Chalinor?"

 14   A.    Yes.

 15   Q.    About halfway through.

 16         Would you read that sentence.

 17   A.    Which sentence?  The one with the --

 18   Q.    "Miss Chalinor reported Mr. Burke will not admit."

 19   A.    Okay.

 20         Miss Chalinor -- yes, "Miss Chalinor reported Mr.

 21   Burke will not admit to being mentally ill, but she wondered if

 22   he was hearing voices, due to his strange grimace."

 23   Q.    Okay.

 24         In -- if you would then go to page 13.  In the second

 25   paragraph there.
```

LOW / Cross                                                 81

```
 1            THE COURT:  What about it?
 2   BY MR. SCHWEDA:
 3   Q.   He was, Mr. Burke was hospitalized again at Sacred Heart,
 4   at age 13, in 2001, correct?
 5   A.   Yes.
 6   Q.   And he was paranoid and endorsed auditory hallucinations,
 7   according to the records you reviewed, correct?
 8   A.   Yes.
 9   Q.   Go to page, bottom of page 14.
```

11:15AM
```
10            And in reviewing his Presentence Investigation Report
11   you saw that he had received services at Spokane Mental Health
12   in 2004, correct?
13   A.   Yes.
14   Q.   And if you go to page 15.
15            The second to last sentence says, "The case manager at
16   Spokane Mental Health noted Mr. Burke was becoming increasingly
17   delusional, believing the case manager and Mr. Garver were
18   conspiring against him."
19   A.   Yes.
```

11:16AM
```
20   Q.   So, wouldn't it be delusional to be at Western State
21   Hospital and thinking that you're going to get out?
22   A.   Not necessarily.
23   Q.   On page 15, in the third paragraph.
24            It's true that Mr. Burke was released from his
25   involuntary commitment at Sacred Heart Hospital to a place
```

```
 1   called McGraw, in September of 2004.

 2          Correct?

 3   A.   That is what I wrote, yes.

 4   Q.   And he stayed there until February of 2005.

 5   A.   Yes.

 6   Q.   And then would you read that next sentence?

 7          THE COURT:  I'm not sure where you are, counsel.

 8          MR. SCHWEDA:  In the third paragraph, on page 15,

 9   Your Honor.

10          THE COURT:  Sure.

11          If you're trying to elicit that he used the word,

12   "delusional thoughts," why don't you just do that.

13          I'm trying to enlist your aid in, in aid of your point

14   of view.  Which is, there's some references to delusions in the

15   2007 report.

16          So, if, if you, if you do it in a direct fashion, it

17   would be efficient.

18          MR. SCHWEDA:  I'll try to do the best I can.

19          THE COURT:  Okay.  I appreciate your efforts in that

20   regard and I certainly know you do that.

21          Doctor Low, in page 15, in that paragraph beginning,

22   "Mr. Burke," did he endorse that he was, he was, he felt he was

23   going to McGraw because he had delusional thoughts in part?

24          THE WITNESS:  He felt he was sent there for

25   perseveration delusional thoughts.
```

LOW / Cross                                                83

```
 1                THE COURT:  Okay.

 2                Go ahead, counsel.

 3    BY MR. SCHWEDA:

 4    Q.   And he also, he's reporting, or it's reported that that's

 5    when he's not on medications, correct?

 6                THE COURT:  That's correct.

 7                THE WITNESS:  Yes.

 8    BY MR. SCHWEDA:

 9    Q.   And, in fact, when you did your testing --

11:18AM 10                THE COURT:  Excuse me, counsel.

11                In that same paragraph, did he deny being delusional,

12    but expressed that he had concentration difficulties?  In the

13    next sentence?  "He denied being delusional, but had

14    concentration difficulties."

15                Do you see that sentence?

16                MR. SCHWEDA:  I'm waiting for you to respond to the

17    Judge's question.

18                THE WITNESS:  I'm sorry, I thought you were -- yes, I

19    do see that sentence.

11:19AM 20                THE COURT:  Go ahead.

21    BY MR. SCHWEDA:

22    Q.   And then the next sentence says that his mother reported

23    her son had both visual and auditory hallucinations when

24    unmedicated.  Which the defendant denied.

25    A.   Yes.
```

1   Q.   And, in fact, when you did your testing in June and July of

2   2016, Mr. Burke was, when you did your testing, he was on 20

3   milligrams a day of Zyprexa, correct?

4   A.   Yes.

5   Q.   And, in fact, before that, when he had been at the Spokane

6   County Jail, he was on 40 milligrams a day Zyprexa.

7        Did you know that?

8   A.   I think so, but his dosage was also increased to 40

9   milligrams a day at our facility.

11:20AM 10   Q.   Okay.

11        But does Zyprexa, that's something that calms him down

12   and prevents the psychosis, correct?

13   A.   It's an antipsychotic medication, so it, it can help with

14   voices, with delusions, and it has a very sedating quality to

15   it.

16   Q.   Okay.

17        And so, when you're doing some of your testing, he's

18   only on 20 milligrams.  He's been, his medication has been

19   reduced, correct?

11:20AM 20   A.   I would have to check and see at what date he started the

21   new medication, compared to the time that I actually tested him.

22   So I can't answer that for sure.

23   Q.   Okay.

24        So, if we --

25        MR. SCHWEDA:  If I may, Your Honor, grab -- oh --

LOW / Cross

```
 1   BY MR. SCHWEDA:

 2   Q.    Do you know who Doctor Hugh Grant is?

 3   A.    Doctor who?

 4   Q.    Hugh Grant.

 5   A.    I don't believe -- that name is not striking me.

 6   Q.    Okay.  He's a psychiatrist that saw Mr. Burke on June 22nd

 7   of 2016.

 8   A.    No, that would be Doctor Grant Haven.

 9   Q.    Okay.  Excuse me, Grant Haven.

11:21AM 10   A.    Yes.

11   Q.    And he's the doctor that increased his dosage of his

12   Zyprexa, correct?

13   A.    Yes, on June 22nd, 2016.

14   Q.    Okay.

15         And so some of your testing was, had already been done

16   at that point, correct?

17   A.    No.  The testing did not start until June 29th.  According

18   to my records.

19   Q.    Okay.

11:22AM 20         Now when you -- Zyprexa, it takes a while for Zyprexa

21   to take effect, full effect, correct?

22   A.    I don't know how to answer that question because, A, I'm

23   not a pharmacologist or pharmacist, but, secondly, he was

24   already taking 20 milligrams, and then it was increased.

25         So I don't know how long that would take for an
```

LOW / Cross                                                86

1    increase to show its effects, versus if somebody were not taking

2    any medications at all and was starting on something.

3    Q.   But you would agree that if we were going to start someone

4    on Zyprexa, it takes awhile for it to take its full effect?

5    A.   If they were on nothing, certainly.

6    Q.   Okay.

7         And what would be a range of time that you would

8    expect the Zyprexa to take effect?

9    A.   We usually tell people three to four weeks to really see

11:22AM 10    effects of any psychotropic medication.

11   Q.   And so here, Doctor Haven increased the dosage of Zyprexa,

12   because he felt Mr. Burke needed it, correct?

13   A.   He increase the defendant because Mr. Burke requested it.

14   Q.   Well, he wouldn't have done it if he didn't think that Mr.

15   Burke needed it, correct?

16   A.   Well, oh, yes, he felt that Mr. Burke needed it, too.  But

17   Mr. Burke also requested the increase.

18   Q.   Okay.

19        So your testing takes place before the three to four

11:23AM 20   weeks that we would expect the increased dosage to get to its

21   optimal level, correct?

22        MS. VAN MARTER:  Your Honor, I'm going to object.

23        That mischaracterizes the testimony.  She specifically

24   testified that she cannot provide an opinion as to what length

25   of time.  She's not a pharmacologist.

```
 1            And given that he was on the medication previously,
 2      that's not an opinion she can render.
 3            THE COURT:  She can answer, if she can.
 4            THE WITNESS:  I can't answer that question, because I
 5      don't know.
 6            I don't think it would take that long for an increase
 7      to, to effect itself, but I really don't know.
 8      BY MR. SCHWEDA:
 9      Q.   All right.
11:23AM 10            And then if we would go back to exhibit 107, which is
10
11      your 2007 report.
12            On page 16, in the second to the last paragraph?
13      A.   Yes.
14      Q.   This is 2006.
15            And Mr. Burke is, again, involuntarily committed at
16      Sacred Heart Hospital, correct?
17      A.   Yes.
18      Q.   And in the middle of the paragraph it states, "No psychotic
19      symptoms were observed, but some staff suspected he was
11:24AM 20      responding to internal stimuli."
20
21      A.   Yes.
22      Q.   And so, when, would you take that indication from the staff
23      at Sacred Heart to mean that he's having some kind of auditory
24      hallucinations?
25      A.   It could.
```

1   Q.   If you are having auditory hallucinations and responding to

2   them, what we would see that person doing is responding to

3   internal stimuli, correct?

4   A.   Yes, that would be an example of such.

5   Q.   And if you go to page 16 of your report, at the bottom.

6        It states that Mr. Burke was hospitalized at Eastern

7   State Hospital in 2006, for a 90-day commitment, as gravely

8   disabled, correct?

9   A.   Yes.

11:25AM 10   Q.   It says that he was an unreliable historian, who minimized

11   and excused his behavior, correct?

12   A.   Yes.

13   Q.   On page 17, it indicates that Eastern State Hospital staff

14   had talked to the defendant's mother, Mrs. Garver, correct?

15   A.   Yes.

16   Q.   And she reported he saw monsters, he saw, he saw people, he

17   woke up in the middle of the night screaming.

18   A.   Yes.

19   Q.   And if you go to page 18 --

11:26AM 20        MS. VAN MARTER:   Your Honor, I'm just going to renew

21   my objection for relevance.   I understand we're going through a

22   historical --

23        THE COURT:   No, I'm going to give counsel some

24   latitude.   He has a theory and he's entitled to pursue it by

25   showing a history of, of an infant waking up in the middle of

```
 1   the night, worried about monsters and other such things.

 2           Okay.  Go ahead.

 3           MR. SCHWEDA:  Thank you, Your Honor.

 4   BY MR. SCHWEDA:

 5   Q.   At the bottom of page 18, you, you interviewed Taldja

 6   T A L D J A, Garver, the defendant's mother, correct?

 7   A.   Yes, I did.

 8   Q.   And she reported, at the bottom of page 18, that, at age

 9   five or six, Mr. Burke began to exhibit signs of mental illness.

11:27AM 10   A.   Yes.

11   Q.   She reported that he woke up in the middle of the night,

12   claiming he saw things.

13   A.   Yes.

14   Q.   And she denied that these were nightmares.  Stating that he

15   was fully awake and was pointing at what he saw, the people, the

16   monsters.

17   A.   Yes.  That is what she reported.

18   Q.   And that, at age 13 or 14, he told his mother that he saw

19   and heard things.

11:27AM 20   A.   Yes.

21   Q.   And on page 18, he said he told his mother that the voices

22   were telling him to stab his younger brother?

23   A.   Yes.

24   Q.   And that Mr. Burke stopped confiding in her, because

25   Mrs. Burke, or Mrs. Garver had told the doctor about this.
```

1  A.     Correct.

2             (Pause.)

3             THE COURT:  Counsel?

4             MR. SCHWEDA:  I'm proceeding, Your Honor.  I'm just

5  trying to get organized here.  Just take me a second.  Thank

6  you.

7  BY MR. SCHWEDA:

8  Q.     I'm going to leave that report now, Doctor, and go on to

9  the M-FAST.

11:28AM 10            Which, correct me if I'm wrong, it's the Miller

11  Forensic Assessment of Symptoms.

12  A.     Yes.

13  Q.     And --

14  A.     Yes.

15  Q.     And it's, you indicated it's a screening vehicle.  Correct?

16  A.     Yes, it is.

17  Q.     And so what you're trying to determine is, it's a screen to

18  try to determine if someone is malingering?

19  A.     If somebody is feigning psychotic symptoms.

11:29AM 20  Q.     Well, feigning is different than malingering, right?

21  A.     Malingering has the component of a secondary gain to it.

22  So, yes, there are some slight differences.

23  Q.     Okay.

24             And so you're saying that the, his description of

25  hallucinations is intentionally exaggerating them.

```
 1   A.    Yes, I'm saying he's exaggerating them, not completely

 2   making it all up.

 3   Q.    But he has this history of having hallucinations, correct?

 4   A.    Yes.

 5   Q.    And so you're using the M-FAST to try to screen on whether

 6   he's malingering.

 7   A.    Yes.

 8   Q.    But you know he's had hallucinations, so we know he has a

 9   history of that, a long history of that.

11:30AM 10   A.    Yes.

11   Q.    And, in fact, up to this point, not only what I've gone

12   through here, but numerous doctors at Western State Hospital

13   have determined that Mr. Burke is psychotic, he didn't have the

14   ability to assist in his own defense, correct?

15   A.    With regard to the murder charge that was dropped, yes.

16   Q.    Yes.

17         And so, when you gave the M-FAST, he scored an eight,

18   correct?

19   A.    Yes.

11:30AM 20   Q.    How many questions are there on the M-FAST?

21   A.    If you'll give me a moment I can look.  There are 25

22   questions.

23   Q.    And at what point, what's the cutoff to saying you're not

24   malingering to now you're screened to be a malingerer?

25   A.    The manual suggests a cutoff of six.
```

```
 1    Q.    Isn't there some later research that indicates that the

 2    cutoff should really be an eight?

 3    A.    I'm not familiar with that specific research, but, yes, I

 4    have heard that in some samples that six could be too low.

 5    Q.    And would that be samples of people that have a long

 6    history of psychosis?

 7    A.    It could be.

 8    Q.    And here he scored an eight, correct?

 9    A.    Yes.

11:31AM 10    Q.    Which, if this other body of opinion is correct, he

11    wouldn't have been, he would have passed the M-FAST test,

12    correct?  He would have been right at the cutoff point.

13    A.    On this particular test, yes, some people could certainly

14    come to that conclusion.

15    Q.    And one of the questions that you asked him, one of the

16    questions on the M-FAST test is, I often find myself not being

17    able to sit still in a chair.

18    A.    Yes.

19    Q.    And he said, false.

11:32AM 20    A.    Yes.

21    Q.    And that got, and the test says that you're supposed to

22    observe if the individual's report is consistent with his

23    behavior.

24    A.    Correct.

25    Q.    And you, you gave him a one for that, saying that it, that
```

```
 1  he was not able to sit still in a chair.  Or, excuse me, that he

 2  was able to sit still, still.  You tell me how you scored that.

 3  A.    Well, he answered, false, and then he said, both.

 4        So, I scored him as being inconsistent, as his

 5  report's being inconsistent with his behavior.

 6  Q.    Okay.

 7        So, because he was inconsistent, you gave him a one on

 8  that?

 9  A.    Yes.

10  Q.    And so that's really a judgment call, correct?

11  A.    Well, it's a judgment call for people who have had the

12  opportunity to observe a person's behavior.

13        If you don't know a person well, have not met with

14  them very often, it would be hard to score these sorts of

15  questions.

16  Q.    Okay.

17        Well, you met with him in 2007.

18  A.    Yes, well, and I met with him plenty of times during the

19  current evaluation, so I felt I had enough information to --

20  Q.    Okay.

21        But my question was, you met with him in 2007.

22  A.    Yes.

23  Q.    And spent considerable, significant time with him then.

24  A.    Yes.

25  Q.    And you met with him in 2016 and spent significant time
```

1    with him then.

2    A.    Yes.

3    Q.    And so it's really a judgment call on whether he can sit

4    still and whether his answer is true or not, correct?

5    A.    No, it's based on observed behavior.

6    Q.    But aren't you, you're observing whether his answer is

7    correct or not.  And that's how your, that's how you score it,

8    correct?

9          THE COURT:  Well, I thought you were asking if she was

11:34AM 10    observing his behavior and then you switched to behavior or to

11    observing his test result.

12          So which is it?  Or is it both?

13          Because she's scored it after looking at his answer

14    and observing his behavior.  That's what I understand,

15    Mr. Schweda.

16    BY MR. SCHWEDA:

17    Q.    Is that correct?

18    A.    Yes, what the Judge said is correct.

19    Q.    And that's really a judgment call.

11:34AM 20    A.    No, because I can compare his actual behavior to his actual

21    reports.

22    Q.    But you're making a judgment about his actual behavior,

23    correct?

24    A.    I --

25          THE COURT:  Counsel, you're quibbling about the

1   difference between judgment and observation and she said she

2   made the observation.  That's a percipient event.

3            So, go ahead.

4            MR. SCHWEDA:  Okay.

5   BY MR. SCHWEDA:

6   Q.   One of the other questions on the test is, I experience

7   hallucinations that last for days.

8   A.   Yes.

9   Q.   And he said, he answered, true, and said, and you indicated

11:35AM 10   in quotation marks, "definitely true."

11  A.   That was his answer, "definitely true."

12  Q.   And so you gave him another point here that gets him to the

13  eight, correct?

14  A.   That's how the test is scored, correct.

15  Q.   But he has a history of hallucinations.

16  A.   That's not the question.

17            The question in the test is, I experience

18  hallucinations that last continually for days.

19            That's qualitatively different from simply having a

11:35AM 20   history of hallucinations.

21  Q.   So, the, you're going strictly by the book then.  If the

22  test says -- if you say it's true, you get a one, a one point,

23  even if the person has a long history of hallucinations.

24  A.   I'm scoring the test the way that it's standardized and

25  that is the proper way to score the test.

```
 1    Q.    Okay.

 2          So, if you scored it and knew about his history,

 3    wouldn't that raise any questions in your mind as to whether you

 4    should do some additional testing after the M-FAST?

 5    A.    No.

 6          As I said, we read the questions exactly as posed,

 7    because that is the way the test was standardized and validated.

 8          I took into consideration his history and that's why I

 9    diagnosed him with schizophrenia.

11:36AM 10    Q.    But the, you've, you agree that the M-FAST is just a

11    screening tool.

12    A.    Yes.

13    Q.    It's not a diagnostic tool.

14    A.    It's a screening tool.

15          But the only other diagnostic test available, the

16    SIRS-2, is not a valid measure, so I really wasn't, I had

17    nothing else to go to.

18    Q.    Okay.

19          Another question on the M-FAST was, often I get the

11:36AM 20    strange feeling that I can, that I, that I am from another

21    planet.  And he answered, true.

22          And that got him another --

23    A.    Yes.

24    Q.    -- point on the M-FAST, correct?

25    A.    Yes.
```

LOW / Cross                                    97

```
 1   Q.    But he's reported for a long time that he feels that
 2   there's this alternate universe that he, he's a part of,
 3   correct?
 4   A.    Correct.
 5   Q.    Another question on the test is, when I hear voices, I
 6   often develop fears of leaving my house or room.   And he
 7   reported, sometimes.
 8         And that got him another score to make him a
 9   malingerer, correct?
10   A.    It added another point onto his total score, yes.
11   Q.    And, but the records are replete with, he stays in his
12   room, he's seclusive, he doesn't come out, he's observed in his,
13   in seclusion, responding to internal stimuli.
14         So, wouldn't that be, wouldn't that validate that that
15   isn't a sign of malingering, but that's actually the history of
16   Mr. Burke?
17   A.    No, that's totally separate from what the question is
18   asking.
19         The question is asking, when I hear voices, I often
20   develop fears of leaving my house or room.
21         That's not, necessarily, the same as these other
22   behavioral observations you just mentioned.
23   Q.    Okay.
24         So, the SIRS-2, and that's, S I R S -2, is the
25   Structured Interview of Reported Symptoms, correct?
```

LOW / Cross                        98

1    A.    Yes.

2    Q.    And it's actually meant to be the diagnostic tool that you

3    would use after screening under the M-FAST, correct?

4    A.    Yes, it would be.

5    Q.    And, but you think that there's some opinions that this is

6    not a valid test any longer?

7    A.    I know that there are some definite opinions that it's not,

8    not a good test to use.

9    Q.    Okay.

11:38AM 10          You think that there's a proportion of the clinical

11   psychology community that would still endorse using the SIRS-2?

12   A.    I don't know.  I haven't spoken to anybody who has debated

13   about that or would say that they would continue to use it, with

14   all of this information that's out there.

15   Q.    And that the SIRS-2 has eight scales, correct?

16   A.    Yes.

17   Q.    And do you know what the scales are, offhand?

18   A.    Not all of them, off the top of my head.  I don't have it

19   in front of me.

11:39AM 20   Q.    Well, it's on page 24 of Doctor Brown's report.  Which is

21   in your tab 13.  Would you go to that page.

22   A.    Okay, I'm there.

23   Q.    So, about in the middle of that page, the sentence starts

24   out, the SIRS-2 has eight primary scales.

25   A.    Yes.

1    Q.    None of which were elevated on Mr. Burke's interview

2    profile.

3    A.    Yes, I see where it says that.

4    Q.    And then would you go through and tell us what the

5    different scales are and how Mr. Burke scored on Doctor Brown's

6    test?

7    A.    Well, she says that he scored a one on rare symptoms.  Zero

8    on symptom combination.  Zero on improbable or observed

9    symptoms.  Eight on blatant symptoms.  Six on subtle symptoms.

11:40AM 10   13 on selectivity of symptoms.  Six, severity of symptoms.  Zero

11   reported versus observed symptoms.

12   Q.    So he passed the test.

13   A.    Well, she is saying that these were not elevated.

14   Q.    Correct.  And so --

15   A.    So --

16   Q.    -- so to, if they were elevated, that would be evidence of

17   malingering, correct?

18   A.    Well, I would have to see the profile, because she also

19   doesn't reference the decision tree that is supposed to be used

11:40AM 20   in coming up with the final conclusion.

21           I have not seen SIRS-2 reports or SIRS results

22   reported in such a manner before, so it's hard to make that

23   opinion, without seeing the actual profile and the protocol.

24   Q.    Okay.

25           So, the last sentence of Doctor Brown's report

1   indicates, these scores are not indicative of someone feigning

2   psychosis?

3   A.    That is what she writes, yes.

4   Q.    But you disagree with that?

5   A.    No, I didn't say that.

6         I said that I would like to see the profile.  But

7   again, putting all that aside, I don't even think this is a

8   valid test to use for psychosis.  So, I wouldn't even look at

9   that, in general.  Or -- excuse me -- not a valid test for

11:41AM 10  malingering of psychosis.

11        THE COURT:  Excuse me.

12        Just so the record's clear, less there be some parsing

13  of part of what the doctor said, I understand the doctor to say,

14  in response to your questions, that she, that this is not a

15  standard, not a standard subtest and not a standard scoring of

16  that test.  When it was used before, it was contraindicated by

17  virtue of a sampling error that was raised at a conference that

18  she was at.

19        That's what I understand her testimony to be.

11:42AM 20  Not that she agrees with it in any way.

21        Do you understand it to be that?

22        MR. SCHWEDA:  Correct, Your Honor.

23        And, and Doctor Brown will address this very issue

24  and --

25        THE COURT:  Yeah, I just wanted the record to be

 1    clear, that's all.

 2              Go ahead.

 3    BY MR. SCHWEDA:

 4    Q.    In your direct examination, you referenced a Doctor

 5    Gallagher at Western State Hospital.

 6    A.    Yes.

 7    Q.    And she recommended that Mr. Burke be tested for

 8    malingering, correct?

 9    A.    Yes.

11:43AM 10    Q.    But that was never done.

 11    A.    As far as I know it didn't seem like it had been done.

 12    Q.    And so there's no evidence, no testing evidence from

 13    Western State Hospital, that said Mr. Burke was malingering.

 14    A.    No formal testing, correct.

 15    Q.    You've indicated that Mr. Burke understands enough about

 16    the legal process to be competent to assist his counsel and

 17    understand the peril he's in, correct?

 18    A.    Yes.

 19    Q.    But isn't that impeached by statements like, I thought I

11:43AM 20    could go home?

 21    A.    He did not say that to me, that was what he said at Western

 22    State Hospital.

 23    Q.    Okay.

 24              But wouldn't that be evidence of someone who doesn't

 25    understand the legal process, has no conception of that he --

```
 1              THE COURT:  No, no, no.  One question at a time.  So
 2   what is the question?
 3              THE WITNESS:  Would you repeat it.
 4              THE COURT:  No, no, excuse me.
 5              What's the question?
 6   BY MR. SCHWEDA:
 7   Q.   The first question is, isn't that evidence of someone who
 8   doesn't understand the legal process?
 9   A.   Not necessarily.
11:44AM 10  Q.   But he, there wasn't any way he's going home, is there?
11   A.   I don't know.  I don't know the laws about civil commitment
12   and going home.
13   Q.   Isn't his statements, I'm ready to be on the street,
14   delusional, when you look at what he's there for --
15   A.   Not necessarily.
16   Q.   -- and his symptoms he's having?
17   A.   Not necessarily.
18   Q.   You indicated that he's goal-oriented and that makes him
19   competent.
11:45AM 20       But the goal that you stated was that he wanted to
21   leave the hospital.  And that isn't, that's not realistic, is
22   it?
23   A.   Can you tell me where you're referring to?
24   Q.   Well, at that point, we were on page 18 of the, of your
25   report.
```

```
 1                THE COURT:  Of what?

 2                MR. SCHWEDA:  Page 18 of Doctor Low's report.

 3                THE COURT:  Okay.

 4                MS. VAN MARTER:  Of which one, just for the record?

 5                MR. SCHWEDA:  Pardon?

 6                MS. VAN MARTER:  You've gone back and forth between

 7      the 2007 and the --

 8                MR. SCHWEDA:  Yeah, this is the 2016.

 9                MS. VAN MARTER:  Oh, so government's exhibit 1?

11:45AM 10        MR. SCHWEDA:  Correct.

11                Actually, I believe it's exhibit 2.

12                THE COURT:  Okay, so we're talking about exhibit 2.

13      What page, page 18?

14                MR. SCHWEDA:  Correct, Your Honor.

15                THE COURT:  Okay.  What paragraph?

16                MS. VAN MARTER:  It's actually exhibit 1, Your Honor.

17      Her CV is exhibit 2.

18                THE COURT:  I apologize, exhibit 1.  So, what

19      paragraph, Mr. Schweda?

11:46AM 20        MR. SCHWEDA:  The last paragraph.

21                THE COURT:  Last paragraph.  Beginning, on October

22      31st?

23                MR. SCHWEDA:  No, page 18.

24                THE COURT:  That's what I'm on.

25                So I'm using ECF 250.  Are you, does your document
```

```
 1    have ECF 250 at the top of it?

 2              MR. SCHWEDA:  No, it has ECF 231.

 3              THE COURT:  Okay, then let me get there.

 4              MR. SCHWEDA:  This is the government's --

 5              THE COURT:  I'm going to be using -- the one I'm

 6    using -- so tell me what paragraph you're on and go ahead.

 7              I have her report, it's the one that's ECF 250.

 8              MR. SCHWEDA:  I believe ECF 250 is Doctor Brown's

 9    report.  And I'm referring to Doctor Low's report.

11:46AM 10              THE COURT:  Is it?  Oh, okay.

11              MR. SCHWEDA:  And Doctor Low's report is not in the

12    exhibit, my exhibit binder, it's the government's.

13              THE COURT:  231 is.  I have it.

14              Thank you for that.

15              MR. SCHWEDA:  Okay.

16              THE COURT:  Page 18.  Thanks.

17    BY MR. SCHWEDA:

18    Q.    So, at the bottom of the last paragraph, on February 12th

19    of 2016, he stated, I'm ready to be on the streets.

11:47AM 20    A.    Well, first of all, he was at Western State Hospital when

21    he made this statement.  This was not part of my direct

22    competency evaluation of him.

23              So, we weren't talking about him being ready for the

24    streets, because that had no bearing on his supervised release

25    violations that we were addressing.
```

1    Q.    But we're talking about whether he's psychotic or whether

2    he's malingering, correct?

3    A.    In terms of diagnosis, yes.  But this doesn't relate

4    specifically to the issue of competency that was at hand when I

5    evaluated him.

6              THE COURT:  Okay, just so we're all on the same page.

7              The terms are being thrown around, like whether he's

8    psychotic or malingering, and I don't understand that be to the

9    issue.

11:48AM 10              The issue is, he can't have a, some sort of a

11    diagnosis of a psychosis, like schizophrenia, if that's correct,

12    and at the same time, with medication, he can be, he can be

13    behaving in an acceptable way, and can, in fact, make judgments

14    about what he will exaggerate or not.

15              So, I don't see it as a choice between psychotic,

16    meaning right now being psychotic, versus he has a history of

17    some diagnosis of a mental, mental issue, mental illness.

18              So, mixing the terms doesn't help me very much as the

19    decider.  So, I would ask you to be as precise as you can in

11:48AM 20    using terms, okay?

21              Thanks.

22    BY MR. SCHWEDA:

23    Q.    That statement, I know I'm ready to be on the streets,

24    that's not realistic, is it?

25    A.    It may not be realistic, but that doesn't mean that it's a

LOW / Cross                                          106

1    psychotic statement either.

2    Q.    But if, if you take that and put it in the context of being

3    able to assist your attorney and appreciate what's going on in a

4    courtroom, if that's unrealistic, then there, that person is not

5    able to assist their attorney, they're not able to understand

6    the proceedings against them, are they?

7    A.    I disagree with that statement.

8          And, again, that statement was not made in the context

9    of our current evaluation, so it really has no bearing upon

11:49AM 10    anything.

11   Q.    In your direct examination, when referring to the page 19,

12   he, he was making, you testified that he made the statement

13   that, when he absconded from the halfway house, he said the

14   voices effect one part of his functioning, but not the other.

15         So, and he said it was the voices that made him

16   abscond, correct?

17   A.    He gave two different answers to the social worker.

18         So, as you can see in that last paragraph, on page 19,

19   she pointed out, he absconded from parole while in the halfway

11:50AM 20   house.  He then claimed that he couldn't stay there because of

21   the voices.

22         So, then the social worker addressed the concern about

23   being discharged, when he's got active symptoms.

24         And then he kind of changed his story and said he

25   didn't want to give the impression that the voices influenced

LOW / Cross                                                107

```
  1   his decisions, but he actually willingly, knowingly,

  2   volitionally left and he knew he would be violating parole.

  3              So -- and he, he changed his own story within that,

  4   that conversation with the social worker.

  5   Q.   So, it doesn't make much sense, does it, if he changes his

  6   story?

  7   A.   Yes, it does make sense.

  8              Again, as I testified earlier, it's clear that his

  9   goal was to get out of the hospital, yet still evade criminal

 10   charges, by claiming that he was too impaired with his symptoms.

 11   Q.   On page 20.

 12              In your direct examination, you stated that Mr. Burke

 13   let the staff know that he was ready to be released.

 14              And let me preface this.  This report that you're

 15   referring to here was done after Mr. Burke had eloped from the

 16   Western State Hospital, correct?

 17   A.   If you're referring to the release summary.

 18   Q.   Yes.

 19   A.   By Western State Hospital.

 20              Yes, it was dated April 15th.  And that was after he

 21   escaped.

 22   Q.   Okay.

 23              So, this is a report done by the professionals at

 24   Western State Hospital, after they have had this problem with

 25   him leaving, correct?
```

1    A.   Yes.

2    Q.   In his, in Mr. Burke's history, he's denied hearing voices,

3    but then admitted hearing voices, correct?

4    A.   Yes.

5    Q.   And so the, is that part of his mental illness, that he

6    will deny it and then admit it and then deny it and then admit

7    it?

8    A.   I'm not quite sure how to answer that.   I think it's very

9    common for patients with severe mental illness, in general, to

11:52AM 10   deny being mentally ill, and I think that's what was going on in

11   his younger years.

12   Q.   When you were giving these tests, the PIA and the TOMM and

13   the others, did Mr. Burke have the right to refuse to take those

14   tests, in your mind?

15   A.   Of course.

16   Q.   Okay.

17        And, in fact, the when Mr. Burke would say something

18   outlandish, you would correct him, correct?   And you would

19   encourage him to take the testing.

11:53AM 20        MS. VAN MARTER:   Objection, Your Honor.

21        We have got multiple questions going on at the same

22   time.

23        MR. SCHWEDA:   Sorry.

24        THE COURT:   Sustained.

25

```
 1   BY MR. SCHWEDA:

 2   Q.    Did you have any arguments with Mr. Burke or discussions

 3   where --

 4             THE COURT:  No, no you need to rephrase, counsel.

 5             MR. SCHWEDA:  Okay.

 6   BY MR. SCHWEDA:

 7   Q.    Did you have any discussions with Mr. Burke where you

 8   corrected him?

 9   A.    Where I corrected him?

10   Q.    On factual statements.

11   A.    I don't have any recollection of anything specific.

12   Q.    Okay.

13             The --

14             MR. SCHWEDA:  I don't have anything further,

15   Your Honor.

16             THE COURT:  Do you have any follow-up, Miss Van

17   Marter?

18             MS. VAN MARTER:  Your Honor, I'll keep this brief.

19   The Court covered a few of my clarifying areas.

20

21                       REDIRECT EXAMINATION

22

23   BY MS. VAN MARTER:

24   Q.    Doctor Low, you were asked some questions about

25   administering an IQ test back in 2007.
```

11:53AM (line 10)
11:54AM (line 20)

```
 1   A.    Yes.

 2   Q.    Why did you administer the IQ test back in 2007 in that

 3   original, if you recall?

 4   A.    Back then I believe that was just, my standard practice was

 5   to give an IQ test and personality testing and anything else

 6   that was needed.

 7            THE COURT:  Keep your voice up, please.

 8            THE WITNESS:  Yes, sir.

 9   BY MS. VAN MARTER:

10   Q.    And during the administration of that test, back in 2007,

11   if you recall, was there any anything of concern to you

12   regarding Mr. Burke taking that test?

13   A.    Well, in reviewing my old report just now, yes, I noted

14   many concerns about poor effort, where he actually referenced me

15   to go back to the Eastern State Hospital testing, because he

16   tried harder then.

17   Q.    So why, in this particular case, relevant to today and the

18   current evaluation in government's exhibit number 1, did you

19   rely on the Eastern State Hospital IQ test?

20   A.    Because I believe that those are probably the most reliable

21   reports that are out there of his IQ functioning.

22   Q.    Okay.

23            There's been lots of questions by Mr. Schweda about

24   history of symptoms and hallucinations, comparative to the

25   current testing that occurred here today.
```

LOW / Redirect                          111

1              Are you denying that Mr. Burke had a history of

2    hallucinations?

3    A.    Absolutely not.

4    Q.    Are you denying that Mr. Burke had a history of delusional

5    behavior, reports of delusional behavior?

6    A.    No.

7    Q.    So, in this particular case, when you were also asked about

8    the testing that you did, is that testing measured, intended to

9    measure history of symptoms?

11:56AM 10   A.    No, testing done at any given time is supposed to measure

11   the functioning right then.

12   Q.    And so, all the questions about the consideration of

13   history, had you considered all of the historical information in

14   employing these actual tests, would that invalidate those

15   results?

16   A.    No.

17   Q.    Okay.

18              Explain the interaction between the two.

19   A.    I really don't see much interaction between the two, those

11:56AM 20   personality tests.  There are a lot of questions on these

21   personality tests and they query into a person's history and all

22   of their various symptoms, so that would have captured some of

23   that.

24              And again, the way these tests are administered, we

25   have to give them in a standardized fashion, we can't just

LOW / Redirect                                                        112

 1   arbitrarily change a meaning or interpretation, because then

 2   these tests would be completely useless.

 3   Q.    So, in this particular case, you were, the results that you

 4   provided were based upon the standardized testing, as you

 5   understand them, for those particular personality tests.

 6   A.    Yes.

 7   Q.    And, with respect to the significance in this particular

 8   case regarding Mr. Burke's discussion of his symptoms, you

 9   understand there's the history and then you have the current

11:57AM 10  discussion.

11              What's the significance to you between the two?

12              And I think you were trying to provide an answer to

13   Mr. Schweda during one of his questions.

14   A.    Yes.

15              Again, there's no dispute that Mr. Burke has a pretty

16   long-standing history of psychotic symptoms.

17              There's no dispute that he has schizophrenia or some

18   sort of a thought disorder.

19              I think that what seems to be confusing here is that

11:57AM 20  you, a person can have a bona fide mental illness and be

21   exaggerating those symptoms at the same time.

22              They are not mutually exclusive.

23              Just because a person's mentally ill does not mean

24   that there's no, no chance that they are not exaggerating.

25   Q.    And in this particular case, your conclusion regarding Mr.

LOW / Redirect                                             113

```
 1    Burke was what, as to his symptoms?

 2    A.   Was that he is exaggerating and malingering his symptoms.

 3    Q.   And again, as some of the questions eluded to, can you have

 4    hallucinations and still be competent?

 5    A.   Yes.

 6    Q.   And can you have delusions and still be competent?

 7    A.   Yes.

 8    Q.   Just a couple other quick questions.

 9            The M-FAST test.  Did you base your diagnosis as to

11:58AM 10  malingering, solely upon the M-FAST results?

11    A.   Absolutely not.

12            Again, it was just one piece of many pieces of data

13    that I used.

14    Q.   And those you previously testified to.

15    A.   Correct.

16    Q.   And there's some questions about medication.

17            What impact, if any, does the level of his medication

18    have on his testing?

19    A.   Well, that's hard to, that's really hard to answer.

11:58AM 20      Again, I think Mr. Burke's medications are working

21    pretty well, so, if anything, his thoughts are going to be more

22    clearly organized, so he would be better able to participate in

23    testing.

24            If I had someone who was really acutely psychotic, I'm

25    not even going to give those tests, because I know they can't
```

1   participate in a meaningful way.

2   Q.    And you, consistent with some of your other conclusions,

3   Mr. Burke appeared to be able to carry on the conversations,

4   interact with you, and carry on with the tests; is that correct?

5   A.    Yes, that is correct.

6   Q.    And is that then inconsistent with his self reports.

7   A.    Yes.

8   Q.    All right.

9             MS. VAN MARTER:  If I could have a moment, Your Honor.

11:59AM 10             (Pause.)

11             MS. VAN MARTER:  Thank you, Doctor Low.  I have no

12   further questions.

13             THE COURT:  Anything else, Mr. Schweda?

14             MR. SCHWEDA:  No, Your Honor.

15             THE COURT:  You may step down.  Thank you.

16             THE WITNESS:  Thank you.

17             THE COURT:  Do you have any other witnesses?

18             MS. VAN MARTER:  Not from the United States,

19   Your Honor.

11:59AM 20             THE COURT:  Do you have any witnesses, Mr. Schweda?

21             MR. SCHWEDA:  Yes, Your Honor.  Doctor Brown.

22             THE COURT:  Okay.

23             Doctor Brown.

24             (Pause.)

25             THE COURT:  Let's see.  Miss Vargas, would you police

LOW / Redirect                                    115

```
 1    this a little bit.
 2              THE DEPUTY CLERK:  I'm sorry, would I what?
 3              THE COURT:  There's a couple -- if you would remove
 4    that, please.
 5              All right.  Thank you.
 6              Please raise your right hand.
 7
 8        WHEREUPON,
 9                          DEBRA BROWN
12:00PM 10                  having been first duly sworn
11                          testified as follows:
12
13              THE COURT:  Good morning or good afternoon.  Please be
14    seated.
15              When you're comfortable -- watch your step getting
16    into that chair -- and proceed to get your foot on there.  Okay.
17              THE WITNESS:  Yeah.
18              THE COURT:  Go ahead.
19              THE WITNESS:  Okay.
12:01PM 20              THE COURT:  The microphone should be on.
21              THE WITNESS:  Yes.
22              THE COURT:  Yes.
23              Tell us your first and last name and spell them both
24    for the record.  Thank you.
25              THE WITNESS:  My name is Debra Brown.  D E B R A.
```

```
 1    Brown.   B R O W N.

 2              THE COURT:  Okay.

 3              And do you go by Doctor Brown?

 4              THE WITNESS:  I do.

 5              THE COURT:  Okay.

 6              Doctor Brown, good afternoon.

 7              Let's proceed.

 8

 9                    DIRECT EXAMINATION

10

11

12    BY MR. SCHWEDA:

13    Q.    Thank you, Your Honor.

14              Doctor, would you tell us a little bit about your

15    education.

16    A.    Yes.

17              I have a Bachelor's Degree, a BS degree in psychology

18    from the University of Washington.  I received that in 1988.

19              And a Master's Degree in psychology, clinical

20    psychology, from California School of Professional Psychology in

21    Berkeley in 1991.

22              Ph.D. in clinical psychology from the California

23    School of Professional Psychology in Berkeley in 1997.

24              THE COURT:  Okay.

25
```

(12:01PM at lines 10, 20)

BROWN / Direct                                    117

 1   BY MR. SCHWEDA:

 2   Q.    And what, tell us a little bit about your work history,

 3   experience in the psychology area.

 4   A.    Well, I think that the major ones that you would want to

 5   hear about is I had an APA internship in Spokane Mental Health.

 6   And that's how I came to Spokane.

 7            I did some previous work as a psych assistant and

 8   different things like that before getting my Ph.D.

 9            But then I, after that internship, I started working

12:02PM 10   for the Asbell Professional Group.  That's where I got my

11   post-doc hours.

12            And then I started my own private practice called

13   Brown and Associates.

14            And I have been working for myself since then.

15            THE COURT:  When did you start your private practice,

16   Doctor?

17            THE WITNESS:  1998.

18            THE COURT:  So right after you got your Ph.D.?

19            THE WITNESS:  Right after I was licensed.

12:03PM 20            THE COURT:  Okay.  Thank you.

21   BY MR. SCHWEDA:

22   Q.    And that was my next question.

23            Are you licensed to practice clinical psychology in

24   the State of Washington?

25   A.    I'm licensed to practice psychology in the state of

BROWN / Direct                                    118

```
 1    Washington.  There isn't any differentiation --

 2    Q.    Okay.

 3    A.    -- in Washington state.

 4    Q.    And as you just indicated, that's been since 1998?

 5    A.    Correct.

 6    Q.    Is that correct?

 7    A.    Correct.

 8    Q.    Now --

 9    A.    Before -- I'm sorry -- before that I was licensed with my

12:03PM 10    Master's Degree, not as a psychologist, but with a counseling,

11    masters in counseling.

12    Q.    All right.

13          Now, in front of you there should be a white binder.

14    Could you turn to tab 13 or exhibit 113.

15          THE COURT:  What's exhibit 113?  That's previously

16    been admitted, isn't it?

17          MR. SCHWEDA:  Yes, this is Doctor Brown's report.

18          THE COURT:  Okay.

19          So exhibit 113 previously admitted.  Thank you.

12:04PM 20    BY MR. SCHWEDA:

21    Q.    And if you would, page -- turn to -- well, page one.

22          I wanted you just to tell the Court what documents

23    that you have reviewed for your testimony.

24          THE COURT:  It's an exhibit and I've read the exhibit.

25          MR. SCHWEDA:  Okay.
```

BROWN / Direct                                       119

1    BY MR. SCHWEDA:

2    Q.    Then let me ask you, are there any other records that you

3    have reviewed that are not disclosed in your report?

4    A.    I tried to list them all.

5          I'm not sure if I have Doctor Low's reported data or

6    her test, raw data, in there or not.

7    Q.    Okay.

8          THE COURT:  Well, the date of the report is November

9    14th, 2016, right?

12:05PM 10    THE WITNESS:  Yes.

11         THE COURT:  Okay.

12         THE WITNESS:  Should be there.

13         THE COURT:  And I know that we have had some

14   interactions with attorneys on the issue of production of

15   documentation and reports.

16         So the question here is, does this report, on pages

17   one, two, and three, list all of the documents that you've

18   considered?  Is that what you're asking?

19         MR. SCHWEDA:  Yes, Your Honor.

12:05PM 20    THE COURT:  All right.  Does it?

21         THE WITNESS:  Yes.

22         THE COURT:  Okay.

23   BY MR. SCHWEDA:

24   Q.    You did a history on Mr. Burke, correct?

25   A.    I did.

1   Q.   Tell us, briefly, and I don't want you to repeat what's in

2   your report, necessarily, but tell us about what your history,

3   what you discovered by preparing your history.

4   A.   Well, there, it was done in two different ways.

5            I went through lots of records.

6            THE COURT:   Feel comfortable, as I said to Doctor Low,

7   to just address Mr. Schweda.

8            THE WITNESS:   Okay.

9            THE COURT:   And I'll listen along.

12:06PM 10           THE WITNESS:   Okay.

11           I did that in two different ways.

12           I went through as many records as I had and put

13  together a history.

14           And I also did a clinical interview with Mr. Burke and

15  asked him history then.

16  BY MR. SCHWEDA:

17  Q.   Okay.

18           And can you highlight some of the more significant

19  items of his history?

12:06PM 20  A.   I --

21           THE COURT:   I don't think that -- please rephrase your

22  question to be specific, so that you're phrasing it either in

23  social terms, psychological terms, testing terms.   Be specific

24  as to what you want, because that's too broad a question.

25           And Doctor Brown reviewed so many documents, it would

BROWN / Direct                                121

1    help if you could phrase it in a way that directs her attention

2    to what you actually want.

3              Thank you for your cooperation.

4              MR. SCHWEDA:  Yes, certainly, Your Honor.

5    BY MR. SCHWEDA:

6    Q.   Does Mr. Burke have a history of psychiatric problems?

7    A.   He does.

8              And what was significant to me is that his psychiatric

9    and behavioral problems started when he was extremely, very

12:07PM 10   young.

11             His mother's reporting that he started having

12   problems, I believe, at the age of three or four.

13             And then he started having psychiatric

14   hospitalizations at the age of 11.

15             Psychotic symptoms have been described beginning

16   around the age of 12 or 13 onward.

17             And he was found incompetent by several different

18   clinicians, psychologists, and psychiatrists at Western State

19   Hospital, over a period of a number of years.

12:08PM 20             And, as Doctor Low reported, he is still psychotic.

21             THE COURT:  Doctor Brown, you use the word "found

22   incompetent."  Is that what they found?

23             THE WITNESS:  Yes.

24             THE COURT:  He was incompetent for what purposes?

25             THE WITNESS:  To stand trial.

BROWN / Direct                                                   122

```
 1              THE COURT:  At 13 and 14?

 2              THE WITNESS:  No, I'm sorry, no.

 3              THE COURT:  Okay.

 4              So you were talking about --

 5              THE WITNESS:  The recent, the recent Western State

 6    hospitalization.

 7              THE COURT:  Okay.  Now I understand where you are.

 8    Okay.  Thank you.

 9    BY MR. SCHWEDA:

12:08PM 10    Q.   Did you review any of the videotape of Doctor Low engaging

11    with Mr. Burke?

12    A.   I did.

13    Q.   And was there anything significant in reviewing those

14    tapes, to you?

15    A.   Well, there were a couple things.

16              Mr. Burke was considerably disheveled and became more

17    so over time.

18              I believe until around July 6th, I think the last

19    video that I watched, where he had, finally had, someone had cut

12:09PM 20    his hair and so he looked more clean and less disheveled.

21              He did not want to do any testing.  He repeated that

22    several times.

23              And Doctor Low told him that he had to.

24              I, I kind of question that or I wondered about it.

25              There was a point where she told him, well, we can
```

MARK A. SNOVER
OFFICIAL COURT REPORTER

BROWN / Direct                              123

```
 1   either do some testing today or you can talk to me.
 2           He had wanted to go back to his cell, I believe.  And
 3   he didn't want to do any testing.
 4           And so, they talked and he answered questions that
 5   day.
 6           There weren't any video, I didn't see any videos of
 7   the testing.
 8           I'm not sure that -- well, I know not everything was
 9   taped, because the order to videotape wasn't in place when some
10   of the discussions started, that I understand.  And, of
11   course --
12           THE COURT:  I'm not sure what you mean by that.
13           Is there some issue that about the videotaping,
14   Mr. Schweda?  Because there was none raised by you.
15           MR. SCHWEDA:  No, we're, --
16           THE COURT:  And I recall no such motion, except the
17   one that granted it.
18           MR. SCHWEDA:  Correct.
19           THE COURT:  That it be granted of the interviews,
20   correct?
21           MR. SCHWEDA:  Correct, Your Honor.
22           THE COURT:  Okay.
23           Is there some defect in that that I should --
24           MR. SCHWEDA:  No, no.
25           THE COURT:  Okay.
```

BROWN / Direct                          124

1              MR. SCHWEDA:  And I don't think that Doctor Brown was

2       going to get into any more than what she said.

3              THE COURT:  Really?  That's what I thought she was

4       saying.

5              Go ahead.

6              THE WITNESS:  Well, I understand that there were some

7       interviews that were done before the court order was issued.

8       And those weren't taped.

9              MR. SCHWEDA:  Correct.

12:11PM 10      And I, and I think that Doctor Low's report reflects

11      that, Your Honor.

12             THE COURT:  Okay.

13      BY MR. SCHWEDA:

14      Q.   How did Mr. Brown and Doctor Low get along, as far as

15      developing a rapport?

16      A.   Mr. Burke?

17      Q.   Or excuse me, Mr. Burke.

18      A.   I think that they got along fairly, fairly well.

19             THE COURT:  Excuse me one second, Doctor.

12:11PM 20      The probation officer on this file has been stuck in

21      Yakima, because of snow conditions in Eastern Washington, and

22      he's been participating by video.

23             He is headquartered here in Spokane, and would like to

24      start driving back.

25             I don't anticipate the need for his testimony today in

BROWN / Direct                                    125

1    a competency hearing, so I'm going to permit that, unless either

2    counsel have an objection.

3                 MS. VAN MARTER:  We would concur, Your Honor.  No

4    objection.

5                 MR. SCHWEDA:  No objection, Your Honor.

6                 THE COURT:  Mr. Moore, you're excused, thank you.

7    We'll see you next Friday.

8                 MR. MOORE:  Thank you, Your Honor.

9                 THE COURT:  Yes.

12:12PM 10           You may proceed.  Sorry for the interruption.

11   BY MR. SCHWEDA:

12   Q.   Go ahead.

13   A.   Could I have the --

14   Q.   We were talking about --

15   A.   I need, I need the question repeated.

16   Q.   Yeah.

17           Well, we were discussing if Doctor Low, what kind of a

18   rapport she developed with Mr. Burke, in the interviews that you

19   witnessed.

12:12PM 20   A.   I think that they had relatively good rapport.

21           There were times when they disagreed with each other

22   and went back and forth about a couple things.

23           Part of it being Mr. Burke's not wanting to do any

24   testing.

25           And again, I, like I said, I don't know what was

BROWN / Direct                                    126

1   happening during the actual testing, because that wasn't

2   videotaped.

3   Q.   Was it to the extent that it might have affected Mr.

4   Burke's doing the testing?

5   A.   I think that's possible, but that's based upon what Mr.

6   Burke told me when I met with him personally.

7   Q.   And what did he tell you?

8   A.   Well, he starts off right away telling me that Doctor Low

9   was, it, her questioning was, or that her report was wrong and

12:13PM 10   that she had known him from before, and that was wrong, and that

11   she had already made up her mind.

12          And so, this was his reasoning, that their rapport

13   wasn't as good as he would have liked it.

14   Q.   Okay.

15          So, his position was that he didn't think he was going

16   to get a fair deal from Doctor Low?

17          THE COURT:  Well you, this is your witness, so --

18          MR. SCHWEDA:  Pardon me?

19          THE COURT:  You need to let her testify.

12:14PM 20          MR. SCHWEDA:  Okay.

21   BY MR. SCHWEDA:

22   Q.   Go ahead.  Go ahead.

23   A.   It was, it was my impression that --

24          THE COURT:  There's no question for her to actually

25   answer, so you need to rephrase your question.

BROWN / Direct                               127

```
 1              MR. SCHWEDA:  Okay.

 2    BY MR. SCHWEDA:

 3    Q.   Was he suspicious of Doctor Low?

 4    A.   Yes.

 5    Q.   Was he suspicious of her motivations in preparing a report?

 6    A.   Yes.

 7    Q.   Can you explain that?

 8    A.   I --

 9              THE COURT:  Could I, could you reference the report,

12:14PM 10   so I could read that.

11              MR. SCHWEDA:  I don't believe it's in the report,

12    Your Honor.

13              THE COURT:  I'm sorry?  What page?

14              MR. SCHWEDA:  I don't believe it's in the report.

15              THE COURT:  Oh, it's not in the report?  Is it in the

16    report?

17              THE WITNESS:  I think that there's some of it, yes.

18              MR. SCHWEDA:  If you could find it, Doctor.

19              THE COURT:  I just wanted to have a written, so I

12:15PM 20   could review her position and her interview with Mr. Burke on

21    that point.

22              THE WITNESS:  Oh.

23              THE COURT:  So, on page 19 it starts in her report,

24    dated August 18 -- and you're referring to Doctor Low's report?

25              THE WITNESS:  There we go.  I'm --
```

BROWN / Direct                    128

1              THE COURT:  That's page 19.

2              So that's the first reference I have to it.

3              THE WITNESS:  I have, on page 20, of that report --

4              THE COURT:  Right.

5              THE WITNESS:  -- on the, in the second paragraph,

6    under the heading of clinical interview and behavioral

7    observations, Mr. Burke began talking to me with the statement

8    of, the other report is wrong, I'm mentally ill.

9              Stating that perhaps she had interpreted his bad mood

12:16PM 10   as him not wanting to participate.

11             And stating, isn't everyone's psychosis different.

12             He felt Doctor Low didn't listen to me and she had an

13   opinion from before I started to hear voices.

14             THE COURT:  So that's what you're referencing?

15             THE WITNESS:  Yes.

16             THE COURT:  Okay.  Thank you.

17   BY MR. SCHWEDA:

18   Q.   Do you think that that had any effect on some of the

19   testing that was done?

12:16PM 20             THE COURT:  Well, there's nothing in her report to

21   effect, is there?

22             MR. SCHWEDA:  Pardon?

23             THE COURT:  Is there an opinion expressed in her

24   report to that effect?

25             MR. SCHWEDA:  No, but I'm asking her if that, that

BROWN / Direct                                            129

```
 1   question right now, Your Honor.  Am I limited to --
 2               THE COURT:  Let me get this straight.
 3               She issued a report.  And there's nothing in the
 4   report that says that, but now, not having it in the report,
 5   you're asking her a question about whether on the basis of that
 6   paragraph, there was, in her opinion, an effect on the testing
 7   results?
 8               MR. SCHWEDA:  Well --
 9               THE COURT:  Isn't that your question?
12:17PM 10               MR. SCHWEDA:  Yeah, did --  well, let me ask, let me
11   ask a question, if I may.
12               THE COURT:  Go ahead.
13   BY MR. SCHWEDA:
14   Q.   Do you, do you believe that that affected some or part
15   of --
16               THE COURT:  No, no.  You need to be specific.  That
17   what?
18               MR. SCHWEDA:  I'm, I will follow-up on what, after I'm
19   just asking the --
12:17PM 20               THE COURT:  When you said, do you believe that, and I
21   think "that" is undefined.
22   BY MR. SCHWEDA:
23   Q.   Well, Mr. Burke's feelings, that he wasn't going to be
24   treated fairly, did that affect --
25               THE COURT:  No, no.  That's not what it says.  It says
```

BROWN / Direct                                    130

1    that she didn't listen to me.  It doesn't say anything about

2    being treated unfairly.  The report itself doesn't say that,

3    Mr. Schweda.

4              MR. SCHWEDA:  All right.

5    BY MR. SCHWEDA:

6    Q.   Did the fact that she wouldn't, he expressed that she

7    wouldn't listen to him, did that have any affect on the testing

8    that Doctor Low performed?

9    A.   It could.

12:18PM 10   Q.   Well, Doctor Low reported that he failed some of the tests,

11   he didn't try on some tests.

12   A.   Yes.

13   Q.   Which ones, which ones did he not try on?  According to

14   Doctor Low.

15   A.   Well, the results of the TOMM.  And what Doctor Low

16   explained, it doesn't look like he tried on that, giving just

17   chance, answers that are chance.

18              And that, in her report, that she says that, on the

19   MMPI, I believe, that he over endorsed and that was because he

12:18PM 20   wasn't being cooperative, I believe.

21   Q.   And how did you score those tests?

22   A.   Well, I agree totally with Doctor Low on the TOMM.

23              And I agree that the MMPI-II is over reported.  It's

24   primarily inconsistent, the responses are inconsistent, as

25   though he's not, that occurs when the answers aren't consistent

1    with one another.

2            So, his interest isn't there or he's or psychotic

3    symptoms or something is making that not consistent.  And it

4    could be because he is just not being cooperative.

5    Q.   But it could be because of he's hearing voices?

6            THE COURT:  No, you need to ask her questions.

7    BY MR. SCHWEDA:

8    Q.   It could also be because --

9            THE COURT:  Now, counsel, in fairness to you, this,

12:19PM 10   this is your witness.

11           So you can ask her, but you can't put words in her

12   mouth.

13           So you can't tell her the answer and ask her to agree

14   with you.  And you know that.

15           So, please do that the way you know how to do it.

16   BY MR. SCHWEDA:

17   Q.   Could -- could a mental disease or defect affect how he

18   performed on these tests?

19   A.   Yes, of course.

12:20PM 20           I believe that Doctor Low just said that sometimes you

21   don't give people tests, because you know they're so psychotic

22   it won't come out appropriately or valid.  And so, yes.

23   Q.   Is that probable that that happened in this case?

24   A.   It's possible.

25   Q.   The --

BROWN / Direct                                    132

1              THE COURT:  Just so we're on the same page, I would

2       expect you to elicit every opinion that's in her report as you

3       judge necessary.

4              And if you're going to be trying to elicit opinions

5       that she has not filed a report on, then I would have some

6       concerns about that.

7              So, if you have some basis for doing it, that would be

8       different, but I think it's important that we, that we, that the

9       report, so -- both parties had a chance to prepare for this

12:21PM 10      hearing, and be adequately prepared -- my understanding was we

11      were going to elicit testimony, based on the opinions expressed

12      in the report about competency, and then impeach on the basis of

13      history, other records, and the reports themselves, and the

14      testing results.  That's what I understood.

15             MR. SCHWEDA:  Okay.

16             So I'm going to change the way I order, this

17      Your Honor.

18      BY MR. SCHWEDA:

19      Q.   If you would go to your report, Doctor Brown, at page

12:21PM 20      three, under, it's under tab 13.

21             MR. SCHWEDA:  And I'm referring, Your Honor, to ECF

22      number 251.  It's in the, it's the last document in the binder

23      that we handed up to the Court.

24             THE COURT:  Okay.  I have that.

25             MR. SCHWEDA:  There was a, there was an, I believe,

BROWN / Direct                                   133

1   ECF 251 was a, was one that we filed originally.  Doctor Brown

2   wanted to make some corrections, some spelling corrections,

3   there was a redundant paragraph that was taken out, but,

4   substantially, they're the same, but they're not, they're not

5   exactly on the same pages.

6           THE COURT:  Okay.  I'll use 251.

7           MR. SCHWEDA:  Okay.

8           Thank you, Your Honor.

9   BY MR. SCHWEDA:

12:22PM 10  Q.   So, Doctor, in your review of the records, it, did it

11  demonstrate that Mr. Burke has mental, a mental disease or

12  defect?

13  A.   Yes.

14  Q.   And you've already indicated that he -- how does that

15  manifest itself?  Let me ask you that way.

16  A.   Well, with the documents that I reviewed, it begins when he

17  was 11 years old and he was went to Sacred Heart Medical Center

18  and participated in the Behavioral Education Skills Training

19  program.  It's called BEST.

12:23PM 20          Where, upon admission, he was, he was having problems.

21  His mother reported that he had been abused, beginning when he

22  was three years old, and that his stepfather had been rough with

23  him.

24          He was having trouble getting along with peers.

25          He was impulsive.

BROWN / Direct                        134

1              And he had poor coping skills.

2              He was in that program for two weeks.  I believe it

3    generally lasts six weeks.  And he was discharged early, with a

4    diagnosis of oppositional defiant disorder.

5    Q.   And then when was he again involuntarily committed to, to

6    Sacred Heart Medical Center mental ward?

7    A.   I believe he was admitted the next time, when he was 13, to

8    Sacred Heart.

9              Where he was diagnosed again with the oppositional

12:24PM 10   defiant and a conduct disorder.  After he had been threatening,

11   making threats at school about shooting people and hurting

12   people.

13             And also some preoccupations with chemical warfare and

14   the government conspiracies.  Concern by Spokane Mental Health

15   Mary Kannegaard, who, who I know is a counselor that works

16   actually at the school, at the various schools, from Spokane

17   Mental Health.

18             And she was saying that he had numerous problems with

19   authority, he was a loner, and he was externalizing blame for

12:24PM 20   problems.  That he had killed some, there was thought that he

21   may have killed someone's cat.

22             He was tested during that hospitalization and found --

23   let me see -- that he was introversive, sexually uncomfortable,

24   there was family discord, and anxious feelings.

25             He was put on some antipsychotic medication, hoping

BROWN / Direct                                                     135

1   that would control his behavior and his anger.

2   Q.   Then he was, again, hospitalized at Sacred Heart in 2002;

3   is that correct?

4   A.   Yes, six months later he was hospitalized involuntarily

5   again.

6   Q.   And that's reflected in your report at the bottom of page

7   four.

8   A.   Page four, yes.  Where he thought --

9            THE COURT:  No, there's no question at this time.

12:25PM 10          THE WITNESS:  Oh, sorry.

11           THE COURT:  So --

12   BY MR. SCHWEDA:

13   Q.   Go ahead, tell us about that hospitalization.

14           THE COURT:  Well, I'm not sure where we're going with

15   this.

16           If there's a diagnosis at that hospital that's

17   important to you, certainly the diagnosis would be helpful as a

18   matter of history, unless you think there's something about the

19   actual admission notes or other things that are going to help me

12:26PM 20   make a decision, Mr. Schweda, about whether he's competent at

21   this time, so --

22           MR. SCHWEDA:  The --

23   BY MR. SCHWEDA:

24   Q.   Was there any report of auditory hallucinations?

25   A.   He had odd and unusual beliefs that reported that they were

BROWN / Direct                                  136

 1   bordering on psychosis.

 2          And what they did, interestingly, was they diagnosed

 3   him with obsessive compulsive disorder and they did rule out

 4   diagnosis of schizoid and schizotypal disorders, which are

 5   personality disorders.  Which is unusual, in that those types of

 6   diagnosis aren't generally given until after you're 18.

 7          He was, I believe, 13 at the time.  And so that's a

 8   little unusual.

 9   BY MR. SCHWEDA:

12:27PM 10   Q.   To get it that early.

11   A.   To get those types of diagnosis, absolutely.

12   Q.   Okay.

13          He was then released to Excelsior, correct?

14   A.   He was in Excelsior, but before that, I believe he went to

15   the Crisis Residential Center, after he had run away from home.

16          He was having a lot of, a lot of behavior and

17   psychological problems.

18   Q.   So, on page five, you indicate that he was at the Crisis

19   Residential Center after running away from home.

12:27PM 20          And then a month later he was admitted to Excelsior,

21   correct?

22   A.   Yes.

23   Q.   And what did the staff at Excelsior observe?

24   A.   Well, he was tested by Doctor Kevin Heid and it was

25   determined that he had a long history of peculiar behavior and

BROWN / Direct                          137

1    that they thought he, or Doctor Heid reported that he thought

2    that he was in the process of developing a significant thought

3    disorder, which is, is another way of describing psychosis.

4          They thought that the symptoms were more likely

5    psychotic versus Asperger's or autistic type of symptoms.

6          He had different behaviors, to where it looked, they

7    don't, they don't call it a multiple personality, but they say

8    that, he's saying that he can be really cooperative and then in

9    the next moment he can be really disruptive.

12:29PM 10         And that looks like a cluster A personality disorder,

11    which, again, are antisocial and some schizoid, schizotypal

12    things.

13    Q.   He then went to the Youth Care Center in Seattle; is that

14    correct?

15         THE COURT:  Counsel, this report is of record, it's

16    admitted as an exhibit, and I've read it several times.

17         So, help me understand what we're doing and how you're

18    approaching the subject.  Because the report speaks for itself

19    and it's already an exhibit.

12:29PM 20         MR. SCHWEDA:  Okay.

21         Well, I was going to approach it a different way,

22    Your Honor, but you indicated you wanted to go by what was

23    written in the report, so I was --

24         THE COURT:  Well, help me understand where you're

25    going, because this is, essentially, reading the report into the

BROWN / Direct                         138

1    record.

2              MR. SCHWEDA:  And I'm not, and I don't want her to

3    read the report, but I wanted to ask some questions.

4              But you indicated that I was limited to what was in

5    the four corners of the report, so I'm --

6              THE COURT:  No, no.

7              MR. SCHWEDA:  -- following the Court's instruction.

8              THE COURT:  Well, then tell me -- I'll listen to

9    counsel.

12:30PM 10        Help me understand what you think today's hearing is.

11   Because I thought it was about competency.

12             What did you think?

13             MR. SCHWEDA:  It is about competency.

14             THE COURT:  So we were here to evaluate, under the

15   particular statute, whether Mr. Burke is competent.

16             Isn't that what we're trying to do?  Whether he's

17   competent now?

18             MR. SCHWEDA:  Correct, Your Honor.

19             THE COURT:  Isn't that right?

12:30PM 20        MR. SCHWEDA:  Yes.

21             THE COURT:  And that's why I thought the two

22   examinations were done.

23             And if that's what we are here for, then that's the

24   issue that I think I'm trying to decide, with the help of the

25   two psychologists, who are here and who have rendered their

BROWN / Direct                                                     139

1    report.

2              So, if, if I'm wrong, Miss Van Marter, is there some

3    other issue that we are here for that I'm overlooking?

4              MS. VAN MARTER:  No, Your Honor, that is the sole

5    issue.

6              And I, I would echo the Court's concerns.  And I think

7    the Court addressed this in a, in an ECF order, that that's the

8    exclusive issue for today.

9              THE COURT:  Well, then, what is it that you think we

12:30PM 10    should be doing that we're not doing, Mr. Schweda?

11             MR. SCHWEDA:  I think that the issue of Mr. Burke's

12   competency is more nuanced than it being black and white.

13             I'm, and I'll, I'll cut to the chase on that part of

14   it.

15             I want to go through some of the testing that was

16   done, and then I'll, I'll get to the issue of competency.

17             THE COURT:  Well, I've read the reports, as I said,

18   several times.  And I've listened to it.

19             And then I read her, Doctor Brown's ultimate opinions

12:31PM 20    on page 27, competency and then competency.  On page 27 and page

21   28 of 251.

22             And isn't that what we are here about?  Her opinions

23   that are elicited?

24             MR. SCHWEDA:  Um-hum.  Yes.

25             THE COURT:  And to the extent that there's some

BROWN / Direct                          140

1    support for those opinions, or support in the history or the

2    tests that she administered, to determine competency at this

3    time, right?

4              MR. SCHWEDA:  Correct.

5              THE COURT:  Okay.

6              Well, that, what time are we starting Rodriguez?

7              THE DEPUTY CLERK:  1 o'clock.

8              THE COURT:  Okay.

9              We're going to start Rodriguez at 1 o'clock.  And so

12:32PM 10   we'll take an intermission at that time.

11             And we'll have a supervised release hearing in a

12   different case, and so you folks can, will get some relief, and

13   then we'll be back at quarter of two to finish up.

14             MS. VAN MARTER:  Your Honor, if I could just inquire,

15   on, along those lines.

16             The Court has pointed out the conclusion in Doctor

17   Brown's report is, likewise, that Mr. Burke is competent.

18             THE COURT:  Exactly.

19             MS. VAN MARTER:  So my, my objection to Mr. Schweda's

12:32PM 20   questioning is, we're outside of the report.

21             Is he now trying to claim that he is incompetent or is

22   he agreeing with his own expert's opinion?

23             THE COURT:  No, there's only, the only thing before me

24   is the expert's opinion.  That, that's what he's submitted, so

25   that's what we are here for.

BROWN / Direct                    141

```
 1            MS. VAN MARTER:  I would, Judge, given some of his
 2   questions -- so he's not going to be presenting a different
 3   opinion than what is concluded in his own expert's report.
 4            THE COURT:  I -- Mr. Schweda?
 5            MR. SCHWEDA:  Well, let me ask some questions,
 6   Your Honor and --
 7            THE COURT:  No, no.
 8            She asked the question and it's the right one.  The
 9   questions today are, the opinions that the, that both sides
12:33PM 10   prepared for, in the form of the report.  None of which, one of
11   which was supplemented, yours, Doctor Brown's, and those are the
12   things that brought us here today.
13            I don't know of any other opinions that have been
14   expressed by anybody.
15            And she's, and Miss Van Marter's simply saying, that's
16   what we are here for, the opinions expressed.
17            And the answer is, I believe that to be correct.
18            Am I wrong in that, Mr. Schweda?
19            MR. SCHWEDA:  Well, let me --
12:33PM 20            THE COURT:  No, Mr. Schweda, just tell me if I'm
21   wrong.
22            MR. SCHWEDA:  I think you're somewhat wrong,
23   Your Honor.
24            THE COURT:  How could I be wrong?
25            So -- tell me how I could be wrong, given the fact
```

1    that I've read the report several times.

2            MR. SCHWEDA:  Well, the report starts out, on page

3    one, basically, that says that he's currently charged with

4    absconding.

5            Well, what I think that there's -- and I expect Doctor

6    Brown to be different on and what she expresses the opinions in

7    her report, is that he would be, he's competent to assist

8    counsel and appreciate the --

9            THE COURT:  I read the opinions.  So -- I read them.

12:34PM 10    I understand what her opinions are.

11            So, you're not, I don't know what you're trying to do,

12    except to say she's, are those the violations that were alleged?

13            MR. SCHWEDA:  There's, well, there's one that's

14    absconding and there's one that relates to --

15            THE COURT:  A commission of another crime.

16            MR. SCHWEDA:  Yes.

17            THE COURT:  Okay.

18            MR. SCHWEDA:  And so she is clear that Mr. Burke can

19    defend the absconding violation charge.

12:35PM 20            She is not so clear that he can defend against a

21    supervised release violation of committing another crime.

22            THE COURT:  That's what her, that's what her opinions

23    say.

24            MR. SCHWEDA:  I -- well, I think you have to -- I

25    don't -- I'll, I'm going to get to that, Your Honor.

BROWN / Direct                                  143

 1            I think that her opinion is, is that, if it gets to be
 2    more complicated than just --
 3            THE COURT:  I read her opinions, Mr. Schweda.  I've
 4    just alluded to them.  I read them repeatedly.  So I know what
 5    they are.
 6            So we are here for competency on the violations, to
 7    face the violations that are alleged.
 8            So you can elicit the testimony about those, her
 9    opinions, as are expressed in the report.
12:35PM 10        They weren't supplemented.  Those are the opinions.
11            This is a competency hearing.
12            Is there something that you're going to elicit that's
13    not in the report, that's a new opinion?
14            MR. SCHWEDA:  I don't think it's a new opinion at all,
15    Your Honor, I think it's in the report and --
16            THE COURT:  Good.
17            Then, if it's in the report, let's get --
18            MR. SCHWEDA:  And if you give me the opportunity, I'll
19    develop it.
12:36PM 20        THE COURT:  Well, at some point, Doctor Brown's going
21    to be asked about her opinions on competency and I, and I would
22    anticipate that her opinions will be exactly as they're
23    expressed in her report.  That's what I would anticipate.  Go
24    ahead.
25

BROWN / Direct                          144

1   BY MR. SCHWEDA:

2   Q.   Is Mr. Burke competent to face a supervised release

3   violation of absconding?

4   A.   I believe that he's competent, yes, to participate fully in

5   a simple hearing, trial.

6           I think he is going to have difficulty, a lot of

7   difficulty, with a more complex trial.

8           I am currently taking supervision from Patricia Zapf,

9   who is a forensic psychologist, and just wrote Best Practices

12:37PM 10   Modeled in Forensic Judicial Competency.

11           MR. OHMS:   Your Honor, I'm going to object.   This is

12   not responsive to the question.

13           THE COURT:   It's not responsive to the question.

14           Doctor Brown, the question was a simple one, and then

15   you gave an opinion and that's it.

16           And nothing in the report references any other

17   literature or that sort of thing, so...

18   BY MR. SCHWEDA:

19   Q.   What is your opinion based on?

12:37PM 20   A.   My opinions are based on Best Practices Model For Judicial

21   Competence, done by Patricia Zapf.   And her supervision that, in

22   competency evaluations, there are various types of competency --

23           MR. OHMS:   Your Honor, I'm going to object this

24   information -- I'm objecting, this information's not in the

25   expert's report.

BROWN / Direct                        145

1              THE COURT:  I, that's -- it's not.

2              Mr. Schweda?

3              It's not in your report.

4              MR. SCHWEDA:  I --

5    BY MR. SCHWEDA:

6    Q.    Is it in your report, Doctor Brown?

7    A.    I was trying to explain why there is report of two

8    different parts of the competency evaluation.  That that is

9    current best practices model in forensic psychology.

12:38PM 10             And I made two -- in the report, I gave two opinions

11   of competency.

12             That Mr. Burke is competent to do a simple absconding

13   trial.  I think he could do that.

14             But something that is more complicated, where there is

15   different testimony, where there is more evidence, where there

16   is more scientific research, different, much more complicated

17   case, I do not think he will be able to assist his attorney or

18   testify relevantly or understand what people are saying.

19   BY MR. SCHWEDA:

12:39PM 20   Q.    And would that go to the violation that alleges commission

21   of a murder?

22   A.    It would go to anything more complicated than a simple

23   absconding plea.

24             I think that's, I think that's a very simple, cut and

25   dried.

BROWN / Direct                    146

```
 1              Any charge that is more complicated than that, I think
 2    he's going, I don't think he's competent for.
 3              And so I guess my answer is yes.
 4              MR. SCHWEDA:  May I proceed, Your Honor?
 5              THE COURT:  Sure.
 6    BY MR. SCHWEDA:
 7    Q.   So, what is, what, your opinion then, if it's more
 8    complicated, what's that based upon?
 9    A.   It's based upon the, the amount of rational understanding
10    that an individual has to have to participate in something
11    that's much more complex.
12    Q.   And does Mr. Burke have that rational understanding for a
13    more complex procedure?
14    A.   I do not -- I don't think so.
15    Q.   And what's that based upon?
16    A.   His psychosis.
17    Q.   And tell us about his psychosis and how that affects his
18    ability to be rationally defend himself.
19    A.   In my opinion, Mr. Burke's diagnosis is a schizoaffective
20    disorder.  That is a diagnosis where he has symptoms of
21    hallucinations and delusions, but also the affective component,
22    where there's also depression and some hypomanic, if not out
23    right manic symptoms.
24              And so he presents differently.
25              And I think that's being shown since he's about 13, 14
```

BROWN / Direct                    147

1    years old.  Where he will have symptoms and then his symptoms

2    seem to lessen.

3              He -- so I think the diagnosis are very complicated.

4    He has had diagnosis all over the board.

5              I think the one thing that everyone agrees on is that

6    he is psychotic and shows psychotic symptoms.

7              I believe that the testing I did is, was appropriate.

8    Q.   Well, let's go to the testing.

9              Can you take us to your, where in your report you talk

12:41PM 10  about the testing you did?

11   A.   On page 24, under psychological competency testing.

12   Q.   So let's, you, you gave Mr. Burke a SIRS-2, correct?

13   A.   I did.

14   Q.   And that was based upon Doctor Low's giving Mr. Burke the

15   M-FAST screen, correct?

16   A.   Yes.

17             The M-FAST is a screen.  If one has questions as to

18   whether or not the person is malingering, or not being truthful,

19   then that is to be followed up by a structured interview.

12:42PM 20             The manual, in several places, suggests the SIRS and

21   Patricia Zapf, again, one, if not -- she and Tom Grisso -- the

22   top forensic psychologists in the country, told me, recommended,

23   as I presented this case to her, under supervision, that that

24   should be done.

25             I do not recall anything about the SIRS-2 not being

BROWN / Direct                                    148

1    used and, in fact, it is the number one structured interview

2    that is used, particularly in combination with the M-FAST.

3    Q.    Now, let me ask you some questions about the M-FAST,

4    preliminarily to your testimony on the SIRS testing.

5          The, you indicated that the M-FAST is a screening

6    test --

7    A.    Yes.

8    Q.    -- correct?

9    A.    Yes.

12:43PM 10    Q.    And it comprises of how many questions?

11    A.    I believe it was 21.   About 21 questions.

12    Q.    And in order to come up to screen you as being a

13    malingerer, the test requires you to come up with how many, he

14    has to endorse how many of the questions that are asked?

15    A.    In the M-FAST model, it suggests six.

16          More current research, particularly with individuals

17    who are inpatient and psychotic, is eight.

18          I looked at the answers on Mr. Burke's test scores and

19    there were some that I, the questions, the way he answered them,

12:44PM 20    are consistent with his history.

21          And so, it does come up to a score of eight, but I

22    think the research is showing that you cannot be malingering and

23    still have a score of eight.

24          But, even so, to take a look at that, I did the SIRS.

25    And with the SIRS, all of his scores are below the threshold of

BROWN / Direct                          149

1    malingering.

2            The SIRS is a much more in-depth, structured

3    interview, which is better, of course, than a screen.

4    Q.    And it has eight different scales; is that correct?

5    A.    Um --

6    Q.    I believe you list them on page 24 of your report.

7    A.    Yes.

8            It has, it has eight primary scores.  And it has a few

9    other general scores.

12:45PM 10           But he was underneath the malingering threshold on all

11   of them.

12   Q.    Okay.

13           Can you go through the eight different scales and just

14   give a very brief description of what they are and --

15   A.    He scored a one, which is supposed to be less than four,

16   for rare symptoms.

17           He scored zero.

18   Q.    Well, let me, what are rare symptoms?

19   A.    Rare symptoms are, oh, I always see helicopters when I'm

12:46PM 20   swimming.  Something odd that is just kind of off the scale.

21           Certainly aliens and orbs, different colors, those

22   aren't odd symptoms.

23   Q.    Okay.

24           And then what's the next scale you report?

25   A.    Odd symptom combinations.

BROWN / Direct                                    150

1            That would be where the auditory hallucinations are

2    interfering with the visual hallucinations that has to do with

3    my delusion, okay?  It would be a combination of a lot of

4    symptoms.

5    Q.   And how did he do there?

6    A.   He got eight.  That is supposed to be less than 10.

7            Oh, I'm sorry, he got zero, which is supposed to be

8    less than 10.

9    Q.   Or less than six, according to your report?

12:47PM 10   A.   Less than -- I'm sorry.

11   Q.   And then the next scale was the improbable or absurd

12   symptoms?

13   A.   Improbable or absurd symptoms.  Where he scored zero out of

14   five.

15   Q.   And what are -- I guess then that that implies that they're

16   absurd symptoms?

17   A.   Yes, like I see helicopters when I'm swimming.

18   Q.   Okay.

19   A.   Run, going through the water or something like that.

12:48PM 20   Something just ridiculous.

21   Q.   And then blatant symptoms?

22   A.   He had eight.  And it's supposed to be less than 10.

23   Q.   And what are blatant symptoms?

24   A.   Blatant are obvious symptoms.  I hear voices.  I see

25   things.

 1   Q.    And the next scale was subtle symptoms?

 2   A.    Subtle symptoms.  He scored six.  It's supposed to be less

 3   than 15.

 4         Those are more subtle symptoms, like low motivation,

 5   insomnia, hypersomnia, something like that.  Selective symptoms.

 6   He scored 14 out of 17.  I can't think of anything for that

 7   right now.

 8         The severity of his symptoms.  He scored six.  One

 9   should score less than nine.

12:49PM 10         So he isn't describing anything more severely than

11   other people who would be psychotic.

12         He got zero out of less than six for reported symptoms

13   versus observed symptoms.

14         On the supplementary scales, it showed that he was

15   being honest, he wasn't defensive, his symptoms weren't overly

16   specified, he wasn't trying to fail, and he was consistent.

17         It's a better test.  It's a better, it's a better

18   structure, it's a structured interview that is used more than

19   any other structured interview for this type of thing in --

12:50PM 20   Q.    Now, Doctor Low, her AXIS-I diagnosis was that he, well

21   which diagnosis, which axis was the malingering?

22   A.    Well, that's a little confusing, too.  We don't use axis

23   diagnoses any more.  That went out with DSM-IV.  We are now

24   currently using DSM-V and there aren't any axis diagnoses.

25   They're all one thing.  Doctor Low diagnosed --

BROWN / Direct                        152

1           THE COURT:  She diagnosed 295.90, schizophrenia,

2    multiple episodes, currently in partial remission.  V 65.2,

3    malingering.  And 301.7, antisocial personality disorder.  Based

4    on the DSM-V.

5           THE WITNESS:  That's right.

6           THE COURT:  Page 26 of her report.

7           Mr. Schweda?

8           MR. SCHWEDA:  So is --

9           THE COURT:  Go ahead.

12:51PM 10   BY MR. SCHWEDA:

11   Q.   Is malingering a diagnosis under the DSM-V?

12   A.   Yes.

13   Q.   And --

14          THE COURT:  It's a V scale.

15          THE WITNESS:  It's a V.

16          THE COURT:  It's a V scale.  Not a diagnosis.

17          MR. SCHWEDA:  Okay.

18   BY MR. SCHWEDA:

19   Q.   Do you agree with that --

12:51PM 20          THE COURT:  Is that correct.

21          THE WITNESS:  Well, I believe V codes are also

22   diagnoses.

23          THE COURT:  Well, it says V 65.2 and that's not a

24   diagnosis as a V scale, is it?

25          THE WITNESS:  It's a V code.  It's a diagnostic code

BROWN / Direct                                      153

```
       1   that I'm --

       2           THE COURT:  It's coded as a V, a V code, though, not

       3   an axis.  Isn't there a difference?

       4           THE WITNESS:  There aren't any axis diagnoses in

       5   DSM-V.

       6           THE COURT:  Okay.

       7           Then I must, I must have an imperfect understanding.

       8   Go ahead.

       9   BY MR. SCHWEDA:

12:52PM 10  Q.   Do you agree with that, that Mr. Burke is a malingerer?

      11   A.    I believe there are times when Mr. Burke denies or, and

      12   sometimes exaggerates symptoms.

      13           I think he does that sometimes, because he wants to

      14   manipulate the situation.

      15           I'm not sure I would go so far as saying that he's

      16   malingering, but I do believe that he feigns symptoms or denies

      17   symptoms and has done so since he was 11.

      18   Q.    How does that affect your opinions as to his ability, his

      19   competency to defend himself and assist counsel?

12:53PM 20  A.    Well, it's, it's going to make it difficult on the, on his

      21   defense attorney, certainly.  Because it's going to be difficult

      22   to know when he's stating the truth.

      23   Q.    How would a psychologist understand that?  When he's

      24   telling the truth?

      25   A.    What's very important for an individual to tell you the
```

1    truth is to have, it's called a therapeutic alliance or good

2    rapport with the client.

3          You also want them to be stable.  So, if they're

4    stable on their medication, you're much more likely to get more

5    accurate thought patterns and definitions and report of their

6    symptoms.

7    Q.    When Mr. Burke went to Sea-Tac to be tested or evaluated by

8    Doctor Low, he was taking Zyprexa at the Spokane County Jail,

9    correct?

12:54PM 10   A.    Yes.

11   Q.    And what was his dosage at the jail?

12   A.    He was receiving 40 milligrams a day.

13   Q.    And when he arrived at Sea-Tac, was that changed?

14   A.    Yes, they dropped it in half.

15   Q.    And would that affect, affect his psychosis?

16   A.    Yes.

17   Q.    How would that affect his psychosis?

18   A.    He's much more likely to have psychotic symptoms and be

19   more confused.

12:55PM 20         So, it's much more likely that he will start

21   hallucinating and hearing auditory and seeing visual

22   hallucinations and becoming confused.

23   Q.    Is the reduction in the dosage significant, as to how Mr.

24   Burke, Mr. Burke's psychosis?

25   A.    Yes.

```
 1   Q.   How so?
 2   A.   Well, I think -- while at Western State Hospital, he was
 3   there for a few years, and they worked very hard with Mr. Burke
 4   in trying to get his doses of appropriate medications correct.
 5            And I believe what they came up with, among other
 6   things, was this 40 milligrams of Zyprexa.
 7            That was followed through at the jail, and I don't
 8   know why, I don't know, I have no idea why they dropped the dose
 9   when he went to Sea-Tac.
12:56PM 10   Q.   And eventually they, Sea-Tac increased the dosage back to
11   40 milligrams, correct?
12   A.   Yes.
13            I'm not, again, I'm not exactly sure how that
14   happened, other than during one of Doctor Low's interviews --
15   well, during all of them, Mr. Burke said that he was
16   hallucinating and that he was having episodes or that he just
17   had a psychotic episode and that he needed more Zyprexa.
18            And so Doctor Low made an appointment with the
19   psychiatrist, but because of vacations and it was summertime, he
12:57PM 20   wasn't able to get in until July 22nd.
21   Q.   I believe the record shows it's June 22nd.
22   A.   June 22nd.  I'm sorry.
23   Q.   Okay.
24            And --
25   A.   And --
```

1    Q.    And that's when they increased his dosage again, correct?

2    A.    Yes.

3          There was a note in the, in the few -- I didn't get

4    very many documents from Sea-Tac, but the one that I did get was

5    from the psychiatrist, who said he was extremely schizophrenic

6    and was having some very severe symptoms, and that that had

7    occurred when his dose had been cut in half, which was when went

8    to Sea-Tac.  And that he was increasing that dose.

9    Q.    When you start or increase the dose from 20 milligrams to

12:58PM 10    40 milligrams, is there a period of time for that, that you have

11    to wait before that becomes effective?

12    A.    Of course.

13    Q.    Tell us about that.

14    A.    Psychotropic medications have to be processed through one's

15    liver.  It's not like taking aspirin that can pass through the

16    blood brain barrier.

17          I don't need to get into a lecture here, but it takes

18    its time for it to process through the liver to be able to get

19    into the brain for it to, to work.  And so it always takes time.

12:58PM 20          If you start from the beginning, what the PDR,

21    Physician's Desk Reference, says is it takes six to 12 weeks.

22          Since he was on half a dose, I wouldn't expect it to

23    take that long, it would probably be quicker.

24          I didn't see where it said any place.  It depends on

25    how it is processing in each individual's liver, on how long it

1  would take, but it certainly wouldn't take affect that morning

2  or even, I would think, even within a week or two.

3  Q.    Would that affect the testing that Doctor Low did at

4  Sea-Tac?

5  A.    It certainly is possible.

6  Q.    And in what ways would it be possible?

7  A.    Well, it's likely that his symptoms were more severe and so

8  he's going to endorse higher symptoms, more symptoms.

9          He might be more confused.  In fact, I'm sure he would

12:59PM 10  be more confused.

11         And so it's possible that he doesn't hold his

12  attention and concentration as well.

13         And so you can get inconsistencies, as Doctor Low said

14  in her testimony an hour or so ago.

15         There are times when you just don't give someone,

16  whose obviously very psychotic, an objective personality test,

17  because it won't, it won't do any good.  It will be invalid.

18  Q.    Now you also administered a Fitness Interview Test,

19  Revised.  This is on page 25 of your report.

01:00PM 20  A.    Yes.

21  Q.    And that's, what's that test for?

22  A.    It's --

23         THE COURT:  Counsel, at this point, we're going to

24  take our recess from this case.

25         You folks will be back at quarter of two.  And we will

BROWN / Direct                                    158

1    resume at that time.

2              And we'll conclude this hearing today at 3 o'clock.

3              Okay, folks.  You're in recess at this time.

4              (Whereupon Court was recessed at 1:00 p.m.)

5              (Whereupon Court reconvened

6              in the courtroom at 1:50 p.m.)

7              THE COURT:  Good afternoon.  Please be seated.  Okay.

8    Let's resume.  Mr. Schweda.

9              MR. SCHWEDA:  Thank you, Your Honor.

01:52PM 10   BY MR. SCHWEDA:

11   Q.   Doctor, a couple of things I wanted to ask you,

12   preliminarily.

13             Do you do much, many competency evaluations?

14   A.   I do.

15   Q.   Tell us about that.

16             How often, what kind of cases.

17   A.   I would say, on average, I do one a week.

18             And have been doing so for about the last five years.

19   Q.   And they -- and what courts do you do them in?

01:53PM 20   A.   I do them in primarily in Superior Court for the County of

21   Spokane, Grant, Garfield.  Eastern Washington.

22   Q.   Okay.

23             Have you ever qualified as an expert in a competency

24   hearing?

25   A.   Yes.

BROWN / Direct                               159

1    Q.    How many times?

2    A.    Maybe a hundred times.

3    Q.    Now, you indicated, when we left off, we were talking about

4    you were explaining that the current standard was, that someone

5    can be competent for a simple proceeding, but not for a more

6    complicated one.  And I wanted to ask you to explain that.

7    A.    Well, just as I said in my report, the idea is that one can

8    be competent for something that's simple and be incompetent for

9    something that's much more complicated.  And I believe that is

01:54PM 10   the case with Mr. Burke.

11   Q.    And why is it that, why is that the case for Mr. Burke?

12   A.    Well, I tested him and he, and gave him a clinical

13   interview and read all of these documents and watched Mr.,

14   Doctor Low's interviews.

15         And I think he's capable and understands this

16   absconding charge and what the results are of that.

17         And he pretty much knows the -- I'm losing my train of

18   thought.  I didn't eat.

19         He understands the factual components of the, of that

01:55PM 20   case.  And there isn't a need for a lot of rational

21   understanding.

22         Whereas, if the case, if the case is more complicated,

23   then one needs to have more rational ability.

24         If you have more witnesses, as the case proceeds, it

25   can become more complicated and you have to understand the

BROWN / Direct                              160

1  infrastructure and how that changes and what the evidence is

2  doing and how you should plan strategy or change strategy.

3         And I think that, I don't believe that Mr. Burke would

4  be able to do that.

5  Q.   How did you come to those conclusions?

6  A.   Well, I, again, I looked at his history.  He's, his very

7  long history of psychosis.  And his symptoms.  The testing, the

8  competency tests that I gave him, and that's what I came up

9  with.

01:56PM 10  Q.   And what competency testing did do you?

11  A.   The first thing I did, I, is I gave Mr. Burke a

12  semi-structured screening interview called the FIT-R.

13  Q.   Spell that for the record.

14  A.   Well, it's a Fitness Interview Test.  F I T.  Revised.

15  FIT-R.  And that test is more, it's a screening interview, and

16  he came out showing some severe deficits in his rational

17  understanding.

18         And so I gave him a more defined structural interview,

19  that's used quite a bit, validated and all of that, that's

01:57PM 20  called the MacCat.

21         And during that testing, I found that, again, that,

22  factually, he could understand what was occurring.

23         But when we got into the reasoning portion of that,

24  and I started questioning him about witness testimony and what

25  would happen if someone began lying, it completely derailed him.

1              And I think that, in my opinion, that's when his

2    psychosis interfered.  And I think that's more than likely to

3    occur, should he get involved in a more complicated case.

4    Q.   So, one of the violations that, or alleged violation is

5    that Mr. Burke has, is a murder that occurred in 2013 in

6    Snohomish County.

7              Would Mr. Burke be competent to defend that charge, of

8    a supervised release violation charge?

9    A.   I didn't understand the question.  Something, a murder

01:58PM 10   versus supervised release?

11   Q.   Well --

12   A.   I didn't understand.

13   Q.   So, Mr. Burke is in this court on supervised release

14   violations.

15   A.   Right.

16   Q.   That's the subject matter of the hearings.

17             And one -- he's -- he has two violations:

18             One is absconding.

19             And the second one is he committed another crime.

01:59PM 20   That is, murder in Snohomish County.

21             Would he be competent to defend and work with an

22   attorney on defending against the supervised release violation

23   of committing a murder in Snohomish County?

24   A.   I think he could, I think he's competent to, to, to go to

25   trial on a, on, on this particular charge, because it's

 1  simple --

 2  Q.    Absconding.

 3  A.    -- absconding.

 4          MR. OHMS:  Objection, Your Honor.  That's leading.

 5          THE COURT:  Overruled.  Go ahead.

 6  BY MR. SCHWEDA:

 7  Q.    But I'm getting back to, does it depend on how

 8  sophisticated the hearing on the supervised release violation of

 9  a murder would be, in order for you to render an opinion as to

02:00PM 10  whether he's competent to defend himself on that?

11  A.    I think the more complicated the case, the less likely it

12  is that he's going to be competent.

13          I don't know what would be involved with a murder

14  trial.  Or particularly one where Mr. Burke would be involved.

15          I have read the Snohomish County records and I have

16  read about the alleged crime, but I don't, I don't have any

17  information on that.

18          And I didn't, I just -- I am just trying to point out

19  that, on a simple case, I believe that he's competent.

02:01PM 20          As a case becomes more complicated, I don't think he

21  would be.

22  Q.    So --

23  A.    If it's an open and shut, I think that would be easy.

24          But if there's a lot of complicated testimony and

25  defense, how we're going to go about doing this, and how, if

BROWN / Direct                                          163

1    that would change during the course of a trial, I think that

2    would set him off, and he would, because of his mental illness,

3    I don't think he would be able to do that.

4            In the Western, the Western State Hospital notes --

5    and I'm sure I put this in the report -- he has this, I don't

6    have any symptoms, "I do have symptoms.  I don't have symptoms,

7    I do have symptoms."  And there's some exaggeration.

8            And they took that into account and still thought he

9    was gravely disabled.  And I do, too.

02:02PM 10           I don't, I don't believe that he's malingering.  I

11   think he is doing some feigning, but I don't think he's

12   malingering.

13   Q.   Why do his symptoms change?

14   A.   Well, that's the reason why I diagnosed him with a

15   schizoaffective disorder.  A schizoaffective disorder is

16   psychotic symptoms, like auditory and visual hallucinations and

17   delusions and that type of things that are like schizophrenia.

18           But there's also an affective component, where there's

19   depression and anxiety, some hypomania, perhaps mania.  And this

02:02PM 20   is the reason, in my opinion, in those -- and those different

21   symptoms come and go.  And that will affect his psychosis and it

22   will, it will affect the way he presents.

23   Q.   I wanted to ask you some, a few questions about the testing

24   that Doctor Low did.

25           She gave what is called the ILK test.  Are you

BROWN / Direct                                        164

1   familiar with that?

2   A.   I am familiar with that, yes.

3   Q.   Is it a published or standardized test?

4   A.   It's a published screening instrument for legal knowledge

5   as to whether or not someone is putting for the best effort on,

6   on that.  It's kind of like a malingering test.

7   Q.   And how did Doctor Low score that test and what conclusion

8   did she have?

9   A.   Her conclusions were that he failed that test and that he

02:04PM 10   wasn't putting forth best effort.

11   Q.   He was not.

12   A.   He was not.

13   Q.   How did you score the test?

14   A.   Well, in looking at the norms, he is right at the cutoff of

15   possibly not telling the truth and telling the truth.

16        The problem with this measure is that both of those,

17   honest responders and malingering people, overlie each other and

18   so you can get false positives and negative negatives.

19        It's, it's to give you a general idea.

02:04PM 20        This, I suspect, is the reason why Doctor Low didn't

21   just rely on that, she also looked into more, more information

22   about his competency.

23   Q.   So, what's your opinion as to the score, Mr. Burke's score

24   on the test?

25        MS. VAN MARTER:  Your Honor, I'm sorry, which test are

BROWN / Direct                              165

```
 1    we talking about?

 2             MR. SCHWEDA:  The ILK.

 3             THE COURT:  The ILK?  Yes.  Page 27 of Doctor Low's

 4    report.

 5             THE WITNESS:  I think it could mean either.  I think

 6    it could go either way.

 7    BY MR. SCHWEDA:

 8    Q.   So --

 9    A.   I think it does not say that he's malingering.

10    Q.   So you disagree with Doctor Low then, to the extent --

11    A.   Yes.

12             I don't, I don't think it -- in the way I read the

13    scales, it shows, it's right on the cutoff of saying that he

14    answered okay.

15    Q.   Okay.

16             The, now, Doctor Low also gave the PAI test.

17    A.   Yes.

18    Q.   And that's Personal Assessment Inventory?

19    A.   Personality Assessment Inventory.

20    Q.   Okay.

21             And Doctor Low said that Mr. Burke's responses were

22    over, an over representation and an exaggeration of his clinical

23    profile.

24             What do you think?

25    A.   I --
```

MARK A. SNOVER
OFFICIAL COURT REPORTER

BROWN / Direct                           166

1              THE COURT:  About what?

2              MR. SCHWEDA:  Whether his responses are an over

3    representation and exaggeration of his clinical profile.

4              THE COURT:  On Doctor Low's test?

5              MR. SCHWEDA:  Correct.

6         I'm asking her to state her opinion as opposed to what

7    Doctor Low has stated.

8              THE COURT:  Well, I'm wondering what the, what you're

9    actually asking her to compare.

02:06PM 10         Is it her judgment, based on her test; or judgment or

11   her opinion, based on all tests; her opinion based only on

12   Doctor Low's tests?  What are you asking?

13             MR. SCHWEDA:  I'm asking if she agrees with Doctor

14   Low's assessment of the PAI test.

15             THE COURT:  All right.

16             Go ahead.

17             THE WITNESS:  Well, I believe that Doctor Low,

18   essentially, is saying that the PAI is over reported.

19         And again, I don't think that means that -- I do not

02:07PM 20   believe that the PAI is showing a malingering profile.

21         I think that the profile -- first of all, there are

22   scale scores on the PAI.

23         As a psychologist, we don't particularly -- we look,

24   of course, at the scores, but what we're looking at primarily is

25   the profile of how that looks.

BROWN / Direct                                    167

1              And the profile on this PAI is consistent with all of

2    his symptoms.

3              So, there's a question as to whether or not it's over

4    reported, but because it fits all of his history, I don't think

5    it is.

6              It isn't defined, there is -- this test does not say,

7    absolutely, that this test is over reported.

8              And because it fits the profile of his history, I

9    don't believe that it is.

02:08PM 10   Q.    Would you go to page 17 of your report.  Which is exhibit

11   113 or ECF 251.

12   A.    Yes.

13   Q.    And there's a paragraph down there where you state it was

14   not lost on the doctors in the June 18, 2015 petition that Mr.

15   Burke would embellish symptoms, but that all of his symptoms of

16   his illness were entirely fabricated.

17             Can you explain that sentence and the rest of that

18   paragraph.

19   A.    Yes.

02:09PM 20            What they're noticing at Western is that there are

21   times when Mr. Burke seems to deny and embellish symptoms.

22             But he also does that when there isn't any secondary

23   gain.

24             And that they believed, at that time, that his

25   symptoms were real, that he was psychotic, gravely disabled, and

BROWN / Direct                                    168

```
 1   should be continued to be hospitalized at Western for another

 2   six months.

 3          I think that's very consistent with his presentation

 4   now.

 5   Q.   If you would go to then the last page of your report.  Page

 6   28.

 7          And during the testimony here, the government

 8   questioned why you would quote U.S. Probation Officer Chalinor

 9   the way you did in that paragraph.

10          Why did you do that?

11   A.   I think -- I concluded that they said it very well.

12          That Mr. Burke has been involved in this system for a

13   very, very, very long time.  And that with all of the

14   accusations and treatment and non-treatment that he has

15   received, the system hasn't done well by him.

16          And I agree with that.

17          Putting a malingering diagnosis in his 25, three and a

18   half inch records, putting a malingering diagnosis in that

19   milieu, I think, complicates the picture.  It's very damaging.

20          And if people are only looking at spot reviewing

21   things, instead of all this tremendous amount of medical record,

22   I think they will get the false impression and he won't be

23   served well.

24          And I think that's what they were saying there, too.

25   And that's why I put it in.
```

 1              MR. SCHWEDA:  That's all I have, Your Honor.

 2              THE COURT:  Thank you.

 3              Cross?

 4

 5                        CROSS-EXAMINATION

 6

 7  BY MR. OHMS:

 8  Q.    Good afternoon, Doctor Brown.

 9              So, I would like to start with some questions about

02:12PM 10  your background, your resume.

11  A.    Sure.

12  Q.    So, do you have a copy of your resume there?

13              Maybe the best thing to do --

14  A.    I think there's one, I think there's one in this.

15  Q.    Well, why don't I do this.

16              I'll make an exhibit out of the one that's been

17  provided to us.

18              MR. OHMS:  May I offer it up and provide a copy to the

19  Court?

02:13PM 20              THE COURT:  What exhibit number are you going to put

21  on that?  You say resume.  Do you mean CV or --

22              MR. OHMS:  I do, Your Honor.

23              THE COURT:  Thank you.

24              MR. SCHWEDA:  I believe that's been admitted,

25  Your Honor.  I thought it was exhibit number 1 in exhibit number

BROWN / Cross                    170

1    or I -- strike that.  That's Doctor Low's.

2              MR. OHMS:  If I may approach, Your Honor.

3              THE COURT:  You may.

4              (Handing exhibit to counsel and witness.)

5    BY MR. OHMS:

6    Q.   So, I handed up to you what's been marked as government's

7    exhibit number 6 for identification.

8              And isn't that, in fact, a copy of the CV that you

9    provided to the defense counsel in this case?

02:14PM 10   A.   It looks like it to me.  It looks like it.

11   Q.   Okay.

12             MR. OHMS:  Government offer's government exhibit 6.

13             THE COURT:  Any objections?

14             MR. SCHWEDA:  Pardon?

15             Oh, no objection, Your Honor.

16             THE COURT:  Admitted.

17             MR. OHMS:  I have a courtesy copy I can hand up to the

18   Court.  If the Court would prefer to --

19             THE COURT:  Fine.

02:14PM 20             MR. OHMS:  -- view it that way.

21             THE COURT:  You can use the ELMO if you want.

22   Whatever is easier.

23             (Handing exhibit to Court.)

24             THE COURT:  Okay.

25             Let's get started.

BROWN / Cross                        171

```
  1   BY MR. OHMS:

  2   Q.    So, as I understand your CV, you, back in August of 1993,

  3   to July of 1994, you were a psychology intern.

  4         Is that correct?

  5   A.    Sure.  Yes.

  6   Q.    And up to that point in time, there isn't anything in your

  7   CV about forensic evaluations or forensic examinations.

  8         Is that correct?

  9   A.    That's correct.

02:15PM 10   Q.    And the forensic evaluations would come in as part of the

 11   work that you began doing or part of the course of study that

 12   you began in clinical psychology.

 13         Isn't that true?

 14   A.    Yes.

 15   Q.    And so your clinical psychology then was in 19, March of

 16   1997 to July of 1998; is that correct?

 17   A.    My clinical psychology training?

 18   Q.    Yes.

 19   A.    No, my clinical psychology training started about in 1986.

02:15PM 20   Q.    All right.

 21         But there's nothing in your CV, up until 1997 to 1998,

 22   indicating that were you working specifically in the area of

 23   forensic assessment.

 24         Isn't that true?

 25   A.    I did not do any clinical -- you're right, yes, you're
```

BROWN / Cross                          172

 1    right.

 2    Q.    So, in 1997 to 1998, you began what you described as a

 3    residency?

 4    A.    Yes.

 5    Q.    And what is a residency?  Why do you describe --

 6    A.    That's your post-doc hours.  That's called a residency.

 7    Q.    Is it also called internship?

 8    A.    No.  The internship is before you get your Ph.D.

 9          Then you get your Ph.D. and then you begin your

02:16PM 10    residency.  It is your post-doc hours.

11    Q.    Okay.

12    A.    That's before you can sit for your test, for your licensing

13    exam.

14    Q.    And I'm, and am I correct that this, this then occurred,

15    the clinical psychology residency occurred before you were

16    licensed as a psychologist?

17    A.    That's true.

18    Q.    All right.

19          So, and then it indicates that you conduct, provided a

02:17PM 20    number of, I guess, services or gained experience in a number of

21    areas, during that clinical psychology residency.

22          Is that, isn't that true?

23    A.    Yes.

24    Q.    And one of those was the forensic clinical, excuse me, the

25    forensic assessment.

                              BROWN / Cross                          173

 1    A.    Yes.

 2    Q.    And by forensic assessment, are you referring to a criminal

 3    forensic assessment of competency?

 4    A.    I didn't start criminal assessment of competency until

 5    about five years ago.

 6    Q.    Okay.

 7            So that, I guess that's what, that's how, that's what

 8    I'm trying to clarify.

 9            So, five years ago, from today's date, would be then

02:17PM 10    -- we're in 2016, 2011 is when you began that area of your

11    practice.

12    A.    That seems about right.

13    Q.    Okay.

14            So, where it says, in your CV, back in 1994 to 1998,

15    that you were an expert witness for forensic evaluations, you're

16    referring to something other than what we're doing here in the

17    courtroom today.

18    A.    Yes.

19    Q.    What were you referring to as occurring back then?

02:18PM 20    A.    I was doing various evaluations for the Court on risk

21    assessments.  I was doing different family law cases.

22    Q.    Okay.

23            So you were doing family law cases.

24    A.    Head injury.  Head injury.

25    Q.    You weren't -- and you were referring to those as forensic

BROWN / Cross                    174

1    evaluations?

2    A.    Yes.

3    Q.    Okay.

4         So, a risk assessment is a forensic evaluation?

5    A.    Yes.

6    Q.    Family, I -- I, you were referring to something having to

7    do with family practice --

8    A.    Right.

9    Q.    -- is a forensic assessment?

02:19PM 10    A.    Yes.

11    Q.    Okay.

12         Where you refer then to July of 1998 to present, and

13    you indicate that you were a consultant and expert witness for

14    forensic evaluations, including competency, that's not

15    exactly --

16    A.    Where do I say that?

17    Q.    -- correct --

18    A.    I'm sorry, where do I say that?

19    Q.    On the first page of your CV.  Where it says, July 1998 to

02:19PM 20    present.  Under your second bullet point, it says that you were

21    a consultant and expert witness for forensic evaluations, which

22    we know you use as a very generic term to mean, essentially, any

23    kind of evaluation, correct?

24    A.    Well --

25    Q.    And here it says, competency.  Isn't that correct?

BROWN / Cross                        175

1    A.    Yes, you're right.    That's wrong.

2    Q.    So that's not an accurate statement of your experience, is

3    it?

4    A.    No, it's not.

5    Q.    Okay.

6          And that creates an impression that you have greater

7    experience than you actually do.

8          Isn't that true?

9    A.    Yes, it would.

02:20PM 10    Q.    All right.

11          Now, you also testified a few minutes ago that, since

12    you've been doing these forensic evaluations in the area of

13    competency, that you've been doing on average about one, one a

14    week?

15    A.    That's what I said.

16    Q.    For about five years?

17    A.    About that.

18    Q.    Okay.

19          So, one, one a week might be four in a given month?

02:21PM 20    Might be six in a given month?

21    A.    Could be four, could be six.    It could be two.

22    Q.    All right.

23          So, are you familiar with the declaration that you

24    provided in this case, under ECF, filed under ECF 209?    209?

25    A.    I don't know that number.

BROWN / Cross                                        176

```
 1   Q.    Well, did you provide a declaration in this case?

 2   A.    I believe I did.

 3   Q.    And --

 4         MR. OHMS:  Your Honor, I would like to show this on

 5   the ELMO.  It's ECF 209.

 6         Does the Court wish that I mark it as an exhibit?

 7         THE COURT:  I don't know what it is.

 8         MR. OHMS:  It's a -- it's the declaration of

 9   Debra D. Brown.

02:21PM 10    THE COURT:  It doesn't have to be an exhibit, it's in

11   the file already, you can simply show it to her and ask her what

12   you're going to ask her about it.

13         MR. OHMS:  All right.

14   BY MR. OHMS:

15   Q.    So, I'm showing you what's been filed as, it's on the

16   screen there --

17   A.    Um-hum.

18   Q.    -- as ECF 209, which indicates it's a declaration by you.

19   Is that correct?

02:22PM 20    A.    Yes.

21   Q.    Do you remember, do you recall writing that?

22   A.    Yes.

23   Q.    All right.

24         And do you see on the second line, of the second

25   paragraph, where it talks about how many competency evaluations
```

1  you do?

2  A.   Right.

3  Q.   What does it say there?

4  A.   It says six to 12 mental competency evaluations in criminal

5  cases per month.

6  Q.   Per month.

7       But, actually, you do on average, four a month, maybe

8  three, maybe two, maybe six; isn't that true?

9       Isn't that true, ma'am?  Isn't that what you just

02:22PM 10  testified to?

11  A.   Yes, that's what I just testified to.

12  Q.   Okay.

13       So doesn't that statement in your declaration tend to

14  over emphasize or over state your level of experience in this

15  area?

16  A.   Yes, I guess it does.

17  Q.   Now, ma'am, when you talk about a competency evaluation

18  that you're referring to in your declaration, and that you've

19  been testifying about, are you referring to, essentially, what

02:23PM 20  has been admitted as government's exhibit number -- excuse me,

21  as defense exhibit 113 -- which is your report in this case?

22  A.   Yes.

23  Q.   Okay.

24       So you're talking about producing, on average, four

25  reports of this nature, similar to this, each month?

BROWN / Cross                        178

1   A.    Well, I would like to -- may I explain that?

2   Q.    Well, I think, I think I can help by asking some questions.

3   Are you actually --

4   A.    Okay.

5   Q.    -- including in your statement about competency

6   evaluations, things that may not ultimately result in a full

7   report?

8   A.    Yes.

9   Q.    Okay.

02:23PM 10   A.    I would also like to say that my husband recently died and

11   my practice is lessened.

12   Q.    Well --

13   A.    I'm not doing as much work.

14   Q.    I appreciate that, ma'am.

15        So, so, even when we're talking about what you

16   describe as a competency evaluation, those don't all result in a

17   report?

18   A.    Not always, no.

19   Q.    And is it often or sometimes the case that you're contacted

02:24PM 20   by a defense attorney and asked to do, to help out with some

21   type of advice on competency?

22   A.    Yes, I'm asked that also.

23   Q.    And that would be preliminary to the defense attorney

24   actually deciding what, what motions to file in court?

25   A.    Sometimes.

BROWN / Cross                           179

1    Q.    And are you including that type of evaluation within the

2    figures?

3    A.    No.

4    Q.    Okay.

5          So, you're a professional, so you get paid for your

6    services, correct?

7    A.    I do.

8    Q.    And how much do you charge to, to do a competency

9    evaluation, that results in a full report, such as the one

02:25PM 10   that's been offered in this case, defense exhibit 113?

11   A.    I charge by the hour.

12   Q.    How many hours does it take you?

13   A.    It depends on how complicated the case is.

14   Q.    Right.

15         But you do an average of four a month, so I'm sure

16   that, on average, you have a sense of how long it takes.

17   A.    Eight to 20 hours.

18   Q.    Okay.

19         And what do you charge?

02:25PM 20   A.    I charge $200 an hour.

21   Q.    And --

22   A.    And I do a flat competency rate at $800 for Spokane County.

23   But if there is more involved, then that goes up, depending upon

24   what needs to be done.

25   Q.    Okay.

1           Do those charges include testing?

2    A.    Sometimes.

3    Q.    Sometimes not?

4    A.    Sometimes not.

5    Q.    So --

6    A.    Depends on how big the case is.

7    Q.    And if you actually, if you are actually going to conduct

8    testing, would that be an additional charge?

9    A.    Usually, yes.

02:26PM 10   Q.    And does that include time that you spend reviewing someone

11   else's work product?

12   A.    Yes, sometimes.

13   Q.    Okay.

14         Because you, you went through and indicated all the

15   records that you reviewed in this case.

16         You're actually billing for all the time that you

17   spent looking at those records, correct?

18   A.    Well, actually, I didn't bill for all of the time.  I ran

19   out of time.

02:26PM 20   Q.    Okay.

21   A.    I ran out of hours that were allowed.

22   Q.    And do you also bill for the time that you watch, that you

23   spend watching the forensic evaluation, conducted by someone

24   else, by video?

25   A.    I do.

BROWN / Cross                                    181

1   Q.   And do you also bill for being in the courtroom and

2   testifying?

3   A.   I do.

4   Q.   And how much do you charge for that?

5   A.   I charge, I believe I charge 350 for that.

6   Q.   350 to testify for the whole day?

7   A.   No, per hour.

8   Q.   Okay.

9        And -- all right.  Let me move on.

02:27PM 10        Oh, do you primarily testify in Federal Court or in

11   State Court?

12   A.   State.

13   Q.   All right.

14        Have you testified in Federal Court before?

15   A.   I have.

16   Q.   And so you're familiar with the standards that are used in

17   the federal system to determine competency?

18   A.   I'm not as familiar with them as I am with the state.

19   Q.   Well, for instance, what statute do you refer to in

02:28PM 20   federal, in the federal system, when you're evaluating

21   competency?

22   A.   I don't know.  I don't know a number.

23   Q.   Have you ever read the federal statute that describes the

24   standard for competency?

25   A.   No, but I'm assuming -- my assumption was that you go by

 1   the <u>Dusky</u> standard.

 2   Q.   Okay.

 3        So, do you know whether that standard, that legal

 4   standard, permits a bifurcation, where a person could be

 5   competent for one type of hearing, like say, for instance,

 6   being, going to trial on a DWI charge, versus going to trial on

 7   a domestic violence charge?

 8        Do you know whether the federal --

 9   A.   I don't know.  I don't know whether it addresses it or not.

02:28PM 10   I've been taught that's the standard.

11   Q.   And that was from the webinar?

12   A.   Yes.

13   Q.   That's the webinar that you were describing when, in your

14   prior testimony.

15   A.   Yes.  That I do once a week.

16   Q.   All right.

17        So, now when you did your evaluation of the defendant

18   in this case, you had video recordings of Doctor Low, of Doctor

19   Low's examination of the defendant to look at, correct?

02:29PM 20   A.   Yes.

21   Q.   And how much time did you, how many meetings did you have

22   with the defendant personally, face-to-face, as part of your

23   evaluation?

24   A.   I believe I had four.

25   Q.   And how much time did you spend with him total?

BROWN / Cross                                183

```
  1   A.    About seven hours.

  2   Q.    And did you videotape those sessions?

  3   A.    No.

  4   Q.    Now, isn't it true, ma'am, that you made it a point in your

  5   declaration to indicate that the, that Doctor Low should

  6   videotape her sessions, in order for you to be able to review

  7   them?

  8   A.    Yes.

  9   Q.    But you chose not to videotape your sessions?

02:30PM 10  A.    Correct.

 11   Q.    So, no one's able to actually review and critique the

 12   sessions that you conducted with the defendant in the manner

 13   that you've done with Doctor Low.

 14   A.    True.

 15   Q.    And isn't it in -- in fact, I'm looking at page two of your

 16   declaration -- isn't it true that, in your declaration, you

 17   actually stated you did not understand why they, meaning Doctor

 18   Low, would want to hide their exam process.  Isn't that true?

 19   A.    True.

02:31PM 20  Q.    Did you want to hide your exam process?

 21         MR. SCHWEDA:  You know, I'm going to object,

 22   Your Honor.

 23         There was never any request from the government that

 24   she videotape any of her interviews.  So if they had made that

 25   request, we would have addressed it at that point.
```

BROWN / Cross                                    184

```
 1              I think it's unfair to try to impeach her testimony in
 2     this fashion now, when they never asked for it.
 3              THE COURT:  You made your record.  You may continue.
 4     BY MR. OHMS:
 5     Q.   And I think -- and you heard the objection of your, of
 6     counsel just now.
 7     A.   Yes.
 8     Q.   All right.
 9              And let's concede there's a fair point there.
10     Nevertheless, you considered it important, very important, that
11     Doctor Low record her sessions for you to see.
12     A.   I did.
13     Q.   And you did not consider it important, equally important
14     for you to videotape your sessions.
15     A.   I didn't think that was my job to figure that out.
16     Q.   Okay.
17              So, with regard to the SIRS-2 test that you did, you
18     heard Doctor Low's testimony that the test has been invalidated,
19     because the author omitted a large amount of the standardized
20     sample?
21     A.   I heard her say that, yes.
22     Q.   And that's something that you indicated that you have never
23     heard of?
24     A.   Never heard of it.
25     Q.   You're not familiar with it whatsoever?
```

BROWN / Cross                                    185

1    A.   No.

2    Q.   And --

3    A.   Not that I, not that I remember.

4    Q.   All right.

5            MR. OHMS:  This is --

6    BY MR. OHMS:

7    Q.   I'm going to show you -- I would ask you to turn, in your

8    CV, in government's exhibit 6, to where it says, special

9    studies.

02:32PM 10           And the CV is not paginated, so I could count the page

11   numbers.  One, two, three --

12   A.   I see it.

13   Q.   -- four, five, six.

14   A.   Yes.

15   Q.   And number one, two, three, four, five, six, seven, the

16   seventh entry in that is -- and first, these special studies are

17   what, ma'am?

18   A.   These are the classes and webinars and things that you take

19   to keep your license.

02:33PM 20   Q.   Right.

21           So this is, essentially, continuing education?

22   A.   And to continue -- continuing education, sure.

23   Q.   Continuing professional education.

24   A.   Yes, sir.

25   Q.   And you see down at about the seventh entry?

BROWN / Cross                                    186

 1   A.   Yes.

 2   Q.   Test Based Evaluation of Feigning in Clinical Forensic

 3   Assessments, May, 2014?

 4   A.   Yes.

 5   Q.   Do you recall where you took that?

 6   A.   San Diego.

 7   Q.   You -- were you personally present for that?

 8   A.   Of course.

 9   Q.   All right.

02:33PM 10        Well, you said some of these are webinars.  So it's

11   not necessary --

12   A.   Well, with the invention of the, yeah, the past couple

13   years they have been.

14   Q.   Okay.

15        So, and isn't it true, ma'am, that at that specific

16   course, they talked about this exact fact?

17   A.   Not that I remember.

18   Q.   If you had known this information, that the author had

19   omitted a large amount of the standardized sample, would that

02:34PM 20   affect your judgment about it?

21   A.   I would look into it more.

22   Q.   Okay.

23        If you determined that that in fact was the case,

24   would that impact your judgment about the test?

25   A.   I would look into it more.

BROWN / Cross                               187

```
 1    Q.    Ma'am, meaning what, ma'am?  I'm asking you.

 2    A.    I mean, I would need to know, I need to know who said that,

 3    why did they say that --

 4    Q.    No, no ma'am --

 5    A.    -- was it published --

 6    Q.    -- we're mis, I'm mis, we're miscommunicating.

 7    A.    -- was there anything else.

 8              MR. SCHWEDA:  Your Honor, I object.

 9              Your Honor, I would ask that she be allowed to finish

02:34PM 10    her answer.

11              THE COURT:  She did finish her answer.  Go ahead.

12              THE WITNESS:  I would --

13              THE COURT:  Do you want to --

14              THE WITNESS:  I would ask other people what their

15    opinions are.  I would need to know the data on that.

16    BY MR. OHMS:

17    Q.    Correct.

18    A.    I don't recall any data on that.

19    Q.    Here's my question --

02:35PM 20              THE COURT:  No.

21              THE WITNESS:  Okay.

22              THE COURT:  Are you okay?

23              THE WITNESS:  Yeah, I'm just getting a headache.

24              THE COURT:  I'm sorry?

25              THE WITNESS:  That's okay.  It's okay.
```

BROWN / Cross                    188

1            THE COURT:  If you're okay, fine.  If you need a

2    break, let me know.

3            THE WITNESS:  Okay.

4            THE COURT:  Go ahead.

5    BY MR. OHMS:

6    Q.    My question is about the assertion that a large amount of,

7    that the author omitted a large amount of his standardized data.

8            Do you consider that a relevant assertion, an

9    important assertion?

02:35PM 10   A.    That he eliminated?  I don't understand what that means.

11   Q.    You don't understand --

12   A.    That means he --

13   Q.    -- the sentence?

14   A.    He cheated on, I mean, he gave false data?  I don't

15   understand what that means.

16   Q.    That he omitted data.  Omitted a large amount of his

17   standardized sample.

18   A.    That he just took the data out?  Yeah, that would, that

19   would concern me.

02:35PM 20   Q.    Okay.

21            And isn't it true then that that would cause you to

22   question the validity of that test?

23   A.    Yes.

24   Q.    And isn't it true that if you had that information, you

25   would include it in your report; if, in fact, you used that, you

BROWN / Cross                                189

1    would say, I'm using the test, but I want you to know there's a

2    caveat.  Isn't that true?  That you would provide the Court and

3    parties with that courtesy.

4    A.    Probably.

5    Q.    All right.

6            Now, ma'am, you indicated in your report and you

7    reference in your report that the defendant tested previously

8    with an IQ of 112.

9            Isn't that true?

02:36PM 10   A.    Can you tell me where I said that?

11   Q.    That would be page seven.  At least, at least, at least

12   it's what I have as page seven.

13           Mine is paginated and it says seven at the bottom.  I

14   don't know if there's an issue with pagination, but it's in the,

15   it's in the, it's in the final paragraph on page seven.

16   A.    Yes.

17   Q.    Second sentence?

18   A.    Yes, I see that.

19   Q.    Okay.

02:37PM 20           Okay.  So you recall that.

21   A.    That, that -- yes.

22   Q.    And isn't it true, ma'am, that a person can score poorly on

23   the IQ test for a lot of reasons.  They may not be trying hard,

24   they may be, they may be feigning that they're not as smart as

25   they are.

BROWN / Cross                                      190

1            Isn't that true?

2    A.    Or psychotic.

3    Q.    But isn't it also true that a person can't score higher on

4    the IQ test by feigning or pretending?

5    A.    I wouldn't think so.

6    Q.    Okay.

7            So, when, when we have a measurable score of 112,

8    that's a genuine score, isn't that true, genuine, in the sense

9    that we know there's no, he might be smarter than that, he might

02:37PM 10   even have a higher IQ, but he doesn't have one that's lower than

11   112, at the time of that test.

12   A.    At the time, yes, of course.

13   Q.    All right.

14           And isn't it true that, in your report, you don't

15   express any concerns about his cognitive ability, in terms of

16   his, his IQ level.

17   A.    True.

18   Q.    And isn't it true, ma'am, that in your report -- in fact, I

19   believe you mentioned this -- when you first had contact with

02:38PM 20   the defendant, he said, essentially, that -- this is on page

21   20 -- that Doctor Low is, that the other report is wrong, I'm

22   mentally ill.  He made that assertion to you.

23   A.    Okay.  Where on page 20?

24   Q.    Well, do you recall testifying about that, ma'am?

25   A.    I need you to ask the question again.

BROWN / Cross                          191

1   Q.   Okay.

2        Do you recall testifying that, when you first met with

3   the defendant, he told you immediately, that the other report

4   was wrong, and that he was mentally ill.

5   A.   Yes.

6   Q.   Okay.

7        And you, in fact, had included that in your report,

8   correct?

9   A.   Yes.

02:39PM 10   Q.   And I believe, in your direct examination, the way you

11   expressed it was, there were reasons why the report wasn't as

12   good as he would have liked it.   That's how you expressed it in

13   your direct testimony.

14   A.   Okay.

15   Q.   So, in other words, he was explaining that Doctor Low got

16   it wrong and that, and, in fact, she was biased from the prior

17   tests that she had done back in 2007, and therefore that was the

18   reason why the report wasn't as good as he would have liked it.

19   Isn't that true?

02:40PM 20   A.   Yes.

21        I don't think it had anything to do with testing, but

22   that, yes, that he --

23   Q.   Well, isn't it true that you testified in that way on

24   direct examination?

25   A.   That it had to do with testing?

1    Q.   No, that it had to do with the fact that he -- he came up

2    with an explanation, that Doctor Low --

3    A.   Yes, that's what he said.

4    Q.   -- was, had prejudged the case.

5    A.   He, I don't know if -- he didn't say that.

6         What he said was, oh, whatever I wrote that he said.

7         THE COURT:  No, just read it, counsel.  You have it

8    right there, don't you?

9         MR. OHMS:  Well, what it says in the report was, "the

02:40PM 10   other report is wrong, I'm mentally ill."

11        My question was having to do with what she testified

12   during her direct.

13        THE COURT:  She may not remember what she testified

14   to.

15        MR. OHMS:  She may not.

16   BY MR. OHMS:

17   Q.   If you don't remember, that's fine.

18   A.   I don't remember.

19   Q.   Okay.

02:40PM 20        Now, isn't it true that if a person is explaining to

21   you the reasons why the report wasn't as good as he would have

22   liked it, that the, that the reasonable conclusion of those

23   words is that there's a way that he wanted that test to come

24   out?

25   A.   What test are you talking about?

BROWN / Cross                                      193

1   Q.   The, the -- excuse me, the report.  There's a way that he

2   would have liked the report to come out.

3   A.   What I heard was that he thought that Doctor Low was saying

4   he wasn't mentally ill.  And that was wrong.  He was.

5   Q.   Correct.

6        But on direct examination, isn't it true that you said

7   that he explained the reasons why the report, Doctor Low's

8   report, wasn't as good as he would have liked it, wasn't it true

9   that that's what you testified to?

02:41PM 10   A.   I may have.  I don't remember.

11   Q.   And doesn't that, in fact, indicate that there's an answer

12   that he believes is good and an answer that he believes is bad,

13   with regard to the report?

14   A.   If that's what he said.

15   Q.   Okay.

16        And doesn't that then suggest that he has an interest

17   in how the test comes out, or not the test, but the report comes

18   out?

19   A.   Yes, I guess it would.

02:42PM 20   Q.   And that kind of interest is called an agenda, isn't it?

21   A.   Yes.

22   Q.   And isn't it true that, when he talks to you, the, when you

23   first meet him and he says, "the other report is wrong, I'm

24   mentally ill," that that's an expression of that agenda.

25   A.   I think it could be, but I don't think that's necessarily

BROWN / Cross                                      194

1  true.  I think that's, I think you're narrowing that down.

2  Q.   Well, you're entitled to, to your opinion, and to, and I'm

3  sure counsel can bring out your, your ambivalence in

4  cross-examination.

5        But isn't it true it's consistent with a person who

6  has an agenda and is telling you how he wants your report to

7  come out?  Isn't it consistent with that?

8  A.   It could be.

9  Q.   All right.

02:43PM 10       Now, ma'am, isn't it true that, during your

11  questioning of the defendant, in terms of getting his

12  background, that he was responsive to your questions?

13  A.   That he was responsive to my questions?

14  Q.   Yes.

15  A.   Yes.

16  Q.   You would answer, you would ask a question, and he would

17  respond, he was responsive to the question.  The answer made

18  sense in context with the question.

19  A.   Often.  Often it, sometimes it didn't.  He would get off on

02:43PM 20  a different topic or become tangential or derailed.

21  Q.   Right.

22        And isn't it true that he expressed the self awareness

23  of his condition, his mental condition?

24  A.   Yes.

25  Q.   He expressed a self awareness of his symptoms?

BROWN / Cross                                    195

```
 1   A.    That he would describe his symptoms to me.

 2   Q.    He was able to describe his medication?

 3   A.    I don't -- I don't remember if he described his medication

 4   or not.  Lots of people know one or two of their medications and

 5   don't know the rest of them.

 6   Q.    Isn't it true, ma'am, isn't it true, ma'am, that he

 7   actually expressed the opinion that he wasn't getting enough of

 8   his medication?  He was very clear about how much medication he

 9   needed.

10         THE COURT:  Are you citing to a particular part of her

11   report?

12         MR. OHMS:  No, Your Honor.

13         THE COURT:  Oh.  You're just asking her a question.  I

14   apologize.  Go ahead.

15   BY MR. OHMS:

16   Q.    Is that true, ma'am, or not?

17   A.    Did I write that down?

18   Q.    Is that what he expressed to you?

19         THE COURT:  He's asking you whether you remember that,

20   during your evaluation.

21         THE WITNESS:  I don't remember.  I don't remember.

22         THE COURT:  Okay.

23         THE WITNESS:  I don't remember that he did.

24   BY MR. OHMS:

25   Q.    All right.
```

BROWN / Cross                                    196

1        Now, isn't it true that some portion of your

2  background interview, the, or the interview that you conducted

3  with the defendant, to develop his background, you talked about

4  his childhood?

5  A.    Yes.

6  Q.    And isn't it true that, at some point in time, he began to

7  meander off of that topic?

8  A.    I'm sure he did.

9  Q.    And isn't it true that you were able to redirect him back

02:45PM 10  on to that topic?

11  A.    There were times when I could, yes.

12  Q.    Okay.

13        Well, I'm looking at page 21, first full paragraph.

14        It states, "Mr. Burke was able to redirect his

15  attention to questions regarding his childhood."

16        Redirect, meaning he was able to shift gears and to

17  move back into the topic he wanted to discuss.

18        Isn't that what that means?

19  A.    That's what that means.

02:46PM 20  Q.    All right.

21        Isn't it true that he recalled specific details from

22  his childhood, that he was able to articulate to you?

23  A.    He did, but it wasn't always accurate.

24  Q.    Isn't it true, ma'am, that he was able to, that he was

25  responsive to questions about his prior court proceedings?

BROWN / Cross                          197

1   Responsive to those questions.  You would ask a question and he

2   would answer.

3   A.    I think he tried to answer my questions.

4   Q.    Isn't it true that he, in fact, described a plea deal that

5   he had struck?

6   A.    He described something about how someone had offered

7   something and he had signed a paper, I believe.

8   Q.    Do you recall him using the words, "plea deal?"

9   A.    I think I remember that, yes.

02:47PM 10  Q.    Do you have your report?  Defense exhibit 1, uh, 230 --

11  113.

12  A.    Yes.

13  Q.    If you look at page 21, again.

14          THE COURT:  20?

15          MR. OHMS:  21.

16          THE COURT:  21.  Yes.

17          Which paragraph?

18          MR. OHMS:  It's the last full paragraph.

19          So it's the one that starts out, "he reported he had

02:47PM 20  gone to court in the past."

21  BY MR. OHMS:

22  Q.    Do you see that paragraph?

23  A.    Yes.

24  Q.    And do you see where he indicated that, instead of going to

25  trial, he took a plea deal?

BROWN / Cross                    198

1              THE COURT:  Go down the left hand margin to the word
2    "instead" and then go across.
3              THE WITNESS:  I must have a different copy.  I don't
4    have an "instead."
5              THE COURT:  Okay.  Well, the report says, on page 21,
6    at that paragraph, "He did not remember going to trial, but
7    instead took a, 'plea deal.'
8              He explained, 'this is where you say you are guilty
9    and sign a paper.'
02:48PM 10              When queried about a plea of not guilty, he reported
11    that he had had three or four charges in the past and though,
12    and although he was actually 'innocent', he would take a 'plea
13    deal.'
14              He explained his reasoning" -- that's not relevant.
15    So, we'll stop there.
16              Do you see that?
17              THE WITNESS:  Yes, I do.
18              THE COURT:  Okay.
19              MR. OHMS:  All right.
02:48PM 20              THE WITNESS:  It's in my second to the last paragraph.
21    BY MR. OHMS:
22    Q.   And I, and I can't explain why the pagination is not
23    exactly the same on mine as it is yours, but that's, that
24    appears to be the way it is.
25              Now, where you put quotes around "plea deal," is that

BROWN / Cross                          199

1   because those are words he's using?

2   A.   Yes.

3   Q.   Okay.

4            And then, just where the Court left off reading, if

5   you read into that next section, isn't it true that he

6   describes, in some great detail, what the event involved with

7   his mother?  The event, meaning the event that led to criminal

8   charges?

9   A.   I need to read -- I need to put this in context and then I

02:49PM 10  can help you.

11           (Pause.)

12           Okay.  Okay.  What's the question?

13  Q.   Isn't it true that he was able to, to describe, in detail,

14  what the incident was about and why he, essentially, why he

15  worked out a plea deal; or what was different about what, what

16  the facts actually were, versus how they were alleged.

17  A.   Well, he said his mom never, his mother never said that --

18  Q.   He said --

19  A.   -- and that the police misunderstood.

02:50PM 20  Q.   Okay.

21           So he's explaining to you actually what happened in

22  that prior case.

23  A.   His view of what happened.

24  Q.   All right.

25           So, he was able to articulate that to you in some

1    detail.

2              I pled guilty to it, but, here's what actually

3    happened.  Isn't that, isn't that what's being expressed there,

4    ma'am?

5    A.   Yes.

6              THE COURT:  Counsel, for your purposes, it's now 11

7    minutes to three.

8              My staff and I have not eaten.  We have been working

9    since three o'clock, or since nine o'clock this morning,

02:50PM 10  actually been here before that, closer to eight.

11             And so we're, the question was, we worked through the

12   lunch hour, so that we could finish by 3.  And that's what we

13   had intended.

14             What's your schedule?

15             MR. OHMS:  You know, as far as continuing with the

16   hearing?

17             THE COURT:  Both the length of your cross, recalling

18   Doctor Low, and the full length of the hearing.

19             MR. OHMS:  You know, Your Honor, if I consult --

02:51PM 20  THE COURT:  Because this was scheduled for four or

21   five hours.

22             MR. OHMS:  Yes, Your Honor.

23             If I can, if I can talk briefly with co-counsel, I may

24   be able to just end the cross-examination.  I don't know how

25   much further --

BROWN / Cross                                            201

1              THE COURT:  That's up to you.

2              I'm not trying to rush anybody.  I'm simply telling

3    you what we scheduled this hearing for and how my staff and I

4    have worked to make sure that we held our, held up our end of

5    the bargain.

6              So, you better consult with co-counsel on the length

7    of your cross and whether you're calling, recalling Doctor Low.

8              And Mr. Schweda may have some redirect for this

9    witness as well.

02:51PM 10              (Pause.)

11   BY MR. OHMS:

12   Q.    Doctor Brown, when you were testifying about your

13   conclusion about competency in this case and the fact that your

14   conclusion was he may be competent for one type of hearing, but

15   not competent for another type of hearing; and the hearing in

16   this case involves allegations that the defendant violated the

17   conditions of his supervised release.

18              Do you know what is involved in a hearing on a

19   violation of supervised release?

02:52PM 20   A.    I don't know exactly, but I would think it's very simple.

21   And he said that he, he, he talked to me about it, and it seemed

22   pretty simple.

23   Q.    Okay.

24   A.    And what he expected and how that would occur.

25   Q.    All right.

BROWN / Cross                                    202

```
 1            So, and you also don't know what would be involved in

 2    a hearing to determine whether or not he violated conditions of

 3    his supervised release, based upon the commission of another

 4    state or federal crime.

 5            Isn't that true?

 6    A.    True.  And I'm not saying that.

 7    Q.    I'm sorry?

 8    A.    I'm not saying that.

 9            I didn't, I, if that's what you heard, that's not what

02:53PM 10    I meant.

11            I meant that, as trials become more complicated, I

12    don't think he can do that.  But I think --

13    Q.    You don't think he --

14    A.    -- I think something simple, he can.

15    Q.    Well, let me ask you this:

16            Part of your concern was the fact that he could become

17    derailed, correct?

18    A.    Yes.

19    Q.    And you, specifically, in your testimony, went back to the

02:53PM 20    fact that he became derailed when you were talking about what

21    would happen if somebody told a lie in the courtroom.  What

22    would he do.

23            And he became derailed and didn't, couldn't respond.

24    A.    Yes.

25    Q.    He wasn't responsive at that point.
```

BROWN / Cross                                      203

```
  1  A.   Yes.

  2  Q.   Did you make any effort to get him re-engaged with the

  3  question?

  4         In other words, if he was derailed, did you try to

  5  bring him back?

  6  A.   I followed the questionnaire.

  7  Q.   Okay.

  8         So you didn't.  Isn't that true?

  9  A.   True.

02:54PM 10  Q.   So, and isn't it true that his counsel wouldn't be limited

 11  by that.  His counsel could say, wait a minute, let me get you

 12  back on track, let me get you back on the rails.

 13         Isn't that true?  I mean, his counsel would not be so

 14  limited.

 15  A.   No, I don't think that's true.

 16  Q.   You don't think his counsel could ask those questions and

 17  tell the defendant --

 18  A.   I don't think, I don't think the counsel would necessarily

 19  know that the client became derailed.

02:54PM 20  Q.   If he was nonresponsive, you don't think counsel would

 21  recognize that?

 22  A.   Well, he's not talking.  He's, they're not talking right

 23  now.  I don't know if he's derailed now or not.

 24  Q.   Okay.

 25         So, if -- do you think there's some reason why he
```

BROWN / Cross                                    204

1    should be talking now?

2    A.    No.

3    Q.    Okay.

4    A.    But I don't know how the counsel would know whether or not

5    he was derailed or not.

6    Q.    Well, if he asked a question and he did not get a

7    responsive answer, isn't it true that he could attempt to get

8    him back on track.  Just like you did with the history about his

9    childhood.

02:55PM 10    A.    Yes, I think that someone could do that.

11    Q.    All right.

12          And isn't it true, in your, ultimately, in,

13    ultimately, in your, in your evaluation, your, your conclusion

14    about competency, on page 27, very first paragraph of that

15    conclusion, you say, it is possible he will become derailed.

16    A.    Yes.

17    Q.    So, your opinion is based upon a possibility that something

18    bad might happen.  Isn't that true?

19    A.    It depends on how complicated things are, yes, of course.

02:56PM 20    Q.    But you said, when he becomes anxious or paranoid.  That's

21    not based upon complications, that's based upon his perception.

22          If you read the statement, ma'am.  Page 27.  "When he

23    becomes anxious and/or paranoid, it is possible he, he will

24    become derailed."

25    A.    Where is this?

BROWN / Cross                                    205

1   Q.   Page 27, first paragraph, under the heading, "Competency."

2   Second sentence.

3   A.   Yes, that's what I say.

4   Q.   Okay.

5        So that didn't have to do with the complexity of the

6   proceeding, that had to do with his perception, when he became

7   anxious or paranoid, he could become derailed.

8        Isn't that true?

9   A.   Yes, that's one sentence of my explanation.

02:56PM 10  Q.   And isn't it true, ma'am, that that's, that that then is an

11  expression of a concern about something that might happen?

12  A.   Yes.

13  Q.   And isn't it true, ma'am, that, if that were to happen,

14  counsel could try to get him back on track.

15  A.   If they knew it.

16  Q.   Okay.

17       And isn't it true that --

18  A.   But I don't see how they would know that.

19  Q.   Isn't it true that he has the intellectual capacity to

02:57PM 20  understand explanations of court proceedings?

21  A.   If he's not currently experiencing delusions or

22  hallucinations, so that he can concentrate, of course.

23  Q.   All right.

24       MR. OHMS:  I don't believe I have further questions,

25  Your Honor.

1          I have no further questions.

2          THE COURT:  Have you actually testified at a criminal

3  trial, in a courtroom, at trial, where the defendant, in your

4  opinion, was incompetent, but the Court had found him competent

5  to stand trial and the defense was one of insanity?

6          Have you testified in such a case where the defense

7  was, he was insane at the time, and that you testified that he

8  was insane at the time, rather than we're talking about

9  competency, but insanity?

02:58PM 10          THE WITNESS:  Yes.

11          THE COURT:  You have?

12          THE WITNESS:  Um-hum.

13          THE COURT:  And the other, and the, the case went

14  forward?

15          THE WITNESS:  Yes.

16          THE COURT:  And the defendant was involved in the

17  case?

18          THE WITNESS:  I don't believe he testified, no.

19          THE COURT:  Well, but he was --

02:58PM 20          THE WITNESS:  He was, he was sitting there.

21          THE COURT:  -- sitting at the table.

22          THE WITNESS:  He was sitting there.

23          THE COURT:  And, despite the fact that you found the

24  person not competent, or was insane, the person, the trial went

25  forward.

BROWN / Redirect                          207

```
 1              THE WITNESS:  Yes, that was my testimony, that I
 2   thought he was.
 3              THE COURT:  Okay.  Thanks.
 4              Do you have any follow-up?
 5              MR. SCHWEDA:  Just real quick, Judge.
 6
 7                      REDIRECT EXAMINATION
 8
 9   BY MR. SCHWEDA:
10   Q.   Your CV, do you have that still in front of you?
11   A.   I do.
12   Q.   So, it says, "Clinical experience, July 1998 to present."
13   And then it goes through a bunch of things that you do.
14              Have you done, do you, do you do all of those things
15   today or have you eliminated some of them, picked some of them
16   up?
17   A.   I do all of those and more.
18   Q.   Okay.
19              The, there was this reference to the quote from Mr.
20   Burke, that the first thing he said, "the other report is wrong,
21   I'm mentally ill."
22              The implication that I received was that Mr. Burke had
23   an agenda to falsely represent his mental condition.
24              Did you ever see any evidence of that, in your
25   dealings with Mr. Burke?
```

02:58PM (line 10)
02:59PM (line 20)

BROWN / Redirect                              208

```
 1   A.    No.

 2               MR. SCHWEDA:  I have nothing further.

 3               THE COURT:  Okay.

 4               What do you want to do about Doctor Low?

 5               MS. VAN MARTER:  Your Honor, I know the Court's -- we

 6   have a very limited scope of --

 7               THE COURT:  Doctor, I think your time in the chair is

 8   over.  So you can step down.  What's watch your step there.

 9               MS. VAN MARTER:  We have a limited scope of redirect,

10   Your Honor.

11               THE COURT:  Sure.

12               MS. VAN MARTER:  If I could.

13               THE COURT:  Go ahead.

14               We'll accommodate you.

15               MS. VAN MARTER:  Thank you.

16               And I know the Court wanted to be done at this time.

17   Is there a second time that I need to make sure that we are

18   cognizant of?

19               I know the roads are getting --

20               THE COURT:  I certainly want to make it clear.  I made

21   my record, as to my staff and I.  That's all I can tell you.

22               So, some leeway, yes, but it's two minutes to three,

23   so go ahead.

24               MS. VAN MARTER:  Yes, Your Honor.

25               THE COURT:  You're still under oath, doctor.
```

1            THE WITNESS:  Yes.

2

3        WHEREUPON,

4                              CYNTHIA LOW

5                    having been previously sworn

6                       testified as follows:

7

8            MR. SCHWEDA:  Your Honor, is it possible that Doctor

9    Brown can sit at counsel table?

03:00PM 10            THE COURT:  Doctor Brown can sit wherever she wishes.

11   You may proceed.

12            MS. VAN MARTER:  Thank you, Your Honor.

13            I marked government's exhibits number 3 and 4 and I

14   have an extra copy for the Court.

15            May I approach?

16            I have provided counsel with a copy as well.

17            THE COURT:  Sure.

18            (Handing exhibit to witness.)

19

03:01PM 20                        DIRECT EXAMINATION

21

22   BY MS. VAN MARTER:

23   Q.   Doctor Low, were you asked to obtain materials relative to

24   the SIRS-2 testing that has been discussed here in court today?

25   A.   Yes, I was.

1    Q.    And, specifically, if you could first look at government's

2    number 3.

3    A.    Yes.

4    Q.    Do you recognize that?

5    A.    Yes.

6    Q.    And how do you recognize that?

7    A.    This is a part of a syllabus that was given to me during

8    training at the San Diego conference in 2014 by the American

9    Academy of Forensic Psychology, specifically in the area of

03:01PM 10    feigning and testing materials.

11    Q.    Is this the same training that Doctor Brown testified that

12    she attended?

13    A.    Yes.

14    Q.    And what is of significance regarding the materials from

15    the syllabus in government's exhibit number 3, specific to that

16    SIRS-2 testing?

17    A.    There are several slides here -- and I'm trying to find the

18    most relevant one.

19          On page 90, which is midway through this paperwork,

03:02PM 20    there's a little section here that shows that, in the SIRS-2

21    data set, that a large chunk of cases were eliminated.

22          Specifically, it says, "The SIRS-2 authors eliminated

23    112 cases from their sample as indeterminate.  And they reported

24    the FPR" which stands for false positive rate, "and TPR," true

25    positive rate, "for only those cases they classified."

 1              So, in other words, the author left out a large part

 2    of his sample and then he devised his classification tables of

 3    feigning and non-feigning, which are found on the other pages,

 4    based on incomplete data.

 5              And this was what the presenter, Doctor Richard

 6    Frederick, wanted to bring to light, was that this presents some

 7    very serious problems in the validity and interpretation of the

 8    SIRS-2.  And he essentially said, don't use it.

 9    Q.   And that was the same class that Doctor Brown attended?

03:03PM 10    A.   Yes, it was.

11    Q.   And that was what you previously testified to, regarding

12    your concerns of her use of this SIRS-2?

13    A.   Exactly.

14    Q.   Government's exhibit number 4.

15              If you could please take --

16              MS. VAN MARTER:  And, Your Honor, the United States

17    would move to admit government's 3.

18              THE COURT:  Any objections to 3?

19              MR. SCHWEDA:  No, Your Honor.

03:03PM 20              THE COURT:  Admitted.

21    BY MS. VAN MARTER:

22    Q.   Government's number 4.

23              Doctor Low, what is that and how do you recognize

24    that?

25    A.   This is a paper by a forensic psychologist who has done

1   some presentations, Doctor DeClue, and it specifically talks

2   about the same problems with the SIRS-2.

3   Q.   And is there a specific page that you can -- is there some

4   highlighted sections in this article that was provided as

5   government's exhibit 4?

6   A.   Yes.

7        The highlighted portions are mine.  Give me one minute

8   to find the relevant sections.  Let's see.  Page 10.

9        There's almost an entire paragraph at the bottom that

03:04PM 10  I highlighted.  And again, this author says, "In the SIRS-2

11   manual, incorrect numbers are provided for the FPR in

12   specificity, in their table 4.2 on page 39.

13        In addition to being inaccurate in parts, the reported

14   test utilities for the SIRS-2 classification are incomplete in

15   at least two ways.

16        First, they ignore the fact that 120 of 522 protocols,

17   23 percent, were classified as indeterminate, that is, more

18   protocols were classified as indeterminant than as feigned, and

19   those classified as indeterminate were ignored in considering

03:05PM 20  how accurate the SIRS-2 classification rules are."

21   Q.   And when was -- is this a published article?

22   A.   Yes.

23        And the publication date was 2011.

24   Q.   And when was this continuing education that you and Doctor

25   Brown both attended?  What year?

LOW / Direct                                        213

```
 1   A.    That was 2014.

 2   Q.    So, for the last five years, there has been information out

 3   there about the invalidity of the SIRS-2 test?

 4   A.    Yes.

 5              And, actually, if you turn to page 15, I highlighted

 6   one sentence there which I found to be very noteworthy.

 7              And it says, "The SIRS-2 appears to be very vulnerable

 8   to challenges, regarding its admissibility in court."

 9   Q.    And is that information that you would expect --

03:05PM 10              THE COURT:  Excuse me.

11              The last paragraph says, "No wizardry is required to

12   avoid this fate.  All that's needed is for the developers of the

13   SIRS-2 to develop and submit a manuscript regarding the SIRS-2

14   classification study that is sufficiently comprehensive to

15   survive peer review for the publisher to allow independent

16   professionals to analyze the data without impediment."

17              Go ahead.

18   BY MS. VAN MARTER:

19   Q.    So, is that information that you would expect an individual

03:06PM 20   who is engaged on an average of four forensic evaluations,

21   specific to competency, to be aware of?

22   A.    Yes.

23   Q.    And to also include in their report, if they are going to

24   utilize that testing in any way?

25   A.    Yes.
```

```
 1   Q.   And so, again, does that support your -- what, again, are

 2   your conclusions about Doctor Brown's opinion as to the SIRS-2

 3   results in this particular case?

 4   A.   Well, again, I don't think it should have been used in the

 5   first place, so I would not even look at whatever results were

 6   obtained.

 7   Q.   We have gone over a couple of these issues before, but just

 8   to follow-up on that SIRS-2.

 9        You heard Doctor Brown's explanation of what that

10   examination was, during her testimony?

11   A.   Yes.

12   Q.   Did you find any issues with her explanation of even what

13   the SIRS-2 was, faulty as it may be?

14   A.   That's a hard question to answer.

15        I don't know if -- I had problems following her

16   explanation of the scales.

17        And, again, if anything, I would just emphasize that

18   it's not an appropriate test to use, to begin with.

19   Q.   I want to just then take it back to her ultimate

20   conclusions, Doctor Low.

21        In this particular case, in terms of assessing

22   competency, are you familiar with the federal statute?

23   A.   Yes, it's 18 USC 4241.

24   Q.   And have you reviewed that statute regularly as a course of

25   your duties and responsibilities in conducting these competency
```

LOW / Direct                                                              215

 1   evaluations?

 2   A.    Yes.

 3   Q.    And are you familiar that there are differences between the

 4   federal competency statute and some state competency statutes?

 5   A.    Yes.

 6   Q.    And is that significant to know before you begin a

 7   competency evaluation?

 8   A.    Very much so.

 9   Q.    Why?

03:08PM 10   A.    Because they can differ vastly, depending upon what state

11   you're working within.

12   Q.    And --

13   A.    So you need to be able to answer the question for the

14   appropriate courts that you're working for.

15   Q.    Was it of significance to you that Doctor Brown was

16   unfamiliar with the federal statute and had never read it?

17   A.    Yes, I found that very alarming.

18   Q.    Why?

19   A.    Because anybody who is doing this sort of work, and saying

03:08PM 20   that they're an expert in the field of criminal forensic

21   psychology, needs to know, as the basic ground work, what

22   statute they're working for, working with, and what the

23   definition of competency is for that particular state or

24   jurisdiction.

25   Q.    And Doctor Brown's admitted unfamiliarity with the federal

 1    statute itself, does that somewhat explain her inconsistent

 2    conclusions, in terms of competency with respect to Doctor Burke

 3    (sic)?

 4    A.    It could.

 5    Q.    And in some of her explanation she discussed a webinar.

 6    A.    Yes.

 7    Q.    Are you familiar with this webinar?

 8    A.    No.

 9    Q.    And have you recently attended updated continuing

03:09PM 10    education, specifically with respect to competency evaluations

11    in that area of forensic psychology?

12    A.    Yes, just last month.

13    Q.    And approximately how many days was that?

14    A.    I attended four days' worth of conferences.

15    Q.    And in those four days, was this webinar ever mentioned, in

16    terms of a new piece of study or new information to be aware of

17    in impacting the competency evaluations?

18    A.    No.

19    Q.    And if it were a significant or an accepted area of study,

03:09PM 20    would you expect it to be included in this most recent

21    continuing education?

22    A.    Yes.

23          And not only that, I would have expected other

24    colleagues to have brought that to my attention.

25    Q.    And have you heard of this webinar?

LOW / Cross                                          217

```
 1    A.    No.

 2    Q.    And in all of your years of experience, and in all the

 3    continuing education, have you ever seen a bifurcated opinion

 4    such as Doctor Brown's, with respect to federal competency?

 5    A.    No.

 6    Q.    And in your assessment of Mr. Burke's competency, again

 7    with respect to the supervised release, you're looking to,

 8    again, assess what of his understanding of the supervised

 9    release violation?

03:10PM 10   A.    Correct.

11            MS. VAN MARTER:  Your Honor, if I could have a moment?

12            (Pause.)

13            MS. VAN MARTER:  Thank you, Doctor Low.

14            I have no other questions, Your Honor.

15            THE COURT:  Mr. Schweda.

16

17                          CROSS-EXAMINATION

18

19    BY MR. SCHWEDA:

03:10PM 20   Q.    You haven't requested Doctor Brown's raw data, have you?

21    A.    No.

22    Q.    The -- do you know what the Dusky standard is?

23    A.    I'm somewhat familiar with it, yes.

24            I believe it's what's used in the state.

25    Q.    Dusky is the name of a Supreme Court case?
```

LOW / Cross                                                218

```
 1   A.    Yes.

 2   Q.    Do --

 3             THE COURT:  Spell it, please.

 4             MR. SCHWEDA:  Pardon?

 5             THE COURT:  Spell it.

 6             MR. SCHWEDA:  D U S K Y.

 7             THE COURT:  Okay.

 8   BY MR. SCHWEDA:

 9   Q.    And --

10             THE COURT:  You mean a state Supreme Court case.

11             MR. SCHWEDA:  United States.

12             THE COURT:  United States, okay.

13             MR. SCHWEDA:  Supreme Court.

14             And, in fact, we cited it in our very short submittal

15   for this hearing, Your Honor.

16   BY MR. SCHWEDA:

17   Q.    Do you, did you know that 4142 is modeled after the Dusky

18   case?

19   A.    Yes.

20   Q.    And so you wouldn't expect there to be any differences

21   between the standards, if Dusky is just putting into code what

22   the Dusky standard is, correct?

23   A.    There's slight differences.

24   Q.    What are they?

25   A.    Well, I believe, in the Dusky case, it refers to a
```

LOW / Cross                                                    219

1    defendant having a rational and factual understanding of the

2    charges against them, so forth.

3          In the federal statutes, it doesn't separate out,

4    separate it out into rational and factual understanding, it just

5    asks about whether or not the defendant's suffering from a

6    mental disease or defect, rendering them mentally incompetent,

7    to the extent that they're unable to understand the nature and

8    consequences of the court proceedings, or to assist properly in

9    the defense.

03:12PM 10   Q.   So the Dusky standard has more then, according to your

11   testimony?

12   A.   A little bit more, yes.

13   Q.   And if that's still the law of the land, the Court would be

14   bound to follow it, correct?

15   A.   That's part of, again, the Washington state statutes and

16   what they use for competency.

17   Q.   I'm not -- I didn't bring up anything about the Washington

18   state standard.

19   A.   Then I'm afraid I'm not understanding your question.

03:12PM 20   Q.   Dusky is a United States Supreme Court case.

21   A.   Yes.

22   Q.   Is the SIRS-2 still published?

23   A.   Unfortunately, yes.

24   Q.   Do you know if the, if there has been any further peer

25   review of the test?

1  A.    I don't know.  I do know that the author, Doctor Rogers, as

2  well as the publisher of the SIRS-2, have been approached by

3  psychologists and have been asked to produce this data that's

4  missing, and they have refused to do so.

5  Q.    Okay.

6        But you don't know when that was.

7  A.    I don't know when that was, no.

8  Q.    Okay.

9        MR. SCHWEDA:  I have no further questions.

03:13PM 10        THE COURT:  Anything else, Miss Van Marter?

11        MS. VAN MARTER:  No, Your Honor.

12        THE DEPUTY CLERK:  Miss Van Marter, were you, did you

13  move to admit number 4?  Or you never --

14        MS. VAN MARTER:  Yes.

15        THE DEPUTY CLERK:  I'm sorry, you did not move to

16  admit it.  Would you like to?

17        MS. VAN MARTER:  I intended to move to admit

18  government 4, Your Honor.

19        THE COURT:  So 3 and 4.

03:13PM 20        MS. VAN MARTER:  3 and 4.

21        THE COURT:  So what exhibits do you show as having

22  been admitted?

23        MS. VAN MARTER:  From the United States is 1, 2, 3, 4,

24  6 -- 1, 3, 4 -- 1, 2, 3, 4, and 6.

25        MR. SCHWEDA:  And, Your Honor, if, I know that 7 and

```
 1    13 have.  If 1 hasn't, we would ask that 1 be admitted, because
 2    Doctor Low was questioned about that and she --
 3              THE COURT:  What is it?
 4              MR. SCHWEDA:  It's the 1999 Sacred Heart discharge
 5    summary of Mr. Burke.
 6              THE COURT:  And that's your number 1 or their number
 7    1?
 8              MR. SCHWEDA:  101, excuse me.
 9              THE COURT:  101?
10              MR. SCHWEDA:  Yes.
11              THE COURT:  Any objections?
12              MS. VAN MARTER:  No, Your Honor.
13              THE COURT:  101 is admitted.
14              So, what do you show for exhibits from you?
15              MR. SCHWEDA:  Just 1, 7, and 13, Your Honor.  Or 1,
16    101, 107, and 113.
17              THE COURT:  Okay.  There we are.
18              How do you want to handle final argument?  Because I'm
19    leaving, at this point.
20              So, I've gone beyond the time, my staff and I haven't
21    eaten since 8 o'clock this morning, so we're done.
22              How do you want to handle final argument?
23              MR. SCHWEDA:  May I suggest that we do it by video
24    conference from the, from the courtroom to Your Honor.
25              THE COURT:  I'm happy to an accommodate you, if I can.
```

LOW / Cross                                                   222

```
 1   My schedule is quite full.

 2              I'm here on Monday, but have no time, because I'm in

 3   mediations all day.

 4              And then on Tuesday I have a full docket.

 5              Thursday I have a full docket.

 6              And it might be that we could squeeze you in -- I'm

 7   sorry, Doctor Low, you may step down.  Thank you.

 8              MS. VAN MARTER:  Thank you, Doctor Low.

 9              THE COURT:  We might be able to squeeze you in on

03:15PM 10   Wednesday, I don't know.

11              Miss Vargas?

12              THE DEPUTY CLERK:  Yes, you have a video conference

13   hearing at 11 on Wednesday.

14              And other than that, you don't have anything else and

15   the courtroom is open.

16              THE COURT:  So we can accommodate you Wednesday.

17              What's your pleasure?  What time?

18              MR. SCHWEDA:  What time -- does the Court have a

19   suggested time?

03:15PM 20              THE COURT:  I have an 11:00 o'clock by video from

21   Spokane.

22              THE DEPUTY CLERK:  About 1:30.  And then you have the

23   afternoon --

24              THE COURT:  1:30?  1:30?  Yes or no?

25              MR. SCHWEDA:  As far as I know, yes, Your Honor.  I
```

 1   don't really have anything on.

 2            THE COURT:  Counsel, I can assure you that I have very

 3   limited time --

 4            MR. SCHWEDA:  Okay.

 5            THE COURT:  -- on this matter or, or to squeeze other

 6   things in.

 7            So it's 1:30, next Wednesday, by video conference.

 8   And we'll hear from you at that time.

 9            MS. VAN MARTER:  Your Honor, just for the record,

03:15PM 10   we're, we were happy to defer to the Court, for the Court's

11   ultimate determination and waive final argument, but...

12            THE COURT:  I think it might be helpful for -- I think

13   it's very important for Mr. Schweda and his client to have final

14   argument, so...

15            MS. VAN MARTER:  Yes, Your Honor.

16            THE COURT:  Don't you agree?

17            MR. SCHWEDA:  Yes, Your Honor.

18            THE COURT:  Yeah.

19            So that said, we have a hearing next week.  And,

03:16PM 20   Mr. Schweda, you have your marching orders on when you're going

21   to submit written materials about the release of this material

22   to the Snohomish County prosecutor and Western State Hospital.

23            I've indicated to you that it seems rational to me

24   that that occur, albeit under seal, but I'll look forward to

25   receiving your briefing on the issue.

1            And then we're prepared to be here next week and begin

2    at nine o'clock in the morning for, on the assumption,

3    tentatively scheduled, that there's a ruling that there's

4    competency and we're facing the violation.

5            To me, it's clear that we're going ahead on the 19th,

6    because Doctor Brown concedes that, at the very least, as far as

7    absconding, he's competent.

8            And my determination will be as to the full ambit,

9    full scope of the violations of failure to, prohibition for

03:17PM 10   commission of another crime; and that would implicate the

11   charges that were dismissed without prejudice in Snohomish

12   County.

13           So, we are going ahead next Friday at nine and I'll

14   make rulings in between.  So, I think we're good to go.

15           Anything else?  No?  Thank you.

16           Court's adjourned.

17           MS. VAN MARTER:  No, Your Honor.

18           THE COURT:  You may go about your business.

19           (Whereupon Court was recessed at 3:16 p.m.)

20

21

22

23

24

25

```
 1    STATE OF WASHINGTON      )

 2                            :   Reporter's Certificate

 3    COUNTY  OF  SPOKANE     )

 4

 5

 6                            I, Mark A. Snover, a Registered

 7    Professional Reporter and Official United States District Court

 8    Reporter;

 9                            DO HEREBY CERTIFY:

10                            That the foregoing transcript

11    contains a true and accurate transcription of my shorthand notes

12    of all requested matters held in the foregoing captioned case.

13                            Further, that the transcript was

14    prepared by me or under my direction.

15             DATED this    12th        day of  December

16    , 2016.

17

18

19

20                                 /s/ Mark A. Snover

21                            MARK A. SNOVER, RPR, CSR

22                            OFFICIAL  U. S. COURT REPORTER

23

24

25
```